# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MICHIGAN FARM BUREAU v DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY

Docket No. 165166. Argued January 11, 2024 (Calendar No. 3). Decided July 31, 2024.

Michigan Farm Bureau, along with numerous farmer associations and livestock farms, brought an action in the Court of Claims against the Department of Environment, Great Lakes, and Energy (EGLE), seeking declaratory and injunctive relief. EGLE administers the National Pollutant Discharge Elimination System (NPDES) program that is outlined in the federal Clean Water Act, 33 USC 1251 *et seq.*; the federal Environmental Protection Agency (EPA) delegated the power to administer the NPDES program within Michigan's borders to Michigan under 33 USC 1342, and Michigan's Legislature, in turn, delegated this authority to EGLE. Under its authority to administer the NPDES program, EGLE has promulgated rules in Mich Admin Code, R 323.2101 *et seq.*, that provide requirements for NPDES permits and the process by which they are issued. Under 40 CFR 122.44(d)(1) (2023), EGLE must include conditions in addition to or more stringent than the conditions set forth in EGLE and EPA rules that EGLE deems necessary to achieve water-quality standards in the relevant waterway; EGLE promulgated these water-quality standards, which are codified in Part 4 of the Michigan Administrative Rules governing water-resource protection, Mich Admin Code, R 323.1041 *et seq.* In this case, EGLE issued a general permit in March 2020 that gave rise to this dispute. The 2020 general permit imposed new conditions that included a reduction of the limit on the amount of phosphorus that may be applied to land; revised setback provisions, requiring both: (1) that farms keep a 35-foot wide vegetated barrier, in which CAFO waste may not be applied, along any surface water of the state, open tile line intake structures, sinkholes, and agricultural well heads, including but not limited to roadside or any ditches that are conduits to surface waters of the state (with the exception of surface waters of the state that are up-gradient of the land application), and (2) that the permittee may not apply waste within 100 feet of any surface water of the state or those same conduits to surface waters of the state; and a presumptive three-month ban during January through March on applying waste on land and on transferring waste to other entities that apply waste to land during those months. Plaintiffs alleged that the added conditions exceeded EGLE's statutory authority and were contrary to state and federal law regulating concentrated animal feeding operations (CAFOs) under the federal Clean Water Act and state law pursuant to Part 31 (Water Resources Protection), MCL 324.3101 *et seq.*, of the Natural Resources and Environmental Protection Act (the NREPA), MCL 324.101 *et seq.*; lacked factual justification under the standard for setting conditions under Part 31 of the NREPA; were arbitrary and capricious; were unconstitutional; and were invalid because of

EGLE's failure to follow the procedures required under the Michigan Administrative Procedures Act (the APA), MCL 24.201 *et seq.*, to promulgate the conditions as rules. A similar group of farms and farm associations first petitioned for a contested-case hearing under Mich Admin Code, R 323.2192(c) to appeal the 2020 general permit and the legality of the new conditions that the permit imposed; however, before a contested-case hearing could be held, plaintiffs brought this action in the Court of Claims. EGLE moved for summary disposition, arguing that because plaintiffs failed to exhaust available administrative remedies, the Court of Claims lacked jurisdiction. Plaintiffs argued that exhaustion was unnecessary because plaintiffs challenged EGLE's authority to include the new conditions in the general permit, which involved legal issues that did not require factual development and exempted the issues from the exhaustion requirement. The Court of Claims, CYNTHIA D. STEPHENS, J., held that it lacked subject-matter jurisdiction because plaintiffs did not exhaust their available administrative remedies and because plaintiffs' contested case remained pending. Plaintiffs appealed, and the Court of Appeals, GADOLA, P.J., and SERVITTO and REDFORD, JJ., affirmed the Court of Claims' ultimate holding that the Court of Claims lacked subject-matter jurisdiction but held that plaintiffs could seek a declaratory judgment by way of MCL 24.264. 343 Mich App 293 (2022). The Court of Appeals specifically held that the 2020 permit conditions were "rules" under the APA because they were in addition to or more stringent than the mandatory minimum conditions but that because plaintiffs had not first requested a declaratory ruling from EGLE, the Court of Claims lacked subject-matter jurisdiction. EGLE sought leave to appeal in the Supreme Court, arguing that the 2020 permit conditions were not rules under the APA, and the Supreme Court granted the application. 511 Mich 971 (2023).

In an opinion by Chief Justice CLEMENT, joined by Justices BERNSTEIN, CAVANAGH, WELCH (as to Parts I, II, III(A), III(B), and III(C)(1)), and BOLDEN, the Supreme Court *held*:

Because EGLE lacks the power to issue rules relating to NPDES permits issued to CAFOs, neither the 2020 general permit EGLE issued pursuant to Part 31 of the NREPA nor the discretionary conditions in that permit can have the force and effect of law, and so they cannot be "rules" as defined by MCL 24.207 of the APA. Accordingly, the Court of Claims lacked subject-matter jurisdiction under MCL 24.264.

1. EPA and EGLE rules require every CAFO permit to include certain conditions (mandatory conditions), but federal and state law give EGLE discretion to include extra conditions (discretionary conditions) in a permit that are more stringent than these mandatory conditions when EGLE decides those discretionary conditions are necessary to achieve applicable Part 4 water-quality standards or to comply with applicable laws and regulations. With regard to issuing general permits, under Mich Admin Code, R 323.2191(2), EGLE must: (1) prepare a draft general permit in which EGLE includes the mandatory conditions and any discretionary conditions that EGLE deems necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations; (2) give public notice of the draft general permit; and (3) allow opportunity for public comment and consider those comments before issuing a final draft of the general permit. After receiving public comment on the draft general permit, EGLE makes a final determination and either issues the general permit, issues the general permit with modifications, or declines to issue it. If EGLE's final determination is not acceptable to the permittee, the applicant, or any other person, they may petition for a contested-case hearing under the APA pursuant to MCL 324.3113(3) and Mich Admin Code, R 323.2133(2). Under MCL 324.1317,

after an administrative law judge makes a final decision as to the general permit following a contested-case hearing, an aggrieved party may appeal to have a panel of the Environmental Permit Review Commission review the administrative law judge's decision. And after the Environmental Permit Review Commission issues a final decision, the final decision is subject to judicial review; judicial review of the administrative law judge's final decision may also be sought directly if no party appeals to the Environmental Permit Review Commission.

2. When a general permit is finalized, the CAFO does not automatically have coverage; the CAFO can apply to EGLE for coverage under the general permit pursuant to Mich Admin Code, R 323.2192. If EGLE decides the CAFO meets the criteria for coverage under the general permit, EGLE issues a certificate of coverage and the CAFO may discharge pollutants in accordance with the mandatory and discretionary conditions in the general permit. If EGLE decides the discretionary conditions are not appropriate as applied to the CAFO, EGLE may require the CAFO to apply for an individual permit; in that case, EGLE will begin automatically processing the application for an individual permit. Likewise, if a CAFO believes that the general-permit conditions are inappropriate as applied to it, the CAFO may apply for an individual permit from EGLE; however, EGLE may deny the CAFO an individual permit if it decides that the general permit is more appropriate. If EGLE denies the CAFO coverage under a general permit, denies the CAFO an individual permit, or the discretionary conditions in an individual permit are unsatisfactory to the CAFO, the CAFO may petition for a contested-case hearing pursuant to Mich Admin Code, R 323.2192(c) and MCL 324.3113(3).

3. Under MCL 24.264, a court has subject-matter jurisdiction to hear a declaratory-judgment action in which a party challenges the validity or applicability of an agency rule unless an exclusive procedure or remedy is provided by a statute governing the agency. MCL 24.264 further includes an exhaustion-of-administrative-remedies requirement: a party may not request a declaratory judgment unless the party first requests a declaratory ruling from the agency and the agency has denied the request or failed to act upon it expeditiously. In this case, to determine whether the Court of Claims correctly concluded that it lacked subject-matter jurisdiction under MCL 24.264, the question whether the general permit or discretionary conditions were "rules" had to be answered.

4. MCL 24.207 of the APA defines "rule," in pertinent part, as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency or that prescribes the organization, procedure, or practice of the agency. Along with many other exceptions to the definition of a "rule" under MCL 24.207, MCL 24.207(h) says that a rule does not include a form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory. An agency action is a "rule" under the APA only if it meets, at minimum, the following elements: (1) it is an agency regulation, statement, standard, policy, ruling, or instruction; (2) it is of general applicability; (3) it implements or applies law enforced or administered by the agency, or it prescribes the organization, procedure, or practice of the agency; and (4) it, in itself, has the force and effect of law. In this case, there could be no serious debate that the discretionary conditions in the general permit satisfied the first and third elements. With regard to the second element, the discretionary conditions were of general applicability. The discretionary conditions were capable of being applied to or were

relevant to all CAFOs because they were EGLE's initial determination of what conditions in addition to and more stringent than the mandatory conditions were necessary to achieve Part 4 water-quality standards for anything meeting the definition of a CAFO. Regarding the fourth element, neither the general permit nor the discretionary conditions in it could have the force and effect of law. EGLE has no power under the NREPA to make rules concerning NPDES permits issued to CAFOs. And, under this Court's decision in *Clonlara, Inc v State Bd of Ed*, 442 Mich 230 (1993), if the Legislature has not delegated to an agency the power to make rules as to a particular subject matter, a statement of general applicability issued by the agency concerning that subject cannot be considered a rule—either valid or invalid—under the APA. If an agency lacks rulemaking power, any statement of general applicability issued by the agency necessarily lacks the force and effect of law, no matter if the agency has issued it following the APA's rulemaking procedures. As a result, neither the general permit in this case nor the discretionary conditions in it could have the force and effect of law, and so they were not rules under the APA.

5. An agency statement of general applicability in itself has the force and effect of law when the statement itself alters rights or imposes obligations and has a present, binding effect on regulated entities, the agency, and the courts. If an agency statement (1) merely explains what the agency believes an ambiguous provision of a statute or agency rule means or (2) explains what factors will be considered and what goals will be pursued when an agency exercises a discretionary power or conducts an adjudication, the statement will generally not be considered to alter rights, impose obligations, or have a present, binding effect.

6. The general permit itself cannot grant any entity meeting the definition of a CAFO the right to discharge pollutants, nor can it require all CAFOs to operate in compliance with the discretionary conditions. That does not mean that a CAFO is not required to comply with the discretionary conditions in the general permit if the CAFO applies for and receives a certificate of coverage. That is because it is the certificate of coverage—not the general permit itself—that grants the rights and imposes obligations on the CAFO. And even though EGLE lacks the power to alter rights or impose obligations by issuing a rule, Part 31 of the NREPA still empowers EGLE to alter rights and impose obligations on individual parties proceeding before it that apply for permits.

7. The general permit and discretionary conditions can be only (1) a statement explaining what EGLE believes an ambiguous provision of the NREPA or one of EGLE's rules means, i.e., an interpretive statement, or (2) a statement explaining how EGLE plans to exercise its discretionary permitting power or a statement explaining what discretionary conditions EGLE plans to prove are necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations in adjudications involving a CAFO. Because the general permit and discretionary conditions were not EGLE's attempt to discern the meaning of an ambiguous provision of Part 31 of the NREPA or one of EGLE's rules, they had to fall in the second category. However, two points had to be emphasized. First, EGLE cannot act as though the general permit or the discretionary conditions constrain its permitting discretion in individual cases involving CAFOs. A CAFO must be allowed to apply for an individual permit with only the mandatory conditions, and EGLE must genuinely evaluate whether the discretionary conditions in the general permit or other discretionary conditions are necessary as applied to that particular CAFO. At the same time, when a CAFO applies for a certificate of coverage under the general

permit, EGLE must retain discretion to decide whether the discretionary conditions in the general permit are necessary as applied to the particular CAFO. And EGLE must genuinely evaluate whether the discretionary conditions are necessary as applied to that particular CAFO. Second, neither administrative law judges, the Environmental Permit Review Commission, nor the courts can treat the general permit and discretionary conditions as though they restrict EGLE's permitting discretion. When EGLE issues a general permit and CAFOs with coverage under the prior general permit petition for a contested case, as happened here, EGLE must carry its burden to prove that any discretionary conditions in the general permit are necessary to achieve Part 4 water-quality standards or to comply with applicable laws and regulations. If EGLE denies a CAFO's individual-permit application because EGLE concludes that the discretionary general-permit conditions are more appropriate and the aggrieved CAFO petitions for a contested case, the administrative law judge and the Environmental Permit Review Commission must require EGLE to prove that the discretionary conditions in the general permit are necessary to achieve Part 4 water-quality standards or to comply with other applicable laws and regulations as applied to the particular CAFO. If EGLE denies a CAFO's general-permit application, EGLE issues an individual permit, and the aggrieved CAFO petitions for a contested case, again, the administrative law judge and the Environmental Permit Review Commission must require EGLE to prove that any discretionary conditions in the individual permit are necessary as applied to the CAFO. Finally, if an aggrieved party seeks judicial review, a court must ensure that EGLE sustained its burden of proof.

Court of Appeals judgment affirmed; Court of Appeals holding that the discretionary conditions in the general permit were rules vacated.

Justice WELCH, concurring, agreed with Chief Justice CLEMENT's analysis in part and joined Parts I, II, III(A), III(B), and III(C)(1) of the majority opinion and concurred in the judgment. The challenged conditions in the 2020 general permit could not be considered rules under the APA because in 2020 EGLE lacked delegated rulemaking authority as to its NPDES program for CAFOs under Part 31 of the NREPA and thus the conditions, on their own, could not have the force and effect of law. Accordingly, plaintiffs' declaratory-judgment action could not move forward. However, Justice WELCH believed that it might have been unnecessary to decide in this case whether the challenged conditions in the 2020 general permit could be considered rules under MCL 24.207. MCL 24.264 is inapplicable if an exclusive procedure or remedy is provided by a statute governing the agency, and the NREPA provides exclusive remedies and procedures for disputing EGLE's exercise of its authority to issue NPDES permits in two ways: (1) a contested-case proceeding pursuant to MCL 324.3112 and MCL 324.3113, and (2) a petition for permit review by the Environmental Permit Review Commission pursuant to MCL 324.1315 and MCL 324.1317. Thus, whether the permit conditions were rules or not, any challenge to EGLE's actions under MCL 24.264 was prohibited given the exclusive remedies and procedures set forth by the NREPA. Whether a statutory remedy or procedure is exclusive requires consideration of both statutory text and the context in which a remedy or procedure exists. It was undisputed that the rights, duties, and obligations associated with the NPDES program are purely statutory and regulatory in nature. There was no indication in Part 31 of the NREPA that the Legislature intended these extensive procedures to exempt the agency's NPDES permitting program or allow for direct litigation against EGLE for exercising its permitting power as a bypass to the administrative review process. Accordingly, the presumption under Michigan law is that the

statutory processes and procedures acknowledged by the NREPA are exclusive as to the enforcement of purely statutory and regulatory rights. While Part 31 of the NREPA does not explicitly refer to remedies or procedures as exclusive when discussing review through the contested-case process or review by the Environmental Permit Review Commission, this was not dispositive. Reading the relevant aspects of Part 31 of the NREPA in a holistic and contextual manner, it was clear that the Legislature intended all challenges to EGLE's exercise of NPDES permitting authority to be funneled through one of its established administrative pathways before the right to seek judicial review ripens.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, would have held, under the NREPA, the APA, and caselaw interpreting those statutes, that it was clear that the 2020 general permit is a rule that could be challenged in a pre-enforcement declaratory-judgment action under MCL 24.264. When distinguishing between rules and interpretative statements, the crucial question is whether the agency intends to exercise delegated power to make rules having the force of law, and the intent usually can best be found in what the agency says at the time of issuing the rules; this factor weighed heavily in favor of finding that the 2020 general permit is a rule because nothing in the 2020 general permit states that it was intended as guidance, an interpretive statement, or some other nonbinding action. Rather, the 2020 general permit commands, requires, orders, and dictates what a CAFO must do to obtain coverage under it. Indeed, EGLE did not expressly argue in this case that the 2020 general permit is nonbinding. Additionally, in determining whether an agency action is a rule, the inquiry must focus on the actual action undertaken by the directive to see whether the policy being implemented has the effect of being a rule; this factor also weighed in favor of finding that the 2020 general permit is a rule. In this case, EGLE's own regulations and historical practice have treated the conditions as mandatory, denying coverage for applicants who do not meet them. The legal effect of the 2020 general permit was clear—it sets the standards that EGLE applies when determining whether to issue certificates of coverage under the general permit. The language in the 2020 general permit itself could lead to no other conclusion than that the 2020 general permit has the force and effect of law. And once a CAFO obtains coverage under the 2020 general permit, its failure to comply with the general permit's conditions carries fines and penalties under MCL 324.3115, which strongly suggested that the 2020 general permit is a rule. The following factors also weighed in favor of finding that the 2020 general permit is a rule: it has conditions that are inconsistent with the existing rule for CAFO general permits, it is not merely explanatory but instead creates new substantive standards, and other jurisdictions consider general permits to be rules. Rather than address those factors, the majority improperly expanded this Court's holding in *Clonlara* by bringing a merits question into the threshold jurisdictional issue of whether the action is a rule under the APA. Whether the 2020 GP conditions are within the scope of EGLE's Part 31 rulemaking power is a question on the merits. Finally, the majority erred when it characterized the 2020 general permit as a policy that EGLE merely hopes to prove is necessary in contested cases. The majority's novel analysis reached a result that was not even contemplated by the parties and that effectively ends EGLE's general permitting program. The confusion and contradictions in the new legal regime that the majority opinion created will require further litigation to resolve, and will be to the financial detriment of CAFOs across the state and will subject them to perpetual permitting litigation.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2024

STATE OF MICHIGAN

SUPREME COURT

MICHIGAN FARM BUREAU, et al.,

> Plaintiffs-Appellees/Cross-
> Appellants,

v

No. 165166

DEPARTMENT OF ENVIRONMENT,
GREAT LAKES, AND ENERGY,

> Defendant-Appellant/Cross-
> Appellee.

BEFORE THE ENTIRE BENCH

CLEMENT, C.J.

Plaintiffs filed an original action for declaratory judgment in the Court of Claims under MCL 24.264, which allows a litigant to challenge the validity or applicability of an administrative agency "rule." Plaintiffs argue that new conditions in a 2020 general

permit[1] issued by defendant, the Department of Environment, Great Lakes, and Energy (EGLE), pursuant to Part 31 of the Natural Resources and Environmental Protection Act (the NREPA), MCL 324.3101 to MCL 324.3134, are "rules" and that the conditions are invalid because EGLE did not process them in accordance with the rulemaking procedures in Michigan's Administrative Procedures Act (the APA), MCL 24.201 *et seq*. We hold that neither the general permit nor the challenged conditions in it are "rules" under the APA, and we therefore conclude that the Court of Claims lacked subject-matter jurisdiction under MCL 24.264. Accordingly, we affirm the judgment of the Court of Appeals but vacate that part of its opinion holding that the challenged general-permit conditions are rules.

## I. BACKGROUND

To understand this case, some background on a complicated regulatory process is in order. It starts with the Clean Water Act, 33 USC 1251 *et seq*. In furtherance of its goal to restore and maintain the integrity of our nation's water, see *Maui v Hawaii Wildlife Fund*, 590 US 165, 170; 140 S Ct 1462; 206 L Ed 2d 640 (2020), the Clean Water Act sets up a permitting system known as the National Pollutant Discharge Elimination System (NPDES) program. See 33 USC 1342. Under the Clean Water Act, "point sources" are prohibited from discharging any pollutants into navigable waters unless they have a valid

---

[1] Michigan Department of Environment, Great Lakes, and Energy, *National Pollutant Discharge Elimination System Wastewater Discharge General Permit: Concentrated Animal Feeding Operations*, Permit No. MIG010000 (issued March 27, 2020), available at <https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/WRD/CAFO/MIG010000-General-Permit-2025.pdf?rev=a4d602d0165c41e096854abe036058f9> (accessed June 6, 2024) [https://perma.cc/6YEW-WSX6].

NPDES permit. See *Maui*, 590 US at 171. Point sources are "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged." 33 USC 1362(14) (emphasis added).

The plaintiffs in this case include the Michigan Farm Bureau (an agriculture-focused trade association), concentrated animal feeding operations (CAFOs), and the owners of CAFOs. CAFOs are large-scale agricultural operations that raise hundreds—or sometimes thousands—of animals in close confinement for slaughter or dairy. See *Waterkeeper Alliance, Inc v US Environmental Protection Agency*, 399 F3d 486, 492-493 (CA 2, 2005); see also 40 CFR 122.32 (2023); Mich Admin Code, R 323.2102(i). These animals produce a lot of manure and wastewater: a single large CAFO can produce "one and a half times more than the annual sanitary waste produced by the city of Philadelphia . . . ."[2] To dispose of all this manure and wastewater, CAFOs often apply it to nearby farm fields or pay to have it hauled to other locations. When properly applied, the nutrients in the manure—largely phosphorus and nitrogen—serve as fertilizer for crops. See Centner, *Courts and the EPA Interpret NPDES General Permit Requirements for CAFOs*, 38 Envt'l L 1215, 1220 (2008). But when excessively or improperly applied, the nutrients and bacteria from the manure and wastewater can run off into navigable waters or leach into groundwater,

---

[2] National Association of Local Boards of Health, *Understanding Concentrated Animal Feeding Operations and Their Impact on Communities* (2010), p 2, available at <https://www.cdc.gov/nceh/ehs/docs/understanding_cafos_nalboh.pdf> (accessed April 3, 2024) [https://perma.cc/2LPY-CD2J].

impairing water quality. See *Waterkeeper Alliance, Inc*, 399 F3d at 493-494.[3] This is why CAFOs are considered point sources under the Clean Water Act and, with few exceptions, must obtain NPDES permits before beginning operation and must renew permits as they expire to continue operating. See Mich Admin Code, R 323.2196(1) and (2); *Milwaukee v Illinois & Michigan*, 451 US 304, 318; 101 S Ct 1784; 68 L Ed 2d 114 (1981) ("*Every point source discharge is prohibited unless covered by a permit . . . .*").[4]

In Michigan, EGLE administers the NPDES program. See *Sierra Club Mackinac Chapter v Dep't of Environmental Quality*, 277 Mich App 531, 535; 747 NW2d 321 (2008) (noting that the Environmental Protection Agency [the EPA] delegated the power to administer the NPDES program within Michigan's borders to Michigan under 33 USC 1342); MCL 324.3101 *et seq*. (wherein Michigan's Legislature in turn delegated this authority to EGLE). Under its authority to administer the NPDES program, EGLE has promulgated rules that provide requirements for NPDES permits and the process by which

---

[3] Animal waste includes a number of potentially harmful pollutants, including

> (1) nutrients such as nitrogen and phosphorus; (2) organic matter; (3) solids, including the manure itself and other elements mixed with it such as spilled feed, bedding and litter materials, hair, feathers and animal corpses; (4) pathogens (disease-causing organisms such as bacteria and viruses); (5) salts; (6) trace elements such as arsenic; (7) odorous/volatile compounds such as carbon dioxide, methane, hydrogen sulfide, and ammonia; (8) antibiotics; and (9) pesticides and hormones. [*Waterkeeper Alliance, Inc*, 399 F3d at 494, citing *National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations*, 66 Fed Reg 2960, 2976-2979 (proposed January 12, 2001).]

[4] A CAFO may operate without an NPDES permit, for instance, if EGLE finds that a CAFO has " 'no potential to discharge' pursuant to [Mich Admin Code, R 323.2196(4)]." See Mich Admin Code, R 323.2196(1)(b).

4

they are issued. These are EGLE's Part 21 rules, which are derived from Part 31 of the NREPA. See Mich Admin Code, R 323.2101 *et seq*.

## A. PERMIT CONDITIONS

An NPDES permit from EGLE does not allow a point source to discharge pollutants in any amount or in any manner the point source pleases. An NPDES permit includes conditions that restrict the manner in which a point source operates or restrict the quantity or concentrations of pollutants the point source may discharge. See 33 USC 1342(a)(2). Usually, these conditions are in the form of either effluent limitations or best-management practices.[5] See *Waterkeeper Alliance, Inc*, 399 F3d at 496-497. Effluent limitations are numerical limitations restricting "the quantities, rates, and concentrations of specified substances which are discharged from point sources." *Arkansas v Oklahoma*, 503 US 91, 101; 112 S Ct 1046; 117 L Ed 2d 239 (1992), citing 33 USC 1311 and 33 USC 1314. Best-management practices are qualitative restrictions on the way a point source operates, including schedules of activities, prohibitions of certain practices, or requirements of certain maintenance procedures. See *Waterkeeper Alliance, Inc*, 399 F3d at 496.

There are certain conditions that every NPDES permit must include or that every NPDES permit issued to a certain category of point source must include. Agency rules issued by the EPA and EGLE list these conditions and require EGLE to include them in every specified permit. See, e.g., 40 CFR 122.41 (2023); Mich Admin Code, R

---

[5] Specifically, 40 CFR 122.44(k) (2023) requires an NPDES permit to include best-management practices to control or abate discharge of pollutants when "[n]umeric effluent limitations are infeasible" or "[t]he practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the [Clean Water Act]."

323.2196(5).[6] Notably, EPA rules list certain best-management practices for CAFOs and require EGLE to include these practices as conditions in every permit issued to a CAFO. See 40 CFR 122.42(e) (2023); 40 CFR 412.4(c) (2023). Relevant here, one of the best-management practices prohibits CAFOs from applying manure and wastewater closer than 100 feet to any surface waters or potential conduits to surface waters unless a CAFO puts a 35-foot-wide "vegetated buffer" between the area where the waste was applied and the surface waters or potential conduit. See 40 CFR 412.4(c)(5)(*i*). These EPA-established best-management practices are incorporated by reference in EGLE's Part 21 rules. See Mich Admin Code, R 323.2189(2)(m). EGLE has also promulgated a Part 21 rule requiring all CAFO permits to include certain best-management practices beyond the ones listed in the EPA rules. See Mich Admin Code, R 323.2196(5). Relevant here, the EGLE rules require CAFO permits to include restrictions on applying manure on water-saturated or snow-covered ground. See Mich Admin Code, R 323.2196(5)(a)(ix).

It is important to highlight that these EPA rules and EGLE rules create only a mandatory minimum set of conditions that every NPDES permit issued to a CAFO must contain. Both federal and state law give EGLE discretion to include conditions in an NPDES permit that are in addition to—or more stringent than—the conditions provided by the rules. Specifically, under 40 CFR 122.44(d)(1) (2023), EGLE must include conditions "in addition to or more stringent than" the conditions set forth in the EPA rules that EGLE

---

[6] Technically speaking, the conditions are part of a CAFO's "comprehensive nutrient management plan," but the comprehensive nutrient management plan is considered part of a permit. See *Sierra Club Mackinac Chapter*, 277 Mich App at 552-553. And there is no dispute that once a CAFO receives an individual permit or certificate of coverage under a general permit, the CAFO is bound to follow the conditions. See MCL 324.3115.

6

deems "necessary to . . . [a]chieve [applicable] water quality standards," in the relevant waterway. See also 33 USC 1313; *American Paper Institute, Inc v US Environmental Protection Agency*, 302 US App DC 80, 83; 996 F2d 346 (1993). These "water quality standards" are those that the Clean Water Act requires states to establish to safeguard specified designated uses of water. See 33 USC 1313 through 33 USC 1315. EGLE previously promulgated these water-quality standards on January 13, 2006, and they are codified in Part 4 of the Michigan Administrative Rules governing water-resources protection. See Mich Admin Code, R 323.1041 *et seq.*[7]

Similarly, in various provisions, Part 31 of the NREPA requires EGLE to include any conditions in an NPDES permit that EGLE deems necessary to achieve applicable Part 4 water-quality standards or to comply with applicable laws and regulations.[8] In particular, MCL 324.3106 requires EGLE to ensure that any permit issued "will assure compliance with state standards to regulate municipal, industrial, and commercial discharges or storage of any substance that may affect the quality of the waters of the state," and it allows EGLE

---

[7] Water-quality standards specify a maximum concentration of pollutants that may be present in water without impairing its suitability for a designated use, such as swimming or drinking. See *American Paper Institute, Inc*, 302 US App DC at 83. In pertinent part, EGLE's water-quality standards limit the amount of nutrients (including phosphorus), harmful microorganisms, and characteristics associated with excess nutrients. See Mich Admin Code, R 323.1060(1) and (2) (plant nutrients, including phosphorus); R 323.1062(1) and (2) (microorganisms); R 323.1050 (physical characteristics); R 323.1055 (taste- or odor-producing substances); R 323.1064(1) (dissolved oxygen in the Great Lakes, connecting waters, and inland streams); R 323.1065(1) and (2) (dissolved oxygen in inland lakes); and R 323.1043(z) (defining "dissolved oxygen").

[8] Part 13 of the NREPA grants EGLE this power as well. See MCL 324.1307(5) ("Approval of an application for a permit may be granted with conditions or modifications necessary to achieve compliance with the part or parts of this act under which the permit is issued.").

7

to "set permit restrictions that will assure compliance with applicable federal law and regulations." One such applicable federal regulation is 40 CFR 122.44(d)(1) (2023), which, again, requires EGLE to include conditions "in addition to or more stringent than" the conditions set forth in the EPA rules that EGLE deems necessary to ensure a waterway receiving pollutants will meet Part 4 water-quality standards. Finally, MCL 324.3113(2) provides, "If a permit is granted, the department shall condition the permit upon such restrictions that the department considers necessary to adequately guard against unlawful uses of the waters of the state as are set forth in [MCL 324.3109]."[9]

In sum, EPA and EGLE rules require every CAFO permit to include certain conditions, but federal and state law give EGLE discretion to include extra conditions in a permit that are more stringent than these conditions when EGLE decides those conditions are necessary to achieve applicable Part 4 water-quality standards or to comply with applicable laws and regulations. For ease of reference, we will refer to the former as "mandatory conditions" and the latter as "discretionary conditions."

### B. THE INDIVIDUAL NPDES PERMITTING PROCESS

In addition to the Part 21 EGLE rules requiring all NPDES permits issued to CAFOs to include certain best-management practices as conditions, see Mich Admin Code, R 323.2189(2)(m); Mich Admin Code, R 323.2196(5), EGLE also promulgated Part 21 rules establishing procedures for issuing NPDES permits. To start, a point source sends a

---

[9] In recognition of this authority granted by the NREPA, EGLE promulgated Mich Admin Code, R 323.2137(d), which provides that any NPDES permit issued by EGLE must contain conditions deemed necessary by EGLE to meet applicable Part 4 water-quality standards.

8

permit application to EGLE. See Mich Admin Code, R 323.2115(1). After receiving the permit application, EGLE must make "preliminary determinations on the application, including a proposed determination to issue or deny" the permit. *Id.* If EGLE's preliminary determination is to issue the permit, EGLE must prepare a draft permit including (1) the mandatory conditions and (2) any discretionary conditions EGLE deems necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations. See Mich Admin Code, R 323.2115(2) and (3).[10]

Once EGLE has prepared a draft permit, EGLE must give public notice of the draft permit and any proposed discretionary conditions. See Mich Admin Code, R 323.2117; R 323.2118. For up to 30 days after EGLE publicly notices the draft permit, EGLE must allow interested persons to submit written comments about the draft permit. See Mich Admin Code, R 323.2119(1). EGLE must retain any written comments submitted and consider them when determining whether to issue or deny the permit. See Mich Admin Code, R 323.2119(2). Interested persons may also petition EGLE for a public hearing on the draft permit, and EGLE has discretion to hold a public hearing. See Mich Admin Code, R 323.2130(1). If EGLE exercises this discretion, it must give notice to the public. See Mich Admin Code, R 323.2130(2).[11]

---

[10] If EGLE's preliminary determination is to deny the permit, the applicant or other person may petition for a contested-case hearing, see MCL 324.3113(3), and the same process described in the next few paragraphs of this opinion applies.

[11] These public-notice and public-comment requirements stem from the Clean Water Act's requiring public notice and an opportunity for a public hearing before an NPDES permit issues. See *Sierra Club Mackinac Chapter*, 277 Mich App at 553.

After receiving comments and holding a public hearing (if EGLE decided to do so), EGLE must "make a final determination on the permit application" and either issue the permit or deny the permit. Mich Admin Code, R 323.2133(1). If EGLE's final determination "is not acceptable to the permittee, the applicant, or any other person," they may petition for a contested-case hearing under the APA. See MCL 324.3113(3); Mich Admin Code, R 323.2133(2).[12] After the contested-case hearing, an administrative law judge makes a final decision as to the permit. See MCL 324.1317(1). Once the administrative law judge makes a final decision, an aggrieved party may appeal to have a panel of the Environmental Permit Review Commission review the decision of the administrative law judge.[13] See MCL 324.1317. The Environmental Permit Review Commission may "adopt, remand, modify, or reverse" the administrative law judge's decision. See MCL 324.1317(4). After the Environmental Permit Review Commission issues a final decision, the final decision is subject to judicial review. See MCL 324.1317(4); see also MCL 324.3113(3); MCL 324.3112(5). Alternatively, if no party timely appeals the final decision of the administrative law judge to the Environmental

---

[12] Broadly speaking, the contested-case procedures under the APA require that the parties to the contested case be given the opportunity to have an impartial decision-maker preside over a hearing, to present oral and written argument, to present evidence, and to cross-examine witnesses. See MCL 24.271 to MCL 24.288.

[13] The Environmental Permit Review Commission is a 15-member commission appointed by the Governor; the commission is composed of persons who are not currently state employees and who have not worked for EGLE within the preceding three years. See MCL 324.1313(2) and (3). The commission is charged with advising the director of EGLE on disputes related to permits and permit applications. See MCL 324.1313(1).

Permit Review Commission, then the administrative law judge's ruling becomes the final decision subject to "any applicable judicial review." MCL 324.1317(7).

## C. GENERAL NPDES PERMITS

Along with Part 21 rules setting up procedures for issuing individual NPDES permits, EGLE also promulgated a Part 21 rule allowing it to issue what is called a general permit. See Mich Admin Code, R 323.2191. A general permit covers a category of point sources, such as CAFOs, rather than a single point source. EGLE may issue a general permit for a category of point sources if EGLE determines: "(a) [t]he sources involve the same or substantially similar types of operations"; "(b) [t]he sources discharge the same types of wastes"; "(c) [t]he sources require the same effluent limitation or operating conditions"; and "(d) [t]he sources require the same or similar monitoring." Mich Admin Code, R 323.2191(1). EGLE has no legal obligation to use the general permitting process over the individual permitting process; general permits are effectively a tool of convenience for both the regulator and the regulated entities.

When issuing a general permit, EGLE follows the same procedures as described earlier. See Mich Admin Code, R 323.2191(2). That is, (1) EGLE must prepare a draft general permit in which EGLE includes the mandatory conditions and any discretionary conditions that EGLE deems necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations; (2) EGLE must give public notice of the draft general permit; and (3) EGLE must allow opportunity for public comment and must consider those comments before issuing a final draft of the general permit. As with an individual permit, after receiving public comment on the draft general permit, EGLE

11

makes a final determination and either issues the general permit, issues the general permit with modifications, or declines to issue it.

And as with an individual permit, if EGLE's final determination "is not acceptable to the permittee, the applicant, or any other person," they may petition for a contested-case hearing under the APA. MCL 324.3113(3); Mich Admin Code, R 323.2133(2). Again, after an administrative law judge makes a final decision as to the general permit following a contested-case hearing, an aggrieved party may appeal to have a panel of the Environmental Permit Review Commission review the administrative law judge's decision. After the Environmental Permit Review Commission issues a final decision, the final decision is subject to judicial review, see MCL 324.1317(4), or judicial review of the administrative law judge's final decision may be sought directly if no party appeals to the Environmental Permit Review Commission, MCL 324.1317(7). If issued, general permits have a fixed term of not more than five years, see Mich Admin Code, R 323.2150, so every five years, EGLE must reissue a new general permit.

When a general permit is finalized, the category of point sources the permit covers does not automatically have coverage. Point sources within that category can apply to EGLE for coverage under the general permit. See Mich Admin Code, R 323.2192. If EGLE decides the applicant "meets the criteria for coverage under the general permit," EGLE issues a certificate of coverage and the point source may discharge pollutants in accordance with the mandatory and discretionary conditions in the general permit. See Mich Admin Code, R 323.2192(b).[14] If EGLE decides the discretionary conditions are not

---

[14] Mich Admin Code, R 323.2192(b) refers to the certificate of coverage as a "notice of coverage." But Mich Admin Code, R 323.2196(1)(b) refers to it as a "certificate of

appropriate as applied to the applicant, EGLE may require the applicant to apply for an individual permit. See Mich Admin Code, R 323.2191(3).[15] In that case, EGLE will begin automatically processing the application for an individual permit. See EGLE, *NPDES Appendix to the Permit Application* (revised May 18, 2022), p 5, available at <https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/WRD/NPDES/permit-application-appendix.pdf?rev=4575168e1ebf4b6b95721728a21b1383> (accessed July 28, 2024) [https://perma.cc/VT8J-MG6E]. Likewise, if an applicant believes that the general-permit conditions are inappropriate as applied to it, the applicant may apply for an individual permit from EGLE. See Mich Admin Code, R 323.2191(5).

---

coverage." The 2020 general permit does as well. See Permit No. MIG010000, p 1. We therefore use the term "certificate of coverage."

[15] Mich Admin Code, R 323.2191(3) provides:

> (3) The department may require any person who is authorized to make a discharge, by a general permit, to apply for and obtain an individual national permit if any of the following circumstances apply:
>
> (a) The discharge is a significant contributor to pollution as determined by the department on a case-by-case basis.
>
> (b) The discharger is not complying, or has not complied, with the conditions of the general permit.
>
> (c) A change has occurred in the availability of demonstrated technology or practices for the control or abatement of waste applicable to the point source discharge.
>
> (d) Effluent standards and limitations are promulgated for point source discharges subject to the general permit.
>
> (e) The department determines that the criteria under which the general permit was issued no longer apply. Any person may request the department to take action pursuant to the provisions of this subrule.

EGLE may deny the applicant an individual permit if it decides that the general permit is more appropriate. See *id*. If EGLE denies a permit applicant coverage under a general permit, denies a permit applicant an individual permit, or the discretionary conditions in an individual permit are unsatisfactory to the permit applicant, the permit applicant may petition for a contested-case hearing, and the same procedures discussed earlier apply. See Mich Admin Code, R 323.2192(c); MCL 324.3113(3).

As this discussion shows, whether coverage is sought under an individual permit or a general permit, EGLE must make an individualized determination as to each point source seeking an NPDES permit. Even if a CAFO shows that it can comply with all the conditions in a general permit, a CAFO is not automatically entitled to a certificate of coverage. EGLE may decide that different conditions than those in the general permit are necessary to achieve Part 4 water-quality standards or to comply with other applicable laws and regulations as applied to the particular CAFO. If EGLE so decides, it will process the CAFO's application as one for an individual permit.

## D. PROCEDURAL HISTORY

Having decided that CAFOs involve the same or substantially similar types of operations, that they discharge the same types of wastes, that they require the same effluent limitations or operating conditions, and that they require the same or similar monitoring, EGLE first issued a general permit for CAFOs in 2005. As the 2005 general permit was approaching expiration, EGLE issued another general permit for CAFOs in 2010. There is no dispute that the 2010 general permit contained only the mandatory conditions, see 40 CFR 122.42(e) (2023); Mich Admin Code, R 323.2196(5); Mich Admin Code, R

14

323.2189(2)(m), but no discretionary conditions in addition to or more stringent than those conditions. Once the 2010 general permit expired five years later, EGLE issued a new general permit in 2015, which again included only the mandatory conditions.

Mich Admin Code, R 323.2196(2)(g) requires all current permit holders to submit an application to renew their permit not later than 180 days before its expiration. All CAFOs with coverage under the 2015 general permit applied for renewal by August 1, 2019. EGLE issued the draft 2020 general permit on October 30, 2019, and gave public notice of it per Mich Admin Code, R 323.2117 and R 323.2118.[16] Unlike the 2010 and 2015 general permits, in the draft 2020 general permit, EGLE included discretionary conditions in addition to or more stringent than the mandatory conditions. See 40 CFR 122.42(e) (2023); 40 CFR 412.4(c) (2023); Mich Admin Code, R 323.2196(5). EGLE deemed these discretionary conditions necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations. According to EGLE's Environmental Quality Specialist, Bruce Washburn, the 2015 general permit had been ineffective and CAFOs' land application of manure had impaired water quality between 2015 and 2020.[17]

---

[16] Although not required to do so, before publicly noticing the draft 2020 general permit, EGLE held three stakeholder meetings between March and June 2019 at which stakeholders were allowed to raise and discuss their concerns with the 2015 general permit and offer suggestions for the 2020 general permit.

[17] Washburn explained that the mandatory conditions required by the EPA rules and EGLE rules did not ensure proper waste tracking, that CAFOs were applying more manure to the land in winter than necessary for crop production, and that some CAFOs were creating separate legal entities and transferring their waste to those entities to avoid responsibility for the waste. As a result, Washburn explained, since 2015, "additional water bodies [have been] listed as impaired . . . ."

As an example of one of the discretionary conditions included, the 2020 general permit included a condition presumptively banning land application of manure from January through March and prohibiting a CAFO from transferring manure to another entity from January through March. This was in addition to or more stringent than the mandatory conditions listed in EGLE's Part 21 rule; that rule only called for a condition restricting land application of manure on snow-covered ground. See Mich Admin Code, R 323.2196(5)(a)(*ix*). Also, the 2020 general permit included a discretionary condition prohibiting a CAFO from applying manure within 100 feet of surface waters or conduits to surface waters *and* requiring a CAFO to keep a 35-foot vegetated barrier between the application of manure and the surface waters or conduits to surface waters. This was in addition to or more stringent than the mandatory conditions listed in EGLE's Part 21 rule because EGLE's Part 21 rule only required a CAFO to keep a 35-foot vegetated barrier between surface waters or conduits to surface waters if a CAFO applied manure within 100 feet of the surface waters or conduits to surface waters. See Mich Admin Code, R 323.2189(2)(m) (incorporating by reference 40 CFR 412.4(c)(5)(*i*) (2023)).

After EGLE gave public notice of the draft 2020 general permit on October 30, 2019, EGLE allowed for public comment on it until December 18, 2019. EGLE received written comments from the public on the draft general permit and held three public hearings in December 2019. After allowing for public comment, EGLE issued the final 2020 general permit on March 27, 2020, with an effective date of April 1, 2020. EGLE kept the discretionary conditions as proposed, and the 2020 general permit issued in March 2020.

Two months later, Michigan Farm Bureau, half a dozen other industry groups, and over 100 individual CAFOs that had applied for coverage under the 2020 general permit

16

(collectively, petitioners) petitioned for a contested-case hearing under MCL 324.3112(5), challenging the discretionary conditions in the 2020 general permit. As a result, EGLE did not issue any notices of coverage under the 2020 general permit. All petitioners had their coverage under the 2015 general permit extended pending the conclusion of the contested-case hearing. See MCL 24.291(2).

In the contested-case hearing, petitioners challenged both the procedural and substantive validity of the discretionary conditions in the general permit. They argued that the conditions were procedurally invalid because they were actually "rules" under the APA and because EGLE had not processed them in compliance with the APA's rulemaking procedures.[18] They also argued that the new discretionary permit conditions exceeded

---

[18] Because a rule alters rights or imposes obligations on society or an open-ended class, the APA prescribes "an elaborate procedure for rule promulgation." *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Servs*, 431 Mich 172, 177; 428 NW2d 335 (1988). This procedure is set forth in MCL 24.231 through MCL 24.264. Overall, that process requires an agency to obtain approval from what was then known as the Office of Regulatory Reinvention to promulgate a rule, see MCL 24.239; MCL 18.446, to give public notice of the proposed rule, see MCL 24.239a; MCL 24.241(1), to prepare a regulatory-impact statement and small-business-impact statement for the proposed rule, see MCL 24.245(3) and (4), to hold a public hearing at which the public may comment on the proposed rule, see MCL 24.241(1), and to obtain approval from the Legislature's joint committee on administrative rules, see MCL 24.245a. When EGLE proposes a rule, it must also obtain approval from the Environmental Rules Review Committee. See MCL 24.266. These procedures ensure that the various groups who will be affected by a rule may take part in the rulemaking process and that the agency carefully considers all possible consequences and implications before making a final decision. See *Detroit Base Coalition*, 431 Mich at 189-190 (noting that the rulemaking procedures " 'are calculated to invite public participation in the rule-making process, prevent precipitous action by the agency, prevent the adoption of rules that are illegal or that may be beyond the legislative intent, notify affected and interested persons of the existence of the rules, and make the rules readily accessible after adoption' "), quoting Bienenfeld, Michigan Administrative Law (1st ed), § 4, p 4-1. A rule is invalid if an agency does not process the rule "in compliance

EGLE's statutory authority, were contrary to state and federal law regulating CAFOs, were unnecessary to achieve applicable Part 4 water-quality standards, were arbitrary and capricious, and were unconstitutional. Soon after petitioners petitioned for a contested-case hearing, several environmental groups—including the Environmental Law and Policy Center; the Michigan Environmental Council; the Environmentally Concerned Citizens of South Central Michigan; Freshwater Future; For Love of Water; Food and Water Watch; the Michigan League of Conservation Voters; and the Alliance for the Great Lakes— moved to intervene in the contested case to support EGLE. Parties pre-filed direct and rebuttal testimony, and the tribunal presided over two-and-a-half weeks of live testimony, including both cross- and redirect examination. In total, 29 witnesses presented testimony accompanied by more than 300 exhibits. The administrative law judge stayed the contested-case proceeding without issuing a final decision to await resolution of this appeal.

Two-and-a-half months after the contested-case hearing was started, Michigan Farm Bureau led an overlapping, but not identical, group of parties (collectively, plaintiffs) in filing an original action for declaratory judgment under MCL 24.264 in the Court of Claims. In part, plaintiffs asked the court to declare that the discretionary conditions in the general permit were procedurally invalid because they were actually "rules" under the APA and because EGLE had not processed them in compliance with the APA's rulemaking

---

with [MCL 24.266], if applicable, [MCL 24.242], and in substantial compliance with [MCL 24.241(2), (3), (4), and (5)]." MCL 24.243(1).

procedures.[19]  EGLE moved for summary disposition under MCR 2.116(C)(4) (lack of subject-matter jurisdiction) and (8) (failure to state a claim), arguing that plaintiffs' declaratory-judgment action was subject to dismissal because plaintiffs had not yet exhausted their administrative remedies.  EGLE asserted that the court would not have jurisdiction at least until an administrative law judge issued a final decision and order regarding the 2020 general permit at the end of the contested-case hearing.

The Court of Claims agreed with EGLE, concluding that plaintiffs' failure to exhaust administrative remedies by seeing the contested case to its end meant that the court lacked subject-matter jurisdiction under MCL 24.301.[20]  Further, the court disagreed with

---

[19] Plaintiffs also asked the court to declare that (1) the discretionary conditions were substantively invalid because they were arbitrary and capricious, beyond EGLE's regulatory authority, and contrary to the intent of Part 31 of NREPA; (2) EGLE's incorporation of the conditions into the 2020 general permit was a violation of plaintiffs' constitutionally guaranteed procedural and substantive due-process rights; (3) EGLE's incorporation of the conditions constituted a violation of the Constitution's Separation of Powers Clause, and any statutory authority on which EGLE relied for such adoption violated the constitutional nondelegation doctrine; (4) EGLE's assertion of control over non-CAFOs went beyond its statutory authority, and its standard for determining such authority was unconstitutionally void for vagueness; and (5) the permit condition requiring CAFOs to install 35-foot permanent vegetated buffer strips and the requirement to have 100-foot setbacks converted cropland acreage to nonfarmable land, which was an unconstitutional taking without just compensation in violation of US Const, Am V and Const 1963, art 10, § 2.

[20] MCL 24.301 states:

When a person has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, the decision or order is subject to direct review by the courts as provided by law. Exhaustion of administrative remedies does not require the filing of a motion or application for rehearing or reconsideration unless the agency rules require the filing before judicial review is sought.  A preliminary, procedural or

plaintiffs that MCL 24.264 vested it with subject-matter jurisdiction to consider their challenge to the validity of the discretionary conditions in the general permit. The court reasoned that under *Jones v Dep't of Corrections*, 185 Mich App 134, 138; 460 NW2d 575 (1990), MCL 24.264 applies only to rules processed in compliance with the APA's rulemaking procedures. Because EGLE did not process the conditions in compliance with the APA's rulemaking procedures, the court held that plaintiffs could not seek a declaratory judgment by way of MCL 24.264 challenging the validity of those conditions.

On appeal, the Court of Appeals affirmed the Court of Claims' ultimate holding that the Court of Claims lacked subject-matter jurisdiction, but it held that plaintiffs could seek a declaratory judgment by way of MCL 24.264. *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 343 Mich App 293, 314-315; 997 NW2d 467 (2022). In the Court of Appeals' view, the discretionary conditions in the general permit were "rules" under the APA merely because they were in addition to or more stringent than the previously promulgated mandatory minimum conditions. *Id*. at 312-313. The Court of Appeals acknowledged that the *Jones* panel had held that MCL 24.264 applied only to rules an agency processed following the APA's rulemaking procedures, but the Court of Appeals found this holding to be unpersuasive, nonbinding authority and declined to followed it. *Id*. at 308.[21] Although the Court of Appeals held that the challenged conditions were rules,

---

intermediate agency action or ruling is not immediately reviewable, except that the court may grant leave for review of such action if review of the agency's final decision or order would not provide an adequate remedy.

[21] *Jones* was issued before November 1, 1990, and a panel of the Court of Appeals is not bound to follow a prior published decision of the Court of Appeals issued before November 1, 1990. MCR 7.215(J)(1).

20

the Court of Appeals ultimately affirmed the Court of Claims' holding that it lacked subject-matter jurisdiction. *Id*. at 314-315. The Court of Appeals noted that before plaintiffs could seek a declaratory judgment from the courts, MCL 24.264 required plaintiffs to first request a declaratory ruling from EGLE, and plaintiffs had not done so here. *Id*.

EGLE sought leave to appeal, arguing that the Court of Appeals erroneously concluded the challenged conditions were "rules" that could be challenged by way of declaratory judgment under MCL 24.264.[22] We granted EGLE's application for leave to appeal. *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 511 Mich 971 (2023).[23] The core issue we must decide is whether the Court of Claims had subject-matter jurisdiction to hear plaintiffs' declaratory-judgment action under MCL 24.264.

---

[22] At the same time, plaintiffs filed a cross-application for leave to appeal, challenging the Court of Appeals' conclusion that summary disposition was still warranted because, while MCL 24.264 would apply to their challenge, they did not first seek a declaratory ruling from EGLE about the validity of the discretionary conditions in the general permit. Because we conclude that the discretionary conditions are not rules, we deny plaintiffs' cross-application for leave to appeal.

[23] In response to EGLE's application for leave to appeal, plaintiffs argued that EGLE lacked appellate standing to challenge the judgment of the Court of Appeals. We disagree. We have held that a party must be aggrieved by the actions of either the trial court or an appellate-court judgment to have appellate standing. See *League of Women Voters of Mich v Secretary of State*, 506 Mich 561, 577-578; 957 NW2d 731 (2020), citing *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291-292; 715 NW2d 846 (2006). Although the Court of Appeals affirmed the Court of Claims' dismissal of plaintiffs' action for lack of jurisdiction, EGLE was aggrieved by the Court of Appeals' decision because the Court of Appeals' holding that the discretionary conditions in the general permit are rules might hinder EGLE's ability to fulfill its statutory duties under Part 31 of the NREPA.

21

## II. SUBJECT-MATTER JURISDICTION

We review de novo a trial court's decision to grant or deny a motion for summary disposition and questions of subject-matter jurisdiction. See *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017). We also review de novo questions of statutory interpretation. See *McQueer v Perfect Fence Co*, 502 Mich 276, 285-286; 917 NW2d 584 (2018).

Subject-matter jurisdiction is a legal term of art that refers to the authority of the court to exercise judicial power over a class or category of cases. See *People v Washington*, 508 Mich 107, 121; 972 NW2d 767 (2021). If a law specifies that a court has the power to adjudicate a class or category of cases and a case falls within that class or category, the court has subject-matter jurisdiction to hear the case, even if the facts of the case do not entitle the plaintiff to relief. See *Winkler*, 500 Mich at 341 ("The existence of subject matter jurisdiction turns not on the particular facts of the matter before the court, but on its general legal classification."). Because subject-matter jurisdiction is a prerequisite for a court to hear and decide a claim, the court may consider it sua sponte at any time, and parties cannot confer subject-matter jurisdiction by their conduct, nor can they waive a subject-matter-jurisdiction challenge by not raising it. See *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 51 n 3; 832 NW2d 728 (2013).

There is no dispute here that MCL 24.264 delineates the class of cases over which the Court of Claims has subject-matter jurisdiction.[24] Broadly speaking, MCL 24.264 vests

_____

[24] Of course, MCL 24.264 refers to the circuit court, not the Court of Claims. But nothing in MCL 24.264 purports to confer exclusive jurisdiction on the circuit courts. Given that the circuit courts are not the exclusive forum for adjudicating these issues, if MCL 24.264 confers the circuit court with subject-matter jurisdiction, MCL 600.6419(1)(a) would

22

the court with subject-matter jurisdiction to declare an agency "rule" invalid or inapplicable before an agency actually enforces or applies the rule to a regulated entity. MCL 24.264 provides:

> *Unless an exclusive procedure or remedy is provided by a statute governing the agency*, the validity or applicability of a *rule*, including the failure of an agency to accurately assess the impact of the rule on businesses, including small businesses, in its regulatory impact statement, may be determined in an action for declaratory judgment if the court finds that the rule or its threatened application interferes with or impairs, or imminently threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The action shall be filed in the circuit court of the county where the plaintiff resides or has his or her principal place of business in this state or in the circuit court for Ingham county. The agency shall be made a party to the action. *An action for declaratory judgment may not be commenced under this section unless the plaintiff has first requested the agency for a declaratory ruling and the agency has denied the request or failed to act upon it expeditiously*. This section shall not be construed to prohibit the determination of the validity or applicability of the rule in any other action or proceeding in which its invalidity or inapplicability is asserted. [Emphasis added.]

Simply put, a court has subject-matter jurisdiction to hear a declaratory-judgment action in which a party challenges the validity or applicability of an agency rule "[u]nless an exclusive procedure or remedy is provided by a statute governing the agency . . . ." MCL 24.264 further includes an exhaustion-of-administrative-remedies requirement: a party

---

operate to transfer that subject-matter jurisdiction to the Court of Claims. Under MCL 600.6419(1)(a), the Court of Claims has exclusive jurisdiction "[t]o hear and determine any claim or demand, statutory or constitutional, liquidated or unliquidated, ex contractu or ex delicto, or any demand for monetary, equitable, or *declaratory relief* or any demand for an extraordinary writ against the state or any of its departments or officers *notwithstanding another law that confers jurisdiction of the case in the circuit court*." MCL 600.6419(1)(a) (emphasis added); see also *Telford v Michigan*, 327 Mich App 195, 198-201; 933 NW2d 347 (2019) (holding that this provision repealed contrary provisions addressing Headlee Amendment suits).

may not request a declaratory judgment unless the party "first request[s] the agency for a declaratory ruling and the agency has denied the request or failed to act upon it expeditiously."[25]

Although a court without subject-matter jurisdiction has no power to decide the merits of a case, a court must necessarily consider the "nature of the claim" to decide whether it has subject-matter jurisdiction. See *Parkwood Ltd Dividend Housing Ass'n v*

[25] The Court of Appeals assumed that this exhaustion-of-administrative-remedies requirement was a jurisdictional prescription. Because we hold that the 2020 general-permit conditions are not rules under the APA, we need not decide today whether this assumption is correct. But we do question this assumption. The exhaustion-of-administrative-remedies requirement in MCL 24.264 is one that seems to "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel Henderson v Shinseki*, 562 US 428, 435; 131 S Ct 1197; 179 L Ed 2d 159 (2011). So it might be more accurate to describe this requirement as a mandatory claims-processing rule. See *Santos-Zacaria v Garland*, 598 US 411, 416-417; 143 S Ct 1103; 215 L Ed 2d 375 (2023) (noting that nonjurisdictional claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times" and that an administrative-exhaustion requirement is "a quintessential claim-processing rule") (quotation marks and citation omitted). Though we need not decide this today, we caution courts to exercise reasoned judgment before branding an exhaustion-of-administrative-remedies requirement jurisdictional, because "[h]arsh consequences attend the jurisdictional brand." See *Fort Bend Co v Davis*, 587 US ___, ___; 139 S Ct 1843, 1849; 204 L Ed 2d 116 (2019) (quotation marks and citation omitted); see also *Washington*, 508 Mich at 118, 124 (noting the importance of distinguishing between the lack of subject-matter jurisdiction and the error in the exercise of jurisdiction, and noting the unfortunate practice among courts of using the term "jurisdiction" imprecisely). If a requirement is jurisdictional, a party's failure to comply with it can be raised at any point during the proceedings, and a court must dismiss the action for the party's failure to comply—even if the issue is raised for the first time on appeal. See *Lehman v Lehman*, 312 Mich 102, 105-106; 19 NW2d 502 (1945); *In re Cody's Estate*, 293 Mich 697, 701; 292 NW 535 (1940); *In re Estate of Fraser*, 288 Mich 392, 394; 285 NW 1 (1939). A court has no discretion to fashion equitable exceptions to a jurisdictional rule or to otherwise excuse noncompliance; subject-matter jurisdiction cannot be conferred by consent or waiver. See *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 204; 631 NW2d 733 (2001).

*State Housing Dev Auth*, 468 Mich 763, 771; 664 NW2d 185 (2003). Put differently, a court must decide whether a particular case falls within the category or class of cases over which it has power to adjudicate the merits. See *Winkler*, 500 Mich at 334. Again, MCL 24.264 gives a court power to adjudicate a declaratory-judgment action challenging the validity or applicability of an agency rule "[u]nless an exclusive procedure or remedy is provided by a statute governing the agency . . . ." So, to decide whether it had subject-matter jurisdiction under MCL 24.264, the Court of Claims needed first to consider whether plaintiffs' action was a declaratory judgment challenging the validity of a rule—specifically, whether the discretionary conditions in the general permit were "rule[s]." Accord *Pacific Gas & Electric Co v Fed Power Comm*, 164 US App DC 371, 374-375; 506 F2d 33 (1974) (holding that, to decide whether the court had jurisdiction to review an agency action under a statute, the court needed to first decide whether the agency action was a "rule" under the federal APA). Accordingly, to determine whether the Court of Claims correctly concluded that it lacked subject-matter jurisdiction under MCL 24.264, we must decide whether the general permit or discretionary conditions were "rules."

### III.  RULES UNDER THE APA
### A.  LOWER COURTS' REASONING

On the question of whether these conditions are rules, we initially note that we are unpersuaded by the reasoning of the Court of Appeals. For its part, the Court of Appeals offered little explanation for why it considered the discretionary conditions in the general permit to be rules. In essence, the Court of Appeals concluded that the conditions were rules because they were in addition to and more stringent than the mandatory conditions. See Mich Admin Code, R 323.2196(5). But the Court of Appeals did not explain why this

necessarily meant that the discretionary conditions were themselves rules. The Court of Appeals recited the general definition of "rule" in MCL 24.207 and noted that the term "rule" does not include "a 'decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected,' " but the Court of Appeals did not discuss how the conditions fall within this definition or outside of this exclusion. *Mich Farm Bureau*, 343 Mich App at 308, quoting MCL 24.207(j).

## B. APA'S DEFINITION OF A RULE

Finding the reasoning of the Court of Appeals unpersuasive, we turn to the APA's definition of a rule. The APA generally defines a rule as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency . . . ." MCL 24.207; see also *American Federation of State, Co & Muni Employees v Dep't of Mental Health*, 452 Mich 1, 8; 550 NW2d 190 (1996) (*AFSCME*). But along with many other exceptions to the definition of a "rule" under MCL 24.207, MCL 24.207(h) says that a "[r]ule does not include . . . [a] form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory." Hence, like the federal APA distinguishes between legislative rules (which have the force and effect of law) and interpretive rules and general statements of policy (which do not), see *Nat'l Mining Ass'n v McCarthy*, 411 US App DC 52, 60; 758 F3d 243 (2014); *American Hosp Ass'n v Bowen*, 266 US App DC 190, 198; 834 F2d 1037 (1987), the Michigan APA distinguishes between legislative rules and "[a] form with instructions, an interpretive

26

statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory." Unlike under the federal APA, however, under the Michigan APA, the latter are not considered rules at all. See *Mich Farm Bureau v Bureau of Workmen's Compensation*, 408 Mich 141, 148; 289 NW2d 699 (1980) ("Hence, while under the Federal act a rule can be legislative or interpretative, under the Michigan act an 'interpretive statement' is *not*, by definition, a rule at all. It would seem, then, that rules which are 'legislative' under the Federal act would be analogous to 'rules' under our act.").

That said, an agency action is a "rule" under the Michigan APA only if it meets, at minimum,[26] the following elements: (1) it is an agency regulation, statement, standard, policy, ruling, or instruction; (2) it is of general applicability; (3) it implements or applies law enforced or administered by the agency, or it prescribes the organization, procedure, or practice of the agency; and (4) it, in itself, has the force and effect of law. There can be no serious debate that the discretionary conditions in the general permit satisfy the first and third elements. They are either an agency regulation, statement, standard, policy, ruling, or instruction. And they implement law enforced or administered by EGLE: they give effect to the NREPA requirement that EGLE include conditions in general permits that EGLE deems necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations. See MCL 324.3106; MCL 324.3113(2).

---

[26] Beyond MCL 24.207(h), MCL 24.207 includes a list of other administrative actions that are not rules. Because we conclude that neither the general permit nor the discretionary conditions are rules under MCL 24.207(h), we need not address whether they fall within any other agency action that MCL 24.207 lists as not being a "rule."

Whether the conditions in the general permit satisfy Elements (2) or (4), however, calls for closer inspection.

To begin, are the discretionary conditions of general applicability? EGLE argues that they are not, but we disagree. Michigan courts have considered a statement to be of general applicability when it is capable of being applied to or is relevant to an open-ended class or category of entities or situations. See, e.g., *Hinderer v Dep't of Social Servs*, 95 Mich App 716, 725; 291 NW2d 672 (1980) (holding that a lag-budgeting system met this requirement because it affected recipients of benefits generally); see also *AFSCME*, 452 Mich at 9-10 (observing that the guidelines at issue in that case directly applied to all who live and work in private group homes). In construing the phrase in the context of their own administrative procedures acts, other jurisdictions have defined the phrase along the same lines.[27] Applying this here, we conclude that discretionary conditions in the general permit are of general applicability. The conditions are capable of being applied to or are relevant to all CAFOs because they are EGLE's initial determination of what conditions in addition to and more stringent than the mandatory conditions are necessary to achieve Part 4 water-

---

[27] See, e.g., *Emergency Med Care Facilities, PC v Div of TennCare*, 671 SW3d 507, 514 (Tenn, 2023) (using dictionary definitions to define "general applicability"); *Blinzinger v Americana Healthcare Corp*, 466 NE2d 1371, 1375 (Ind App, 1984) (stating that rulemaking "is distinguished from the adjudicatory function in that the former embraces an element of generality, operating upon a class of individuals or situations whereas an adjudication operates upon a particular individual or circumstance"); *Northwest Pulp & Paper Ass'n v Dep't of Ecology*, 200 Wash 2d 666, 673; 520 P3d 985 (2022) (en banc) (holding that an action is of general applicability if it applies uniformly to all members of a class); *NC Dep't of Environmental Quality v NC Farm Bureau Federation, Inc*, 895 SE2d 437, 442-443 (NC App, 2023) (holding that a rule is generally applicable if it applies in most situations); *Nat'l Org of Veterans' Advocates, Inc v Secretary of Veterans Affairs*, 981 F3d 1360, 1374 (CA Fed, 2020) (noting that a rule is generally applicable when it affects an "open-ended category" of people or entities).

quality standards for anything meeting the definition of a CAFO. EGLE does not fashion the discretionary conditions in a general permit with an identifiable CAFO in mind, and so anytime a CAFO applies for permit coverage, the necessity of the discretionary conditions in the general permit will be relevant.

Next, do the general permit or discretionary conditions have the force and effect of law? The answer to this question must be "no." Since December 31, 2006, Part 31 of the NREPA has empowered EGLE to make only rules concerning permits issued to oceangoing vessels engaging in port operations in Michigan. See MCL 324.3103(2) ("The department shall enforce this part and may promulgate rules as it considers necessary to carry out its duties under this part. However, notwithstanding any rule-promulgation authority that is provided in this part, except for rules authorized under [MCL 324.3112(6)], the department shall not promulgate any additional rules under this part after December 31, 2006."); MCL 324.3112(6) (requiring oceangoing vessels engaging in port operations in Michigan to obtain a permit, which EGLE may issue only if the applicant can show that the oceangoing vessel complies with a federal regulation specifying ballast-water-management requirements or that the oceangoing vessel will use environmentally sound technology and methods approved by EGLE to prevent the discharge of aquatic nuisance species); MCL 324.3112(8) ("The department may promulgate rules to implement subsections (6) to (8).").[28] EGLE otherwise has no power to make rules to carry

---

[28] Plaintiffs claim that Part 31 of the NREPA empowers EGLE to make rules necessary to comply with the Clean Water Act. See MCL 324.3103(3) ("The department may promulgate rules and take other actions as may be necessary to comply with the federal water pollution control act . . . ."). But MCL 324.3103(2) says "*notwithstanding any rule-promulgation authority that is provided in* [*Part 31*], except for rules authorized under

29

out its duties under Part 31 of the NREPA, a point which EGLE concedes. EGLE, therefore, clearly has no power to make rules concerning NPDES permits issued to CAFOs. See MCL 324.3103(2). And as we held in *Clonlara*, if the Legislature has not delegated to an agency the power to make rules, a statement of general applicability issued by the agency cannot be considered a "rule"—either valid or invalid—under the Michigan APA. See *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 245-248; 501 NW2d 88 (1993).[29] This is because, if an agency lacks rulemaking power, any statement of general applicability issued by the agency necessarily lacks the force and effect of law, no matter if the agency has issued it following the APA's rulemaking procedures. See *id*. at 243 ("An

---

[MCL 324.3112(6)], the department shall not promulgate any additional rules under this part after December 31, 2006." (Emphasis added.) The Legislature thus unequivocally said that EGLE cannot make rules to comply with the Clean Water Act after December 31, 2006, despite MCL 324.3103(3) saying that EGLE may promulgates rules to comply with the Clean Water Act. The Legislature's intent is clear given that MCL 324.3103 empowered EGLE to make rules necessary to comply with the Clean Water Act when the Legislature amended MCL 324.3103 in April 2004 to divest EGLE of rulemaking authority under Part 31 of the NREPA "notwithstanding any rule-promulgating authority that is provided in [Part 31] . . . ." Compare MCL 324.3103, as enacted by 1994 PA 451, with MCL 324.3103, as amended by 2004 PA 91.

[29] See also *Mich Farm Bureau*, 408 Mich at 149 (" 'When an agency has no delegated power to make law through rulemaking, the rules it issues are necessarily interpretive.' "), quoting Davis, Administrative Law of the Seventies, Supplementing Administrative Law Treatise, § 5.03, pp 147-148; *Nat'l Park Hospitality Ass'n v Dep't of Interior*, 538 US 803, 809; 123 S Ct 2026; 155 L Ed 2d 1017 (2003) (considering an agency statement "to be nothing more than a 'general statemen[t] of policy' " where the agency had no delegated rulemaking authority) (citation omitted; alteration by the *Nat'l Park* Court); Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L J 1311, 1321-1323 (1992) (noting that when an agency lacks "delegated statutory authority to act with respect to the subject matter of the rule," statements of general applicability issued by the agency are "either interpretive rules (if they interpret specific statutory or regulatory language) or policy statements (if they do not)") (emphasis omitted).

30

interpretation not supported by the enabling act is an invalid interpretation, not a rule. Otherwise, 'wrong' interpretive statements might become rules with the force of law on the false premise that they were promulgated in accordance with the APA procedures."); see also *Batterton v Marshall*, 208 US App DC 321, 329; 648 F2d 694 (1980) ("Although an agency empowered to enact legislative rules may choose to issue non-legislative statements, an agency without legislative rulemaking authority may issue only non-binding statements. Unlike legislative rules, non-binding agency statements carry no more weight on judicial review than their inherent persuasiveness commands.") (citations omitted). As a result, neither the general permit nor the discretionary conditions in it can have the force and effect of law, and so they cannot be "rules" under the Michigan APA. This would be true even if EGLE followed the APA's rulemaking procedures to issue the general permit and discretionary conditions.[30]

In Justice VIVIANO's view, our holding from *Clonlara* does not apply here. As he sees it, our holding from *Clonlara* applies only when an agency has *no* power to make rules whatsoever. Here, he says, Part 31 of the NREPA gives EGLE at least some power to make rules. So according to Justice VIVIANO, whether Part 31 of the NREPA empowers EGLE to make rules related to NPDES permits issued to CAFOs is irrelevant to deciding

---

[30] Because it is clear based on our decision in *Clonlara* that the general permit and discretionary conditions must lack the force and effect of law due to EGLE's lack of rulemaking power, we need not address the Court of Claims' ruling that they were not rules, which was based on the Court of Appeals' decision in *Jones*. See *Jones*, 185 Mich App at 137 (holding that the plaintiff could maintain an action under MCL 24.264 only if the plaintiff "challenge[d] the validity or applicability of a rule which had been formally promulgated as a rule" under the APA's rulemaking procedures).

whether the general permit or discretionary conditions have the force and effect of law. We disagree.

For starters, we did not suggest in *Clonlara* that its holding applies only if an agency has *no* rulemaking power. This Court in *Clonlara* noted that the School Code, MCL 380.1 *et seq.*, as enacted by 1976 PA 451, had empowered the Department of Education to make rules, see *Clonlara*, 442 Mich at 246 n 31, but it was clear the Department of Education did not have the power to issue rules relating to the subject matter that the policy at issue in that case covered. The policy at issue in *Clonlara* related to the nonpublic school act, MCL 388.551 *et seq.*, as enacted by 1921 PA 302, and the "Department of Education [was] not authorized, explicitly or implicitly, to promulgate rules relating to the nonpublic school act." *Id.* at 248. So while it is true that Part 31 of the NREPA does give EGLE some rulemaking power, like in *Clonlara*, it is beyond dispute that EGLE is not empowered to issue rules concerning the subject matter that the general permit and discretionary conditions cover—that is, NPDES permits issued to CAFOs. Because this is beyond dispute, it is clear that EGLE cannot give any statement of general applicability related to CAFO permits the force and effect of law, even if EGLE intends to do so or else follows the APA's rulemaking procedures before issuing them.

## C. THE FORCE AND EFFECT OF LAW

Even so, this does not mean that EGLE cannot issue a general permit with discretionary conditions in addition to or more stringent than the mandatory conditions. Nor does it mean that those CAFOs that apply for and receive certificates of coverage under the general permit are not required to comply with the discretionary conditions. To explain

32

why this is the case, a deeper dive into what it means for something to have the force and effect of law is in order.

## 1. LEGISLATIVE RULES VERSUS NONBINDING POLICY STATEMENTS

Generally speaking, an agency statement of general applicability in itself has the force and effect of law—or is a legislative rule—when the statement itself alters rights or imposes obligations and has a "present binding effect" on regulated entities, the agency, and the courts.  See, e.g., *Interstate Natural Gas Ass'n of America v Fed Energy Regulatory Comm*, 350 US App DC 366, 407; 285 F3d 18 (2002); see also *American Hosp Ass'n*, 266 US App DC at 198 (observing that agency statements lacking the force and effect of law are those that "are not determinative of issues or rights addressed" and that do not "conclusively affect rights of private parties") (quotation marks and citation omitted); *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Servs*, 431 Mich 172, 189; 428 NW2d 335 (1988) (holding that agencies are bound to follow their own rules).  An interpretive statement, for instance, in itself lacks the force and effect of law because it is the underlying statute that determines how an entity must act, i.e., that alters rights or imposes obligations.  See *Clonlara*, 442 Mich at 245.  Even if a regulated entity does not comply with the statement, the interpretive statement does not bind an administrative law judge to sanction an entity in an enforcement action, nor does it bind a court on judicial review.  See *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 104-108; 754 NW2d 259 (2008) (holding that agency interpretations of statutes are entitled to respectful consideration and should not be overruled without cogent reasons but that

agency interpretations are not binding on courts and cannot conflict with the Legislature's intent as expressed in the plain language of a statute).

For similar reasons, statements explaining how an agency plans to exercise a discretionary power are usually considered to lack the force and effect of law.[31] See *Nat'l Mining Ass'n*, 411 US App DC at 61 (holding that an agency statement explaining how an agency will exercise its broad permitting discretion under some statute or rule is a general statement of policy under the federal APA and not a rule with the force of law). Consider the Court of Appeals' decision in *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563; 609 NW2d 593 (2000), aff'd sub nom *Byrne v Michigan*, 463 Mich 652 (2001). There, the Legislature, in 1996 PA 538, had amended MCL 28.282 of the radio broadcasting stations act, MCL 28.281 *et seq*., to provide the Department of State Police the power to construct the Michigan Public Safety Communications System, which would entail the construction of 181 new radio towers across Michigan. *Kent Co Aeronautics Bd*, 239 Mich App at 566-567, 574. The Legislature gave the department discretion to decide the site upon which to build each tower. Once the department selected a site, the local unit of government with zoning authority over the site had 30 days to either grant the department a special-use permit to build a tower or, if the local unit of government preferred that the department build on a different site, to " 'propose an equivalent site' " to the department. *Id*. at 574-575, quoting MCL 28.282(2), as amended by 1996 PA 538. If the local unit of government did not do either within 30 days, the Legislature allowed the department to build the tower despite any local zoning ordinance prohibiting construction

_____

[31] Under the federal APA, these are termed "general statements of policy."

34

of the tower. *Id*. Without following the APA's rulemaking procedures, the department issued "Equivalent Site Criteria" that explained what the State Police might consider a suitable equivalent site. *Id*. at 570, 583-584. This way, local units of government had some idea about what the department would consider a suitable equivalent site if they wished to propose an alternative site to the department. *Id*. Because these Equivalent Site Criteria simply explained how the department planned to exercise its discretion to decide what constituted a suitable site, the Court of Appeals held that the criteria lacked the force and effect of law. *Id*.[32] The Equivalent Site Criteria did not bind the department and did not grant any right or impose any obligation on local units of government: even if a local unit of government proposed an alternative site that matched the Equivalent Site Criteria, the department was not bound to build on that site instead of its originally selected site. *Id*. The department still had discretion to reject a local unit of government's proposed alternative. *Id*.

---

[32] Specifically, the Court of Appeals held that the Equivalent Site Criteria were either "[a]n intergovernmental, interagency, or intra-agency memorandum, directive, or communication that does not affect the rights of, or procedures and practices available to, the public" under MCL 24.207(g), or "[a] form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory" under MCL 24.207(h). *Kent Co*, 239 Mich App at 582-583. Justice VIVIANO says we "fail[] to properly acknowledge" that the Court of Appeals also concluded that the Equivalent Site Criteria fell within MCL 24.207(g). But it is clear the panel concluded that the Equivalent Site Criteria fell within Subsection (g) only because it found that the Equivalent Site Criteria lacked the force and effect of law. Indeed, it is difficult to imagine an instance in which an "intergovernmental, interagency, or intra-agency memorandum, directive, or communication that does not affect the rights of, or procedures and practices available to, the public," would have the force and effect of law. Stated differently, it is difficult to imagine an instance when an agency statement would fall under the Subsection (g) exception but not the Subsection (h) exception.

Finally, statements announcing a policy the agency plans to establish in future adjudications generally lack the force and effect of law. See, e.g., *Pacific Gas*, 164 US App DC at 376. *Pacific Gas* aptly illustrates this. During a natural-gas shortage, natural-gas-pipeline companies had to submit curtailment plans to the Federal Power Commission (the FPC) for approval, explaining which customers the pipeline company would deliver to first if demand exceeded supply. *Id*. at 373 n 7. Under the governing statute, the FPC would approve a pipeline company's plan only after an adjudicatory hearing and only after finding that the plan was just and reasonable under the circumstances. *Id*. at 374, 379; see also *Hercules Inc v Fed Power Comm*, 552 F2d 74, 77 (CA 3, 1977). At the adjudicatory hearing, customers with low priority under the plan would have an opportunity to contest the plan. *Pacific Gas*, 164 US App DC at 378. Without following the federal APA's rulemaking procedures, the FPC issued a statement announcing that it planned to show at adjudicatory hearings that curtailment plans giving priority to residential customers were just and reasonable. *Id*. at 374, 388. The United States Court of Appeals for the District of Columbia Circuit held that the statement lacked the force and effect of law because the statement itself did not alter rights or impose obligations: pipeline companies were free to submit a curtailment plan giving priority to other types of customers, and an administrative law judge would be free to approve that plan after an adjudicatory hearing. *Id*. at 378-379. Likewise, the statement itself did not deprive nonresidential customers of their contract rights to natural gas, as again, an administrative law judge would be free to approve curtailment plans giving priority to nonresidential customers. *Id*. If an administrative law judge did approve curtailment plans giving priority to residential customers, a court on

judicial review would be free to reject the FPC's decisions if the agency did not provide reasoning or evidence sufficient to support them. *Id*. at 379.

In short, an agency statement of general applicability in itself has the force and effect of law when the statement itself alters rights or imposes obligations and has a present, binding effect on regulated entities, the agency, and the courts. If an agency statement (1) merely explains what the agency believes an ambiguous provision of a statute or agency rule means or (2) explains what factors will be considered and what goals will be pursued when an agency exercises a discretionary power or conducts an adjudication, the statement will generally not be considered to alter rights, impose obligations, or have a present, binding effect. See *Clonlara*, 442 Mich at 245 n 30; Asimow, *Nonlegislative Rulemaking and Regulatory Reform*, 1985 Duke L J 381, 383 (1985) ("For example, a policy statement might indicate what factors will be considered and what goals will be pursued when an agency conducts investigation, prosecution, legislative rulemaking, or formal or informal adjudication.").

## 2. APPLICATION

With that in mind, when we say neither the general permit nor the discretionary conditions in it can have the force and effect of law, we mean that the general permit itself cannot grant any entity meeting the definition of a CAFO the right to discharge pollutants, nor can it require all CAFOs to operate in compliance with the discretionary conditions.[33] This does not mean, however, that a CAFO is not required to comply with the discretionary

---

[33] Compare the general permit here with Mich Admin Code, R 323.2190(1), which provides that an entity automatically has permit coverage if certain conditions are met.

conditions in the general permit if the CAFO applies for and receives a certificate of coverage. That is because it is the certificate of coverage—not the general permit itself—that grants the rights and imposes obligations on the CAFO.[34] And even though EGLE lacks the power to alter rights or impose obligations by issuing a rule, Part 31 of the NREPA still empowers EGLE to alter rights and impose obligations on individual parties proceeding before it that apply for permits. See Freedman, *Administrative Procedure and the Control of Foreign Direct Investment*, 119 U Pa L Rev 1, 9 (1970) (noting that an administrative agency is generally a governmental authority that has the power to affect the rights of private parties through either adjudication or rulemaking).

An analogy illustrates the point. Say each CAFO were required to apply for an individual permit, and rather than issue a general permit, EGLE circulated a letter to all CAFOs explaining that it tentatively planned to tell its permit writers to include the discretionary conditions at issue here in each individual permit issued to CAFOs. If EGLE then issued a CAFO an individual permit with those conditions, a CAFO could not argue in an enforcement proceeding that it had no obligation to comply with the conditions because the conditions were listed in a nonbinding letter. While it is true that EGLE could not bind CAFOs as a class through the letter itself, EGLE could undoubtedly bind the specific CAFO proceeding before it by issuing an individual permit to that CAFO. The same logic applies here. The general permit is functionally the same as the letter, and the

---

[34] We thus agree with Justice VIVIANO that a CAFO with a certificate of coverage under the general permit may be fined or penalized pursuant to MCL 324.3115 for failing to comply with the discretionary conditions. But that does not suggest that the general permit and discretionary conditions themselves have the force and effect of law. It means only that the certificate of coverage has the force and effect of law.

certificate of coverage is functionally the same as the individual permit. The certificate of coverage is simply an individual permit that includes the discretionary conditions listed in the general permit.[35]

When we say that the general permit and discretionary conditions cannot have the force and effect of law, then, we mean only this: that they can be only (1) a statement explaining what EGLE believes an ambiguous provision of the NREPA or one of EGLE's rules means, i.e., an interpretive statement, or (2) a statement explaining how EGLE plans to exercise its discretionary permitting power or a statement explaining what discretionary conditions EGLE plans to prove are necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations in adjudications involving a CAFO.[36] The general permit and discretionary conditions are not EGLE's attempt to discern the meaning of an ambiguous provision of Part 31 of the NREPA or one of EGLE's rules,[37] so they must fall into the latter category. Two points must therefore be emphasized.

---

[35] Indeed, if we were to hold that EGLE cannot issue the general permit, all that would change is that CAFOs would have to apply for individual permits, and EGLE would exercise its discretion to impose the same challenged general-permit conditions in most individual CAFO permits.

[36] We do not suggest that either the general permit or discretionary conditions are necessarily "guideline[s]" as that term is used under MCL 24.207(h) and defined by MCL 24.203(7) (" 'Guideline' means an agency statement or declaration of policy that the agency intends to follow, that does not have the force or effect of law, and that binds the agency but does not bind any other person."). The only issue before us now is whether the general permit or discretionary conditions are rules, and so we need not decide whether they meet the APA's definition of a guideline.

[37] As noted earlier in this opinion, various provisions of Part 31 of the NREPA require EGLE to include any discretionary conditions in the permit that EGLE deems necessary to

First and foremost, EGLE cannot act as though the general permit or the discretionary conditions constrain its permitting discretion in individual cases involving CAFOs. A CAFO must be allowed to apply for an individual permit with only the mandatory conditions, and EGLE must genuinely evaluate whether the discretionary conditions in the general permit or other discretionary conditions are necessary as applied to that particular CAFO. See *American Bus Ass'n v United States*, 201 US App DC 66, 70; 627 F2d 525 (1980) (noting that, when deciding whether an agency statement is binding, courts consider "whether a purported policy statement genuinely leaves the agency and its decision-makers free to exercise discretion"). At the same time, when a CAFO applies for a certificate of coverage under the general permit, EGLE must retain discretion to decide whether the discretionary conditions in the general permit are necessary as applied to the particular CAFO. And again, EGLE must genuinely evaluate whether the discretionary conditions are necessary as applied to that particular CAFO.[38]

---

achieve applicable Part 4 water-quality standards or other applicable laws and regulations. See MCL 324.3106; MCL 324.3113(2). But the discretionary conditions EGLE includes under this statutory authority are not EGLE's explanation of what unclear or ambiguous provisions of the NREPA mean. See *Interpretive Rules*, 41 Duke L J at 1324 (contrasting interpretive rules with general statements of policy and noting that, unlike interpretive rules, general statements of policy "do not rest upon existing positive legislation that has tangible meaning. Neither Congress nor the agency, acting legislatively, has already made the law that the policy statements express. Thus these documents are looked upon as creating new policy, albeit not legally binding policy as the documents were not promulgated legislatively").

[38] We do not suggest that "EGLE must create a full record specific to each CAFO that applies for coverage" under the 2020 general permit or any future general permit, as Justice VIVIANO claims. All we hold is that, when a CAFO applies for a certificate of coverage and agrees to comply with the discretionary conditions in the general permit, EGLE cannot act as though the CAFO is automatically entitled to a certificate of coverage. EGLE must

40

There is nothing in the record to suggest that EGLE does not already genuinely exercise discretion each time a CAFO applies for NPDES permit coverage. EGLE's rules provide that, if an applicant believes that the discretionary conditions in the general permit are inappropriate as applied to it, the applicant may apply for an individual permit from EGLE, and EGLE may grant an individual permit if EGLE determines that to do so would be appropriate. See Mich Admin Code, R 323.2191(5).[39] The rules also provide that EGLE retains discretion to process an applicant's general-permit application as an application for an individual permit if EGLE decides that the discretionary conditions in the general permit are inappropriate as to the general-permit applicant. See Mich Admin Code,

---

retain discretion to deny a certificate of coverage and process the CAFO's application as an individual permit.

[39] Mich Admin Code, R 323.2191(5) says:

> Any person having a discharge which is authorized, or proposing a discharge which may be authorized by a general permit, may request to be excluded from the coverage of the general permit and apply for an individual national permit. An application shall be submitted pursuant to these rules, with reasons supporting the request, to the department. The department may deny an application for an individual national permit if it determines that the general permit is more appropriate.

R323.2191(3).[40] And the 2020 general permit notifies applicants of these rules.[41] It says that "[EGLE] may require any person who is authorized to discharge by a [certificate of coverage] and this permit to apply for and obtain an individual NPDES permit if any of the following circumstances apply" and that "[a]ny person may request [EGLE] to take action pursuant to the provisions of Rule 2191 (Rule 323.2191 of the Michigan Administrative Code)." Permit No. MIG010000, p 27.[42]

_____

[40] Mich Admin Code, R 323.2191(3) says:

> (3) The department may require any person who is authorized to make a discharge, by a general permit, to apply for and obtain an individual national permit if any of the following circumstances apply:

> (a) The discharge is a significant contributor to pollution as determined by the department on a case-by-case basis.

> (b) The discharger is not complying, or has not complied, with the conditions of the general permit.

> (c) A change has occurred in the availability of demonstrated technology or practices for the control or abatement of waste applicable to the point source discharge.

> (d) Effluent standards and limitations are promulgated for point source discharges subject to the general permit.

> (e) The department determines that the criteria under which the general permit was issued no longer apply. Any person may request the department to take action pursuant to the provisions of this subrule.

[41] We therefore disagree with Justice VIVIANO's suggestion that the 2020 general permit contains no disclaimer that the discretionary conditions therein are not legally binding.

[42] This is what distinguishes this case from *AFSCME* and the Court of Appeals' decision in *Delta Co v Dep't of Natural Resources*, 118 Mich App 458; 325 NW2d 455 (1982). *AFSCME* and *Delta Co* each dealt with instances in which an agency purported that a statement was nonbinding, but in practice, the agency treated the statement as binding. In *AFSCME*, the Department of Mental Health issued guidelines that listed what terms and

Second, this means that neither administrative law judges, the Environmental Permit Review Commission, nor the courts can treat the general permit and discretionary conditions as though they restrict EGLE's permitting discretion. So when EGLE issues a general permit and CAFOs with coverage under the prior general permit petition for a contested case, such as here, EGLE must carry its burden to prove that any discretionary conditions in the general permit are necessary to achieve Part 4 water-quality standards or to comply with applicable laws and regulations. And if EGLE denies a CAFO's individual-permit application because EGLE concludes that the discretionary general-permit conditions are more appropriate and the aggrieved CAFO petitions for a contested case, the administrative law judge and the Environmental Permit Review Commission must require EGLE to prove that the discretionary conditions in the general permit are necessary to achieve Part 4 water-quality standards or to comply with other applicable laws and

---

conditions every contract with a private-group-home operator had to include. *AFSCME*, 452 Mich at 6-8. While the guidelines purported to allow a private-group-home operator to negotiate different contract terms, "the record indicate[d] that, in reality, group home providers may only do business with the department if they agree to the standard form contract without modifications." *Id*. at 6. Because the Department of Mental Health effectively required every contract with a private-group-home operator to include the provided terms, then, we held that the guidelines had the force and effect of law and were rules. *Id*. at 10-11. Similarly, in *Delta Co*, the Court of Appeals held that the Department of Natural Resources' guidelines conditioning the issuance of solid-waste-disposal-area licenses on 31 conditions being met were rules because the guidelines "were binding." *Delta Co*, 118 Mich App at 467-468. In contrast to *AFSCME* and *Delta Co*, here, there is nothing in the record to suggest that EGLE treats the general permit and conditions as though they restrict its permitting discretion. Not only that, in *AFSCME*, the Department of Mental Health unquestionably had the power to make rules with respect to the provision of care in private group homes. See *AFSCME*, 452 Mich at 7-8. Put otherwise, unlike EGLE, the Department of Mental Health could give statements of general applicability the force and effect of law if it so intended. Even if EGLE intended to give the general permit or the discretionary conditions the force and effect of law here, it could not do so.

regulations as applied to the particular CAFO. By the same token, if EGLE denies a CAFO's general-permit application, EGLE issues an individual permit, and the aggrieved CAFO petitions for a contested case, again, the administrative law judge and the Environmental Permit Review Commission must require EGLE to prove that any discretionary conditions in the individual permit are necessary as applied to the CAFO. See *Pacific Gas*, 164 US App DC at 376 ("When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued."). Finally, if an aggrieved party seeks judicial review, a court must ensure that EGLE sustained its burden of proof. See *id*. at 379 ("[T]he courts are in a position to police the [FPC]'s application of the policy and to insure that the [FPC] gives no greater effect to Order No. 467 than the order is entitled to as a general statement of policy.").

All in all, if the discretionary general-permit conditions have the force and effect of law, then like the conditions listed in Mich Admin Code, R 323.2196(5), EGLE would have no choice but to include them in every permit issued to a CAFO, individual or general. And CAFOs would not be able to contest the necessity of the conditions in administrative proceedings or on judicial review. In either case, an administrative law judge, the Environmental Permit Review Commission, and courts would be bound to give effect to them. See 1 Hickman & Pierce, Administrative Law Treatise (7th ed), § 4.3.1, p 535 ("A legislative rule can have the effect of eliminating what otherwise would be a party's right to a hearing to resolve contested issues of fact.").

### 3. RESPONSE TO DISSENT

As a final matter, we respond to several points Justice VIVIANO makes in his dissent. First, primarily based on Mich Admin Code, R 323.2192(b) (requiring EGLE to "determine if the [applicant] meets the *criteria for coverage* under the general permit"), Justice VIVIANO believes the discretionary conditions in the general permit are decisive of whether a CAFO will receive a certificate of coverage. We agree that a CAFO applying for a certificate of coverage might have to show how it plans to comply with any discretionary conditions in the comprehensive nutrient management plan it submits along with its application.[43] But we disagree that this can or does control whether a CAFO will receive a certificate of coverage. As discussed earlier, EGLE's rules confirm that it has discretion to deny an application for a certificate of coverage when EGLE determines that the discretionary conditions are inappropriate as applied to the applicant. See Mich Admin Code, R 323.2192(b). So even if a CAFO shows that it can comply with any discretionary conditions in the general permit, this does not—nor could it—legally entitle the applicant to a certificate of coverage. Just like in *Kent Co* where the Department of State Police was not obligated to build on an alternative site when a local unit of government proposed an alternative site satisfying the Equivalent Site Criteria, so too EGLE is not obligated to issue a certificate of coverage because a CAFO shows how it plans to comply with the discretionary conditions in the general permit.

---

[43] Along with their permit applications, CAFOs must submit comprehensive nutrient management plans. See Mich Admin Code, R 323.2196(5); *Sierra Club Mackinac Chapter*, 277 Mich App at 536, 539. Among other things, CAFOs may show in this plan how they intend to comply with the mandatory conditions and any discretionary conditions in the general permit. See Mich Admin Code, R 323.2196(5); *Sierra Club Mackinac Chapter*, 277 Mich App at 536, 539.

45

Second, Justice VIVIANO seems to believe that the general permit and discretionary conditions have the force and effect of law simply because of their practical effect on CAFOs. In reality, Justice VIVIANO suggests, most CAFOs apply for certificates of coverage under general permits, and EGLE will likely grant those CAFOs a certificate of coverage under the general permit. Yet even if Justice VIVIANO is correct that most CAFOs will feel pressured to apply for a certificate of coverage under the general permit and that EGLE is likely to grant them a certificate of coverage, this would not mean that the general permit or discretionary conditions have the force and effect of law. As we held in *Clonlara*, when the Legislature has not empowered an agency to make rules with respect to a particular subject matter, statements of general applicability on that subject matter do not have the force and effect of law even if they have a substantial effect on regulated parties. See *Clonlara*, 442 Mich at 248-249. That is because these statements can in fact have no legal effect—they have no actual power to bind the agency, the public, or the courts, even if the agency issues the statement following the APA's rulemaking procedures.[44] The statement issued by the FPC in *Pacific Gas* might have induced natural-gas-pipeline companies to submit curtailment plans giving priority to residential customers, but the fact remained that the FPC had not finally approved any such plan, and so no nonresidential

---

[44] For that reason, we reject plaintiffs' and Justice VIVIANO's claim that EGLE was attempting to avoid the APA's rulemaking procedures in this case. Because EGLE lacks the power to make rules with respect to CAFO permits, the general permit and discretionary conditions could not have the force and effect of law even if EGLE followed the APA's rulemaking procedures to issue the general permit and discretionary conditions. As we said in *Clonlara*, when an "agency has not been empowered to promulgate rules, policy statements issued by it need not be promulgated in accordance with APA procedures and do not have the force of law." *Clonlara*, 442 Mich at 239.

46

customers' contract rights had been altered yet. And in *Kent Co*, the Equivalent Site Criteria might have induced local units of government to propose alternative sites matching that criteria, but even if they did so, the fact remained that the Department of State Police was not bound to build on that site. Likewise, the general permit and discretionary conditions might induce CAFOs to apply for a certificate of coverage under the general permit, and EGLE might even be likely to grant it. But the fact remains that the general permit and discretionary conditions cannot grant rights or impose obligations on EGLE, CAFOs, or the courts.

Justice VIVIANO laments that our holding today means that agencies without rulemaking power will be able to take actions that have a substantial effect on people without public input or any court oversight. He insists that "agencies will be free to issue documents and take actions that look like a rule, sound like a rule, and have the practical effect of a rule without public input and without court oversight under the APA." This alarmism is unfounded. To begin, when an agency without rulemaking power issues a statement of general applicability, people affected by the statement will have a chance to challenge the soundness and applicability of the statement when the agency enforces or applies it in an individual case—both in agency proceedings and on judicial review. *Pacific Gas*, 164 US App DC at 376 (noting that, if a statement of general application has the force and effect of law, "[t]he underlying policy embodied in [it] is not generally subject to challenge before the agency"). So if an agency fails to establish the soundness of the policy underlying its statement, or the agency or administrative law judge wrongfully treats a statement as legally binding, any order applying or enforcing the policy may be vacated on judicial review. All said, even if an agency without rulemaking power may issue such a

47

statement without following the APA's rulemaking procedures, it is not as if people affected by the statement have no opportunity to offer input before their rights and obligations are finally decided. And even if a person affected by the statement cannot file a declaratory-judgment action under MCL 24.264 to challenge the statement, it is not as if the regulated party has no other means for judicial review. Here, for example, though EGLE is not required to follow the APA's rulemaking procedures, plaintiffs and other CAFOs still have a full opportunity to challenge any discretionary permit conditions in a contested-case hearing. If it turns out that EGLE did not sustain its burden of proving the discretionary conditions are necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations, the administrative law judge or Environmental Permit Review Commission may strike the discretionary conditions from the general permit. If the administrative law judge or the Environmental Permit Review Commission wrongfully treats the discretionary conditions as legally binding, plaintiffs may seek judicial review, and a court may vacate the final order.[45] See MCL 24.306.

In fact, if agencies without rulemaking power were required to fully comply with the APA's rulemaking procedures based on the anticipated practical effect of an interpretive statement or other statement or policy of general applicability, it could in fact lead to less rather than more transparency. A statement or policy of general applicability

---

[45] If the discretionary conditions had the force and effect of law like the mandatory conditions listed in Mich Admin Code, R 323.2196(5), a CAFO or CAFOs could not argue in a contested-case hearing that EGLE has not shown that the mandatory conditions are necessary to achieve Part 4 water-quality standards or other applicable laws or regulations. And CAFOs could not ask an administrative law judge or the Environmental Permit Review Commission to strike the mandatory conditions from the general permit or any individual permit on this basis.

issued by such an agency can never have the force and effect of law, even if the agency fully complies with the APA's rulemaking procedures. Thus, requiring an agency to follow these procedures would demand significant time and expense with minimal benefit from the agency's standpoint: the agency would still have to defend the validity of the statement in every case, and administrative law judges and courts would be free to not enforce or apply it. In this scenario, what incentive would agencies have to issue such statements or policies? They would likely opt not to issue them at all, leaving the regulated public in the dark about how the agency planned to exercise its enforcement or discretionary power. See Sunstein, *"Practically Binding": General Policy Statements and Notice-and-Comment Rulemaking*, 68 Admin L Rev 491, 502 (2016) (noting that, if agencies are required to comply with rulemaking procedures based on practical effect, "they will be encouraged to do one of two things: (1) maintain silence and hence fail to disclose relevant information to the public, perhaps by adopting enforcement practices that are never disclosed, or (2) issue a fuzzy policy statement, full of vagueness and qualifications"). This would ultimately harm the regulated public, as it would make it harder for them to plan their affairs accordingly.[46]

---

[46] See *Pacific Gas*, 164 US App DC at 379 ("In the absence of such a policy statement, the Commission could have proceeded on an ad hoc basis and tentatively approved curtailment plans filed under section 4 of the Act which the Commission found to be just and reasonable. In following such a course the only difference from the present situation would be that the Commission would be acting under a secret policy rather than under the publicized guidelines of Order No. 467."); Manning, *Nonlegislative Rules*, 72 Geo Wash L Rev 893, 914-915 (2004) ("Indeed, nonlegislative rules potentially allow agencies to supply often far-flung staffs with needed direction and, equally important, to give the public valuable notice of anticipated policies."); Asimow, *Guidance Documents in the States: Toward a Safe Harbor*, 54 Admin L Rev 631, 632 (2002) ("Guidance documents

Third, Justice VIVIANO says courts that have considered whether general permits are rules "have had little trouble concluding that general NPDES permits" are legislative rules, as if this Court's holding today is some type of aberration. Yet two of the decisions he cites are merely instances in which a court remarked in passing that NPDES general permits "are issued pursuant to administrative rulemaking procedures." See, e.g., *Natural Resources Defense Council v US Environmental Protection Agency*, 279 F3d 1180, 1183 (CA 9, 2002); *Alaska Community Action on Toxics v Aurora Energy Servs, LLC*, 765 F3d 1169, 1172 (CA 9, 2014) (" '[G]eneral permits are considered to be rulemakings . . . .' "), quoting EPA, *General Permit Program Guidance* (February 1988), p 21, available at <https://www3.epa.gov/npdes/pubs/owm0465.pdf> (accessed June 6, 2024) [https://perma.cc/6F66-CNQC]. Neither of these cases considered whether the EPA had rulemaking authority over the subject matter at issue or whether the general permits otherwise had the force and effect of law. The passing remarks in these cases appear to just be an acknowledgment that NPDES general permits are issued after notice-and-comment proceedings that track notice-and-comment rulemaking requirements under 5 USC 553 of the federal APA. See *Perez v Mtg Bankers Ass'n*, 575 US 92, 96; 135 S Ct 1199; 191 L Ed 2d 186 (2015) (describing federal APA notice-and-comment rulemaking procedures). Like EGLE, the EPA may issue NPDES permits only after giving public notice and an opportunity for public comment. See 33 USC 1342(j) (stating that "[a] copy of each permit application and each permit issued under [the NPDES permitting program]

---

of general applicability are enormously important to members of the public who seek to plan their affairs to stay out of trouble and minimize transaction costs.").

shall be available to the public"); 33 USC 1342(a)(1) (stating that the public must have an opportunity for a hearing before a permit application is finally approved).

The other decision he cites is *Nat'l Ass'n of Home Builders*, which comes a little closer to the mark but is clearly distinguishable from our case here. See *Nat'l Ass'n of Home Builders v US Army Corps of Engineers*, 368 US App DC 23; 417 F3d 1272 (2005). There, the United States Court of Appeals for the District of Columbia Circuit held that general permits issued by the Army Corps of Engineers to allow discharge of dredged or fill material were legislative rules under the federal APA.[47] *Id*. at 35-36. Those general permits were different from the general permits EGLE issues for CAFOs, however, because in most instances, the Army Corps of Engineers' general permits automatically gave parties the right to discharge dredged or fill material so long as they adhered to the conditions in the general permit. *Id*. at 26 ("If the proposed discharge activity is covered by a general permit, the party may proceed without obtaining an individual permit or, in some cases, even without giving the Corps notice of the discharge."), citing 33 CFR 330.1(e)(1) ("In most cases, permittees may proceed with activities authorized by

---

[47] It should also be highlighted that this holding is not unassailable. In fact, the federal APA seems to explicitly provide that, by definition, a general permit is not a rule. Section 551(6) of the federal APA makes clear that the categories of "rules" and "orders" are mutually exclusive, defining "order" as "a final disposition . . . of an agency in a matter other than rule making but including licensing[.]" 5 USC 551(6). The same section says that the final disposition of an agency in the process of "licensing" is an "order." Section 551(9) defines "licensing" as including the "agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license[.]" 5 USC 551(9). And § 551(8) defines "license" to "include[] . . . an agency permit . . . ." 5 USC 551(8). Altogether, the federal APA categorizes a permit as an order, which—by the federal APA's definition—is not a rule.

[nationwide general permits] without notifying the [district engineer].”); *New Hanover Twp v US Army Corps of Engineers*, 992 F2d 470, 471 (CA 3, 1993) (noting that a discharger may “simply operate under the [general] permit without informing the Corps in advance unless the [general] permit in question requires advance approval from the Corps”). By granting rights and imposing obligations, then, the general permits at issue in *Nat'l Ass'n of Home Builders* had the force and effect of law. As already discussed, general permits for CAFOs issued by EGLE do not and cannot automatically give CAFOs the right to discharge in accordance with the discretionary conditions in the general permit. A CAFO cannot just start discharging in accordance with those conditions. A CAFO must apply to EGLE for a certificate of coverage under the general permit, and even if the CAFO agrees to comply with the discretionary conditions in the general permit, EGLE is not bound to grant the CAFO the certificate of coverage.

## IV. CONCLUSION

Having reached the end of a lengthy discussion, we provide a recap of our holding today. If it is clear the Legislature has not delegated to an agency the power to make rules with respect to the subject matter a statement or policy of general applicability concerns, that statement or policy necessarily lacks the force and effect of law and so cannot be considered a “rule”—either valid or invalid—under the Michigan APA. See *Clonlara*, 442 Mich at 245-248; MCL 24.207(h) (providing that “[a] form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory” is not a “rule”). The statement, therefore, cannot alter rights, impose obligations, or have a present binding

effect on regulated entities, the agency, or the courts. It can be only (1) a statement explaining what the agency believes an ambiguous provision of a statute or agency rule means, i.e., an interpretive statement, or (2) a statement explaining what factors will be considered and what goals will be pursued when an agency exercises a discretionary power or conducts an adjudication.

Because it is beyond dispute that EGLE lacks the power to issue rules relating to NPDES permits issued to CAFOs, neither the general permit nor the discretionary conditions therein can have the force and effect of law, and so they cannot be "rules" as defined by the APA. They can be only a statement explaining how EGLE plans to exercise its discretionary permitting power or a statement explaining what conditions EGLE plans to prove are necessary to achieve applicable Part 4 water-quality standards or to comply with other applicable laws and regulations in adjudications involving a CAFO. That means several things. First, the general permit itself cannot automatically grant anything meeting the definition of a CAFO the right to discharge under the conditions in the general permit. Second, during the instant contested case, EGLE must sustain its burden of proving that the discretionary conditions in the 2020 general permit are in fact necessary to achieve Part 4 water-quality standards or to comply with other applicable laws and regulations. Third, new CAFOs or CAFOs with expiring permit coverage must be allowed to apply for an individual permit with different discretionary conditions or no discretionary conditions, and EGLE must genuinely evaluate whether any discretionary conditions in the general permit are necessary as applied to that CAFO. If EGLE denies the CAFO's application and the CAFO petitions for a contested case or later judicial review, EGLE must sustain its burden of proving that the discretionary conditions in the general permit are necessary.

Fourth, when a new CAFO or a CAFO with expiring permit coverage applies for a certificate of coverage under the general permit, EGLE must genuinely evaluate whether any discretionary conditions in the general permit are necessary as to the CAFO and must retain discretion to process the CAFO's application as an individual permit with different discretionary conditions or no discretionary conditions. And again, if a CAFO petitions for a contested case thereafter, EGLE must sustain its burden of proving that the discretionary conditions in the general permit are necessary.

At bottom, neither the general permit nor the discretionary conditions in it are "rules" under the APA, and so the Court of Claims correctly concluded that it lacked subject-matter jurisdiction under MCL 24.264 to hear plaintiffs' declaratory-judgment action challenging their validity. We affirm the judgment of the Court of Appeals but vacate its holding that the discretionary conditions in the general permit are rules. Given our disposition, we need not address whether a contested-case proceeding under MCL 324.3112(5) and MCL 24.271 to MCL 24.288 is "an exclusive procedure or remedy . . . provided by a statute governing the agency" under MCL 24.264.

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch (as to Parts I, II, III(A), III(B), and III(C)(1))
Kyra H. Bolden

54

MICHIGAN FARM BUREAU, et al.,

      Plaintiffs-Appellees/Cross-
      Appellants,

v                                         No. 165166

DEPARTMENT OF ENVIRONMENT,
GREAT LAKES, AND ENERGY,

      Defendant-Appellant/Cross-
      Appellee.

---

WELCH, J. (*concurring*).

I agree with Chief Justice CLEMENT's analysis in part and join Parts I, II, III(A), III(B), and III(C)(1), and I concur in the judgment. Plaintiffs' declaratory action cannot move forward. However, I believe it may be unnecessary to decide, at this time, whether the challenged conditions in the 2020 general permit can be considered "rules" under MCL 24.207 of the Administrative Procedures Act (the APA), MCL 24.201 *et seq*. Plaintiffs' lawsuit was filed under MCL 24.264, which authorizes an action for declaratory judgment challenging "the validity or applicability of a rule" as that term is defined by the APA. But MCL 24.264 is inapplicable if "an exclusive procedure or remedy is provided by a statute governing the agency . . . ." The Natural Resources and Environmental Protection Act (the NREPA), MCL 324.101 *et seq*., provides exclusive remedies and procedures for disputing defendant's exercise of its authority to issue National Pollutant Discharge Elimination System (NPDES) permits in two ways: (1) a contested case proceeding pursuant to MCL

324.3112 and MCL 324.3113, and (2) a petition for permit review pursuant to MCL 324.1315 and MCL 324.1317. Thus, whether the permit conditions are rules or not, any challenge to EGLE's actions under MCL 24.264 is prohibited given the exclusive remedies and procedures set forth by the NREPA.[1]

## I. RELEVANT FACTS

Plaintiffs challenge new conditions that defendant Department of Environment, Great Lakes, and Energy (EGLE) added to the 2020 general permit that is applicable to concentrated animal feeding operations (CAFOs). These new conditions were adopted after an extensive period of public participation. CAFOs in Michigan were faced with the choice of seeking coverage under the 2020 general permit or applying for an individual permit. Most CAFOs, including those who are parties to this case, sought coverage under

---

[1] Plaintiffs argue that the 2020 general permit conditions are "rules" under MCL 24.207 of the APA. However, the substance of plaintiffs' arguments seems to be that the new conditions either are not supported by the enabling statutes governing EGLE or are inconsistent with existing promulgated regulations. Under this Court's precedent, such an argument is better framed as a claim that the 2020 general permit conditions constitute an ultra vires action that improperly interprets and applies the NREPA or applicable regulations. Even if a contested provision is not a rule, the validity of an agency's interpretation can still be challenged in a legal proceeding when the interpretation is at issue. See *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 243; 501 NW2d 88 (1993) ("Clonlara and McConnell contend that the procedures go beyond the scope of the law and therefore are not interpretive statements under an exception set forth in [MCL 24.207(g), as amended by 1989 PA 288] of the APA. An interpretive statement that goes beyond the scope of the law may be challenged when it is in issue in a judicial proceeding. An interpretation not supported by the enabling act is an invalid interpretation, not a rule. Otherwise, 'wrong' interpretive statements might become rules with the force of law on the false premise that they were promulgated in accordance with the APA procedures. '[B]ecause a reviewing court disagrees with an agency interpretation does not render it legislative.' "), quoting *Wayne Twp Metro Sch Dist v Davila*, 969 F2d 485, 494 (CA 7, 1992) (second alteration by the *Clonlara* Court).

the 2020 general permit. At the same time, many of these same entities and individuals commenced a contested case proceeding under MCL 324.3112(5), challenging the validity and necessity of these new conditions. As noted in the majority opinion, that contested case proceeding has been stayed pending resolution of this lawsuit.

This lawsuit, commenced under MCL 24.264 in the Court of Claims, was filed by many of the same individuals and entities who sought coverage under the 2020 general permit and is separate from the contested case proceeding summarized in the prior paragraph. Plaintiffs' theory in this lawsuit is that the new conditions in the 2020 general permit constitute "rules" of general applicability under MCL 24.207 that needed to be formally promulgated and that, therefore, they can seek direct judicial review under MCL 24.264 without first exhausting administrative remedies.

The Court of Claims disagreed with plaintiffs, concluding that their failure to exhaust their administrative remedies deprived the court of subject matter jurisdiction under MCL 24.301, and the court dismissed their case. The Court of Claims also concluded that *Jones v Dep't of Corrections*, 185 Mich App 134, 138; 460 NW2d 575 (1990), precluded plaintiffs' action under MCL 24.264 for reasons aptly described by the majority. The Court of Appeals, while technically affirming the Court of Claims, agreed with plaintiffs' theory that the challenged conditions constituted rules that needed to be promulgated through the formal rulemaking process and thus noted that a declaratory action under MCL 24.264 could be refiled after certain pre-suit statutory requirements had been satisfied. *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 343 Mich App 293, 296, 314-318; 997 NW2d 467 (2022). The Court of Appeals held that MCL 24.264 "does not impose further administrative-remedy-exhaustion requirements,"

3

*id.* at 314, beyond the requirement that a party "first request[] the agency for a declaratory ruling and the agency has denied the request or failed to act upon it expeditiously," MCL 24.264.

This Court granted leave to appeal and requested briefing on the question decided by the Court of Appeals, but we also asked whether an exception built into MCL 24.264— "an exclusive procedure or remedy [that] is provided by a statute governing the agency"— precluded this case from moving forward. Although the majority does not address this alternative pathway, I write to explain why I believe it offers an equally satisfactory means of resolving the present dispute without deciding the "rule" question.

## II. EXCLUSIVITY OF A PROCEDURE OR REMEDY

MCL 24.264 provides that:

> *Unless an exclusive procedure or remedy is provided by a statute governing the agency, the validity or applicability of a rule*, including the failure of an agency to accurately assess the impact of the rule on businesses, including small businesses, in its regulatory impact statement, *may be determined in an action for declaratory judgment* if the court finds that the rule or its threatened application interferes with or impairs, or imminently threatens to interfere with or impair, the legal rights or privileges of the plaintiff. . . . This section shall not be construed to prohibit the determination of the validity or applicability of the rule in any other action or proceeding in which its invalidity or inapplicability is asserted. [Emphasis added.]

The plain language of MCL 24.264 contemplates a difference between an *exclusive* remedy or procedure concerning the validity or applicability of a "rule" and the *availability* of other remedies or procedures in which the validity or applicability of a "rule" could be challenged. Whether a statutory remedy or procedure has been made exclusive is a question of statutory interpretation. A remedy or procedure is most often made exclusive

4

through explicit statutory mandate. However, the exclusivity of a statutory remedy or procedure can also be inferred from the context and purpose of the overall legislative scheme.

This Court has never interpreted the "exclusive procedure or remedy" language in MCL 24.264, but the Court of Appeals did in *Slis v Michigan*, 332 Mich App 312; 956 NW2d 569 (2020). The issue in *Slis* was whether the plaintiffs could successfully pursue an action for declaratory judgment under MCL 24.264 to challenge the validity or applicability of *emergency rules* prohibiting the sale of flavored nicotine vapor products that had been *promulgated* by the Department of Health and Human Services (DHHS) under MCL 24.248. *Id*. at 318, 340-342. *Slis* held that the declaratory action could proceed because there was "no exclusive procedure or remedy provided in a different statute governing the DHHS with respect to challenging the validity of a[n] [emergency] rule promulgated by the DHHS." *Id*. at 341. The panel further opined:

> We reject any contention that MCL 24.248—the statute authorizing the promulgation of an emergency rule—provides "an exclusive procedure or remedy" as that phrase is used in MCL 24.264. The "exclusive procedure or remedy" language of MCL 24.264 plainly and unambiguously pertains to a procedure or remedy related to challenging the validity of a rule, not just any procedure or remedy. Although MCL 24.248 sets forth the *exclusive procedure* to promulgate an emergency rule, it has no language with regard to allowing or disallowing the challenge of an emergency rule. [*Id*.]

The Court also noted that MCL 24.248 was not a statute specifically governing DHHS; this also weighed against it providing an exclusive remedy or procedure for purposes of MCL 24.264. *Id*. at 341-342.

This Court has discussed exclusivity requirements in other contexts. These include disputes over which court or tribunal has jurisdiction, as well as disputes concerning the

5

exclusivity or exhaustion of administrative remedies. In the context of exhaustion of administrative remedies, the Court has held that " 'no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' " *Holman v Indus Stamping & Mfg Co*, 344 Mich 235, 260; 74 NW2d 322 (1955), quoting *Myers v Bethlehem Shipbuilding Corp*, 303 US 41, 50-51; 58 S Ct 459; 82 L Ed 638 (1938). Administrative law principles also "dictate[] that courts move very cautiously when called upon to interfere with the assumption of jurisdiction by an administrative agency." *Judges of 74th Judicial Dist v Bay Co*, 385 Mich 710, 727; 190 NW2d 219 (1971). From this, and other considerations, "emanates the doctrine of exhaustion, by which the courts have declined to act in contravention of administrative agencies where the remedies available through administrative channels have not been pursued to completion." *Id*. at 728.

Michigan's general rule of exhausting administrative remedies is premised on the idea that "where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive." *Pompey v Gen Motors Corp*, 385 Mich 537, 552; 189 NW2d 243 (1971). See also *Monroe Beverage Co, Inc v Stroh Brewery Co*, 454 Mich 41, 45; 559 NW2d 297 (1997) (making the same point and holding that former MCL 436.30b(28) of the Liquor Control Act provided the exclusive remedy for a wholesaler against a supplier where there was no contractual agreement between the two as required by § 30b(28) to authorize a lawsuit for damages).

Whether a statutory remedy or procedure is exclusive requires consideration of both statutory text and the context in which a remedy or procedure exists. Sometimes the

6

Legislature is clear when providing for exclusive remedies, such as with the Worker's Disability Compensation Act, MCL 418.101 *et seq.* See MCL 418.131(1) ("The right to the recovery of benefits as provided in this act *shall be the employee's exclusive remedy* against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort.") (emphasis added). There are also some environmental permitting statutes that use explicit language when describing whether judicial review is permitted following a contested case proceeding. See MCL 324.5506(14) (stating that following an administrative decision to grant or deny a permit to operate or install equipment that releases toxic fumes into the air, "[a] *petition for judicial review is the exclusive means* of obtaining judicial review of a permit and shall be filed within 90 days after the final permit action") (emphasis added). Explicit statutory language is the simplest way for the Legislature to convey its intent for an exclusive remedy or procedure.

This Court has also inferred exclusive remedies from less explicit statutory text. For example, in *Pompey*, 385 Mich at 552-553, this Court acknowledged that

> where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive. Correlatively, a statutory remedy for enforcement of a common-law right is deemed only cumulative. [Citations omitted.]

*Pompey* noted "two important qualifications" to this rule of exclusivity: (1) where the statutory "remedy is plainly inadequate," and (2) where "contrary [legislative] intent clearly appears." *Id*. at 553 n 14. As a result, in an action concerning statutory civil rights claims, the Court rejected an argument that the Michigan Civil Rights Commission had

7

exclusive jurisdiction over those claims because "the judicial remedies provision in [Const 1963, art 5, § 29] clearly intended no *displacement* of judicial remedies . . . ." *Pompey*, 385 Mich at 559. But statutory remedies enacted for the enforcement of purely statutory rights are generally considered exclusive so long as the remedy is adequate and the Legislature has not clearly demonstrated a contrary intention. See *id*. at 552-553 & n 14; *Int'l Brotherhood of Electrical Workers, Local Union No 58 v McNulty*, 214 Mich App 437, 445; 543 NW2d 25 (1995) ("As a general rule, the remedies provided by statute for violation of a right having no common-law counterpart are exclusive. However, an exception to this general rule provides that if the statutory remedy is plainly inadequate, a private cause of action can be inferred.") (citation omitted). This Court reaffirmed this principle of exclusivity with exceptions this term. See *Stegall v Resource Technology Corp*, ___ Mich ___, ___; ___ NW2d ___ (2024) (Docket No. 165450); slip op at 14 ("Accordingly, we take this opportunity to reaffirm the aforementioned caselaw and hold that the 'plainly inadequate' qualifier is consistent with Michigan jurisprudence and that courts must therefore conduct an inquiry into the adequacy of the remedy when addressing whether statutory remedies are exclusive or cumulative. Furthermore, we disavow *Lash* [*v Traverse City*, 479 Mich 180; 735 NW2d 628 (2007),] to the extent that it disavows *Pompey*'s adequacy analysis as dictum.").[2]

---

[2] For the purpose of resolving the appeal in *Stegall*, the Court also assumed but did not decide that both the federal and Michigan Occupational Safety and Health Acts created a new right or imposed a new duty not previously recognized under the common law while noting conflicts in existing caselaw on this point. *Stegall*, ___ Mich at ___ n 5; slip op at 11 n 5.

8

Conversely, in *Lamphere Sch v Lamphere Federation of Teachers*, 400 Mich 104; 252 NW2d 818 (1977), the Court examined the exclusivity of remedies for an illegal teachers' strike as set forth in MCL 423.206, as amended by 1965 PA 379, of the public employment relations act (PERA), MCL 423.201 *et seq*. The law provided:

> "*Notwithstanding the provisions of any other law, any person holding such a position who, by concerted action with others*, and without the lawful approval of his superior, wilfully [sic] absents himself from his position, or abstains in whole or in part from the full, faithful and proper performance of his duties for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment shall be deemed to be on strike but the person, upon request, shall be entitled to a determination as to whether he did violate the provisions of this act." [The remainder of the provision describes the procedure and timeline for filing such a request as well as provides the right of judicial review in circuit court.] [*Lamphere Sch*, 400 Mich at 112, quoting MCL 423.206, as amended by 1965 PA 379.]

MCL 423.206, as amended by 1965 PA 379, provided detailed procedures for invoking the statute and explicitly provided for judicial review in the circuit court of a final agency decision finding a violation of law and imposing discipline. *Lamphere Sch*, 400 Mich at 112. While the language of Section 6 of PERA (MCL 423.206, as amended by 1965 PA 379), did not explicitly state that PERA was a striking teacher's exclusive avenue for relief, the Court held that

> when we review the extensive enforcement procedures regarding illegal teachers' strikes as outlined in Section 6 of the PERA, we find that the act's careful wording does indeed provide for exclusive, after-the-fact statutory remedies as to both teachers *and* their federations for participation in such strikes[.]

> \* \* \*

> It becomes evident that the full Court [in *Rockwell v Crestwood Sch Dist Bd of Ed*, 293 Mich 616; 227 NW2d 736 (1975),] recognized that a unitary procedure for the discipline of public employees who strike would be

9

salutary and was intended by legislative enactment. Although a difference of interpretation existed in [*Rockwell*] regarding the priority of two conflicting statutes, the underlying intention of the Legislature to create exclusive remedies by statute is made apparent.

> Equitable relief, of course, always remains available via injunction. See the PERA § 16(h) and *Holland School District v Holland Education Association*, 380 Mich 314; 157 NW2d 206 (1968). But the foregoing emphasized language of § 6 of the PERA reflects legislative intent that the statutorily permitted discipline-discharge should be the unitary and exclusive remedies available to public employers in dealing with illegal strikes by public employees in violation of the PERA's [MCL 423.202, as enacted by 1947 PA 336] strike prohibition. [*Lamphere Sch*, 400 Mich at 111-112, 113-114.]

Statutory remedies or procedures for review of administrative decisions have also been deemed exclusive even when a statute contains arguably permissive statutory language. Courts have held that the permissive language does not open the door to further remedies when an explicit pathway for administrative or judicial review has been provided. For example, the Court of Appeals has long recognized that an administrative complaint procedure is the exclusive remedy for bringing statutory claims under the wage and fringe benefits act, MCL 408.471 *et seq*., even though MCL 408.481(1) states that an "employee who believes that his or her employer has violated [the] act *may* file a written complaint with the department . . . ." (Emphasis added.) See also *Cork v Applebee's of Mich, Inc*, 239 Mich App 311, 317-319; 608 NW2d 62 (2000) (holding that the wage and fringe benefits act "provides the exclusive remedy for that alleged violation" of statutory rights and that this remedy was cumulative as to the enforcement of common-law rights). The same conclusion has been reached in the context of contesting adverse zoning decisions. See *Krohn v Saginaw*, 175 Mich App 193, 195; 437 NW2d 260 (1989) (holding that an appeal was the exclusive means of contesting a zoning board decision where former MCL

125.585(11), as amended by 1986 PA 191, stated that a "person . . . affected by the zoning ordinance *may* appeal to the circuit court") (emphasis added).

### III. MICHIGAN'S NPDES PERMITTING PROGRAM

Parts I(A) to I(C) of the majority opinion provide a comprehensive explanation of the relevant NPDES permit conditions and the individual and general permitting process. For purposes of my opinion, it is important to recognize that most of the permitting process for both individual and general NPDES permits, including seeking a certificate of coverage under a general permit, is governed by promulgated administrative rules. Nobody disputes this. Nor does anyone dispute that the rights and duties created by the NPDES program are purely statutory and regulatory in nature.

The new conditions required by the 2020 general permit that are at issue in this case have not been promulgated as administrative rules at the federal or state level. Plaintiffs claim that EGLE was required to promulgate them through the rulemaking process. The exception to the ability to seek a declaratory action under MCL 24.264 is triggered only by exclusive remedies or procedures found in a "statute governing the agency." It is therefore important to consider the NREPA—a key enabling statute for EGLE—and the remedies and procedures it provides for challenging agency actions and decisions during the NPDES permitting process.

Under the Clean Water Act, 33 USC 1251 *et seq*., no person or entity subject to the act is allowed to discharge pollutants into navigable waters of the United States without first obtaining a permit authorizing the discharge. Michigan law provides for the same prohibition at a state level. See MCL 324.3112(1) ("A person shall not discharge any waste

11

or waste effluent into the waters of this state unless the person is in possession of a valid permit from [EGLE].").  The federal government has delegated to Michigan the power to exercise NPDES permitting authority that would normally be exercised by the Environmental Protection Agency, and Michigan has delegated that authority to EGLE. See 33 USC 1342; MCL 324.3101 *et seq*.; *Sierra Club Mackinac Chapter v Dep't of Environmental Quality*, 277 Mich App 531, 535-536; 747 NW2d 321 (2008).  In Michigan, the NPDES permitting program is governed by Part 31 of the NREPA, MCL 324.3101 *et seq*.  As the majority acknowledges, much of the agency's NPDES permitting program was created by promulgated administrative rules—EGLE's Part 21 rules—but the entire program is subject to and derived from Part 31 of the NREPA.  See Mich Admin Code, R 323.2101 *et seq*.

The NPDES permitting program covers CAFOs because such operations are a point source of water pollution.  As the majority explains, NPDES permits must include conditions designed to restrict the quantity or condition of pollutants that are discharged while keeping in mind target water quality standards.  See, e.g., 33 USC 1342(a)(2). Moreover, as the majority and dissent both acknowledge, the conditions at issue here are technically a part of the "comprehensive nutrient management plan" (CNMP) that is required by both state and federal regulations for CAFOs, and the CNMP is incorporated as part of an NPDES permit obtained by a CAFO.  See *Sierra Club Mackinac Chapter*, 277 Mich App at 552-553; Mich Admin Code, R 323.2196(1)(b); 40 CFR 122.42(e) (2023). Some mandatory conditions or practices that must be included in all NPDES permits issued to CAFOs were promulgated by the federal government, see 40 CFR 122.41 (2023); 40 CFR 122.42(e) (2023); 40 CFR 412.4(c) (2023).  The federal requirements were then

12

incorporated by reference into Michigan's regulations through Mich Admin Code, R 323.2189(2)(m). In 2006, EGLE also promulgated certain practices and conditions that exceed the federal requirements. See Mich Admin Code, R 323.2196(5).[3]

The Clean Water Act also requires public notice and an opportunity for a hearing before an NPDES permit is issued. See *Sierra Club Mackinac Chapter*, 277 Mich App at 553-554. The permitting process that EGLE has established through its promulgated rules reflects this and requires a period of public notice, comment, and agency review, as well as an opportunity to request a public hearing, on an NPDES permit—whether general or individual—before it is issued. See Mich Admin Code, R 323.2117; R 323.2118; R 323.2119; R 323.2191(2); R 323.2130(1) and (2).

For both general and individual NPDES permits, EGLE is required to make a final determination as to whether to issue a permit or, for CAFOs seeking coverage under a

---

[3] Both federal and state law also require EGLE to impose stricter conditions or practices than what is provided for by formal regulations and rules if necessary to achieve applicable water quality standards. See 40 CFR 122.44(d)(1); Mich Admin Code, R 323.2189(2)(h); MCL 324.3113(2); MCL 324.3106. But as of December 31, 2006, the Legislature had rescinded the agency's rulemaking authority under Part 31 of the NREPA "except for rules authorized under [MCL 324.3112(6)]" and "as may be necessary to comply with the federal water pollution control act, 33 USC 1251 to 1387." MCL 324.3103(2) and (3). Neither of these provisions grants EGLE authority to promulgate rules regulating CAFOs under Part 31 of the NREPA. The rulemaking authority related to MCL 324.3112(6) concerns oceangoing vessels engaging in port operations in Michigan that are required to obtain a permit under Part 31 of the NREPA to prevent discharge of aquatic nuisance species. When the Legislature amended MCL 324.3103(2) in 2004 PA 91 to say, "notwithstanding any rule-promulgation authority that is provided in [Part 31], . . . [EGLE] shall not promulgate any additional rules under this part after December 31, 2006," it negated EGLE's rulemaking authority under MCL 324.3103(3) after December 31, 2006. The Legislature has introduced bills that, if adopted, would repeal much of MCL 324.3103(2) and fully restore EGLE's rulemaking authority under Part 31 of the NREPA. See, e.g., 2023 SB 663; 2024 HB 5614.

general permit, a certification of coverage. Mich Admin Code, R 323.2133(1) and (2); Mich Admin Code, R 323.2191(2). For a permit to discharge waste under MCL 324.3112(1), EGLE must "condition the continued validity of a permit upon the permittee's meeting the effluent requirements that [EGLE] considers necessary to prevent unlawful pollution by the dates that [EGLE] considers to be reasonable and necessary and to ensure compliance with applicable federal law." MCL 324.3112(3). For a permit regarding new or increased use of waters for waste or sewage disposal under MCL 324.3113, EGLE is required to "condition the permit upon such restrictions as [EGLE] considers necessary to adequately guard against unlawful uses of the waters of the state as are set forth in [MCL 324.3109]." MCL 324.3113(2).

A person dissatisfied with a final agency decision to issue or deny a permit[4] has the right to petition EGLE to challenge the decision in a contested case hearing conducted

---

[4] MCL 324.1301(g) states that for purposes of MCL 324.1313 to MCL 324.1317—the provisions in Part 31 of the NREPA concerning contested case proceedings and review by the environmental permit review commission—the term "permit" means

> any permit or operating license that meets both of the following conditions:
>
> > (*i*) The applicant for the permit or operating license is not this state or a political subdivision of this state.
>
> > (*ii*) The permit or operating license is issued by the department of environmental quality under this act or the rules promulgated under this act.

14

pursuant to the APA. See MCL 324.3112(5);[5] MCL 324.3113(3).[6] "In a contested case regarding a permit, an administrative law judge shall preside, make the final decision, and issue the final decision and order for the department." MCL 324.1317(1). Administrative rules remove any doubt that proceedings regarding a CAFO applicant's request for coverage under a general permit or an assertion that coverage under an individual permit is more appropriate must occur after the issuance of the general permit. But the decision to allow or deny coverage under the general permit itself is subject to a contested case review process in accordance with MCL 324.3113.[7] See Mich Admin Code, R

---

[5] "A person who is aggrieved by an *order of abatement* of [EGLE] or *by the reissuance, modification, suspension, or revocation of an existing permit* of [EGLE] executed pursuant to this section may file a sworn *petition with [EGLE] setting forth the grounds and reasons for the complaint and requesting a contested case hearing on the matter pursuant to the [APA], MCL 24.201 to 24.328*. A petition filed more than 60 days after action on the order or permit may be rejected by [EGLE] as being untimely." MCL 324.3112(5) (emphasis added).

[6] "If the permit or denial of a new or increased use is not acceptable to the permittee, *the applicant, or any other person, the permittee, the applicant, or other person may file a sworn petition with [EGLE] setting forth the grounds and reasons for the complaint and asking for a contested case hearing on the matter pursuant to the [APA], MCL 24.201 to 24.328*. A petition filed more than 60 days after action on the permit application may be rejected by [EGLE] as being untimely." MCL 324.3113(3) (emphasis added).

[7] Additionally, the 2020 general permit states the following on page two:

**CONTESTED CASE INFORMATION**

Any person who is aggrieved by this permit may file a sworn petition with the Michigan Administrative Hearing System within the Michigan Department of Licensing and Regulatory Affairs, c/o the Michigan Department of Environment, Great Lakes, and Energy, setting forth the conditions of the permit which are being challenged and specifying the grounds for the challenge. The Department of Licensing and Regulatory Affairs may reject any petition filed more than 60 days after issuance as being untimely. [*EGLE, National Pollutant Discharge Elimination System Wastewater Discharge General Permit: Concentrated*

15

323.2192(c).[8]  At all relevant times, the statutes also provided that the results of a contested case proceeding could be reviewed and modified by Michigan's environmental permit review commission and were also subject to judicial review, regardless of whether the commission is petitioned to intervene.  See MCL 324.1317(4) and (7);[9] MCL 324.3112(5); MCL 324.3113(3).

The Legislature has granted parties like CAFOs an entirely separate right to seek review by the environmental permit review commission[10] "before the permit has been approved or denied."  MCL 324.1315(1).  Such proceedings are separate and distinct from

_____

*Animal Feeding Operations*, Permit No. MIG010000 (issued March 27, 2020), p 2, available at <https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/WRD/CAFO/MIG010000-General-Permit-2025.pdf?rev=a4d602d0165c41e096854abe036058f9> (accessed June 6, 2024) [https://perma.cc/6YEW-WSX6].]

[8] "[EGLE] shall promptly report to [EGLE] each person having a discharge for which coverage by general permit has been initiated pursuant to the provisions of subdivision (b) of this rule.  A person who is aggrieved by the coverage may file a sworn petition for a contested case hearing on the matter with [EGLE] in accordance with the provisions of section 3113 of part 31 of the act.  A petition that is filed more than 60 days after coverage by the general permit is reported to [EGLE] may be rejected by [EGLE] as being untimely." Mich Admin Code, R 323.2192(c).

[9] "An environmental permit panel may adopt, remand, modify, or reverse, in whole or in part, a final decision and order described in [MCL 324.1317(1)].  The panel shall issue an opinion that becomes the final decision of [EGLE] and is subject to judicial review as provided under the [APA], MCL 24.201 to 24.328, and other applicable law."  MCL 324.1317(4).  Additionally, "[i]f no party timely appeals a final decision and order described in [MCL 324.1317(1)] to an environmental permit panel, the final decision and order is the final agency action for purposes of any applicable judicial review."  MCL 324.1317(7).

[10] The Legislature has introduced bills that, if adopted, would amend the NREPA and repeal the section that created the environmental permit review commission and the environmental science advisory board.  See 2023 SB 393; 2023 SB 394.

16

the contested case proceedings following a final permitting decision, as I have previously described. The director of EGLE has the discretion to attempt to resolve such petitions directly through negotiation, MCL 324.1315(1), but if this does not occur, the matter must be submitted to the environmental permit review commission to make a formal recommendation to the director of whether to approve or deny the permit, MCL 324.1315(1), (2), and (4) to (6). Although the director's decision on a recommendation from the commission is not immediately reviewable, it "may be included in an appeal to a final permit action." MCL 324.1315(6). If the director's decision is not appealed to the environmental permit review commission, EGLE's decision "regarding the approval or denial of a permit is [a] final permit action for purposes of any judicial review or other review allowed under" the NREPA, MCL 24.201 to MCL 24.328 (the second and third chapters of the APA), and MCL 600.631 (appeals of agency decisions to a circuit court). MCL 324.1315(6).

## IV. APPLICATION

The preceding discussion demonstrates that the Legislature has adopted by statute extensive and *exclusive* procedures and remedies for parties interested in challenging EGLE's exercise of NPDES permitting authority at every step of the process. As previously noted, it is undisputed that the rights, duties, and obligations associated with the NPDES program are purely statutory and regulatory in nature. There is no indication in Part 31 of the NREPA that the Legislature intended these extensive procedures to exempt the agency's NPDES permitting program or allow for direct litigation against EGLE for exercising its permitting power as a bypass to the administrative review process.

17

Accordingly, the presumption under Michigan law is that the statutory processes and procedures acknowledged by the NREPA are exclusive as to the enforcement of purely statutory and regulatory rights. See *Stegall*, ___ Mich at ___; slip op at 11-14; *Pompey*, 385 Mich at 553; *Monroe Beverage Co*, 454 Mich at 45; *Lamphere Sch*, 400 Mich at 111-112, 113-114. And, consistent with this, EGLE has adopted administrative rules for contested case proceedings specific to the NPDES general permitting program. See Mich Admin Code, R 323.2192(c), citing MCL 324.3113.

CAFOs have multiple avenues to challenge an EGLE decision to deny or approve coverage under a general permit beyond the initial notice-and-comment-like proceedings that are mandated before a general permit is issued.[11] They can use the contested case proceeding process. See MCL 324.3112; MCL 324.3113. Or they can seek an additional internal review of a decision by the environmental permit review commission. MCL 324.1317. The outcomes of both avenues are subject to judicial review. See MCL 324.3112(5); MCL 324.3113(3); MCL 324.1315(6); MCL 324.1317(4) and (7). And both avenues provide the exclusive remedy for NPDES general permit applicants, just as they do for those seeking individual NPDES permits.

While Part 31 of the NREPA does not explicitly refer to remedies or procedures as exclusive when discussing review through the contested case process or review by the environmental permit review commission, as noted earlier, this is not dispositive. A statutory remedy or process can still be exclusive even if the statute fails to explicitly state that it is the only avenue for relief. See MCL 324.3112(5); MCL 324.3113(3); MCL

---

[11] EGLE has imposed on itself a fixed five-year term for general permits. See Mich Admin Code, R 323.2150.

324.1315(1); MCL 324.1317. Each of these statutes uses terminology such as "may seek review," and this makes sense given the context. Each of these provisions states that a permit applicant or aggrieved party has the right or option to seek review of an administrative decision through the agency and then later in court. It would make little sense for such a statute to say that a permit applicant or aggrieved party "shall seek review" because that would imply that the party is *obligated to file the petition or appeal*.

As in *Pompey*, determining whether the statutory remedies or procedures laid out by Part 31 of the NREPA are exclusive requires a more nuanced and contextual approach. In the zoning context, it is well accepted that if local zoning ordinances provide an administrative method to seek review of an adverse decision, then that method must be used. See *Cummins v Robinson Twp*, 283 Mich App 677, 690-691; 770 NW2d 421 (2009); *Carleton Sportsman's Club v Exeter Twp*, 217 Mich App 195, 200; 550 NW2d 867 (1996). Zoning statutes that say a person "may" appeal an adverse zoning decision to the circuit court have consistently been read as making such an appeal the exclusive mechanism for bringing the dispute before the judiciary. See *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 99-100; 693 NW2d 170 (2005) (discussing former MCL 125.293a(1), as enacted by 1978 PA 637, which stated that "a person having an interest affected by the zoning ordinance may appeal to the circuit court"); *Krohn*, 175 Mich App at 195. This requirement has generally been referred to as part of the requirement to exhaust administrative remedies.[12] See *Cummins*, 283 Mich App at 691; see also *Cork*, 239 Mich App at 317-319

---

[12] Notably, the current Michigan Zoning Enabling Act, MCL 125.3101 *et seq*., also uses permissive language when describing the ability to appeal a zoning board of appeals decision to the circuit court, even though that is the exclusive means (with some exceptions for constitutional claims and legislative rezoning decisions) of seeking review of a zoning

(holding that the wage and fringe benefits act provides the exclusive process even though MCL 408.481(1) states that the employee "may file" a complaint with the agency).

When the relevant aspects of Part 31 of the NREPA are read in a holistic and contextual manner, it is clear that the Legislature intended all challenges to EGLE's exercise of NPDES permitting authority to be funneled through one of its established administrative pathways *before* the right to seek judicial review ripens.[13]

These pre-judicial review pathways include seeking review before an environmental permit review commission and seeking review by an administrative law judge in a contested case. In each of these administrative proceedings, the permittee can argue that aspects of the 2020 general permit are inapplicable or legally invalid for various reasons. This would include arguments that the newly imposed conditions on the 2020 general permit exceed EGLE's statutory or regulatory authority absent new formal rulemaking or that they are inconsistent with the NREPA or existing regulations. This is unlike the statutory scheme at issue in *Stegall*, ___ Mich at ___; slip op at 16-18, where the Legislature delegated to the agency significant discretion to decide whether to process a complaint that had been filed with the agency. That discretion was relevant to this Court's

---

board of appeals decision. See MCL 125.3605 ("The decision of the zoning board of appeals shall be final. A party aggrieved by the decision may appeal to the circuit court . . . ."); MCL 125.3606(1) ("Any party aggrieved by a decision of the zoning board of appeals may appeal to the circuit court . . . .").

[13] As already noted, the exclusivity of the process or right is often determined from the context in which the process or right is described in the relevant statute. See *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 367-368; 917 NW2d 603 (2018) ("[W]e do not read statutory language in isolation and must construe its meaning in light of the context of its use.").

20

decision in *Stegall* holding that the statutory remedies were inadequate and thus nonexclusive. *Id*. Part 31 of the NREPA also grants EGLE no discretion to refuse to process and adjudicate a timely petition for a contested case or petition for review by the environmental permit review commission concerning the agency's NPDES permitting authority. The outcomes of such administrative proceedings are then subject to judicial review as to whether EGLE exceeded its statutory and regulatory authority.

It would be illogical for the Legislature to create under Part 31 such a comprehensive process of administrative review that follows a period of public notice and opportunity for a hearing before a general NPDES permit can even be adopted if regulated entities were not required to use the administrative process. Moreover, EGLE has presented compelling arguments that it would be difficult to determine whether EGLE has, in fact, exceeded its legal authority absent the fact-intensive process provided for in a contested case. Because EGLE has express legal authority to impose conditions in NPDES permits necessary to achieve water quality standards, regardless of whether those conditions exceed existing regulations, each dispute is fact-specific. See 33 USC 1311(b)(1)(C); 40 CFR 122.44 (2023); MCL 324.3112(3); MCL 324.3113(2). See also MCL 324.1307(5) ("Approval of an application for a permit may be granted with conditions or modifications necessary to achieve compliance with the part or parts of this act under which the permit is issued.").

As this Court concluded in *Lamphere Sch*, 400 Mich at 112, it is clear to me that the Legislature intended a contested case proceeding under MCL 324.3112 and MCL 324.3113 and petition for permit review under MCL 324.1315 and MCL 324.1317 to be the exclusive procedures or remedies for challenging EGLE's exercise of permitting authority under Part 31 of the NREPA. It is undisputed that the NREPA is a statute governing EGLE, and Part

21

31 is the source of EGLE's permitting authority under the NPDES program. Accordingly, even if I were to agree with Justice VIVIANO that the challenged conditions of the 2020 NPDES permit were "rules" for purposes of the APA, I would conclude that these statutory procedures and remedies represent the "exclusive procedure or remedy . . . provided by a statute governing the agency" for challenging the "validity or applicability" of those conditions. MCL 24.264; see *Slis*, 332 Mich App at 341 (holding that a remedy or procedure must allow for a challenge to the validity or applicability of a "rule" to invoke the exception to MCL 24.264's applicability).[14]

---

[14] While not necessary to the resolution of this case, I note a significant point of potential confusion contained within the APA. The APA definition of a "rule," MCL 24.207, does not expressly exclude things or actions that constitute a "license" or "licensing," MCL 24.205(a) and (b), under the APA. A "license" is "the whole or part *of* an agency permit, certificate, approval, . . . or similar form of permission required by law." MCL 24.205(a) (emphasis added). " 'Licensing' includes agency activity involving the grant, denial, renewal, suspension, . . . or amendment of a license." MCL 24.205(b). The APA provides that "[w]hen licensing is required to be preceded by notice and an opportunity for hearing, the provisions of [the APA] governing a contested case apply." MCL 24.291(1). Once a party has "exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, . . . the decision or order is subject to direct review by the courts as provided by law." MCL 24.301. Thus, the APA explicitly provides for contested case review of administrative decisions as to licenses and licensing. But the APA does not explicitly prohibit parties from filing an action under MCL 24.264 to argue that a licensing decision constitutes improper rulemaking. This is a potential source of confusion that the Legislature might wish to address.

Take, for example, the facts of this case. The NPDES permitting process, as set forth in Part 31 of the NREPA and EGLE's Part 21 rules, includes a requirement of notice and an opportunity for a hearing. An NPDES permit therefore seems to fit the definition of a license, and the process of issuing a permit or certificate of coverage would thus be licensing. Under MCL 24.291(1), one could easily assume that only the APA's contested case provision is applicable to the dispute because it involves a license and the licensing process. But as this litigation demonstrates, it is far from clear to litigants and the judiciary whether a challenge to a license or licensing process that allegedly crosses into the realm of rulemaking requires a different pathway under MCL 24.264.

22

## V. CONCLUSION

I agree with the majority that under *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 243, 245-248; 501 NW2d 88 (1993), the challenged conditions in the 2020 general permit cannot be considered "rules" because in 2020 EGLE lacked delegated rulemaking authority as to its NPDES program for CAFOs and thus the conditions, on their own, cannot have the force and effect of law. However, I would have preferred to avoid resolving this question until the now-stayed administrative proceedings concerning the same legal controversy had concluded. Instead, I believe the preferrable resolution would have been to recognize that the Legislature created a comprehensive and exclusive system of procedures and remedies for challenging EGLE's exercise of permitting authority under Part 31 of the NREPA. Because declaratory actions under MCL 24.264 are precluded if there is an exclusive remedy provided by a statute that governs EGLE, I would hold that this alone precluded plaintiffs' current action.

Elizabeth M. Welch

23

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

MICHIGAN FARM BUREAU, et al.,

        Plaintiffs-Appellees/Cross-
        Appellants,

v                                                                       No. 165166

DEPARTMENT OF ENVIRONMENT,
GREAT LAKES, AND ENERGY,

        Defendant-Appellant/Cross-
        Appellee.

---

VIVIANO, J. (*dissenting*).

The majority incorrectly holds that the conditions in the 2020 National Pollutant Discharge Elimination System general permit (2020 GP)[1] governing discharges from concentrated animal feeding operations (CAFOs) issued by the Michigan Department of Environment, Great Lakes, and Energy (EGLE) are not "rules" that must be promulgated in conformity with the Administrative Procedures Act (the APA), MCL 24.201 *et seq*., and that since they are not rules, plaintiffs cannot challenge the validity of the general permit

---

[1] Michigan Department of Environment, Great Lakes, and Energy, *National Pollutant Discharge Elimination System Wastewater Discharge General Permit: Concentrated Animal Feeding Operations*, Permit No. MIG010000 (issued March 27, 2020), p 1, available at <https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/WRD/CAFO/MIG010000-General-Permit-2025.pdf?rev=a4d602d0165c41e096854abe036058f9> (accessed June 6, 2024) [https://perma.cc/6YEW-WSX6].

conditions in a declaratory-judgment action under MCL 24.264. I disagree with both conclusions and respectfully dissent for the reasons set forth in this opinion.

## I. BACKGROUND

Under the federal Clean Water Act (the CWA), 33 USC 1251 *et seq*., a CAFO may not discharge any pollutants into navigable waters unless it has obtained a permit from EGLE.[2] Those permits are governed by Part 31 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. EGLE's authority to promulgate rules under Part 31 of NREPA was circumscribed by 2004 PA 91. See MCL 324.3103(2) ("[N]otwithstanding any rule-promulgation authority that is provided in this part, except for rules authorized under [MCL 324.3112(6)], the department shall not promulgate any additional rules under this part after December 31, 2006.").[3] Perhaps in anticipation of the rule moratorium, in 2005, EGLE's predecessor promulgated a rule

---

[2] As the majority notes, the Environmental Protection Agency (EPA) has approved EGLE as a permitting authority for purposes of issuing permits under § 402 of the Clean Water Act, 33 USC 1342, which are the permits at issue in this case. These permits are also known as National Pollutant Discharge Elimination System or NPDES permits. See *Nat'l Mining Ass'n v McCarthy*, 411 US App DC 52, 56; 758 F3d 243 (2014).

[3] The majority concludes that, because of this provision, EGLE does not have authority to "make rules concerning NPDES permits issued to CAFOs." *Ante* at 30 (opinion of the Court). I clarify that, while the majority notes that EGLE concedes it does not have such authority, *ante* at 30 (opinion of the Court), plaintiffs argue that EGLE does have that authority. I take no position on that disputed issue because, as explained below, it is not necessary to resolve this case. See note 21 of this opinion and surrounding text. Rather, I note this statutory history simply for context. I also note that bills have recently been introduced in the Legislature to repeal this provision in MCL 324.3103(2). See, e.g., 2023 SB 663; 2024 HB 5614. But no legislation has been enacted. Yet the majority opinion now provides the agency wide flexibility to impose new mandates through general permits under the guise of purportedly nonbinding requirements.

2

setting forth detailed requirements that a CAFO must satisfy to be eligible for coverage under a CAFO NPDES permit.  See Mich Admin Code, R 323.2196(5).

As the Court of Appeals observed, in prior permitting cycles, the general permits governing CAFOs contained the conditions specified in the rule and "permitted what the rule permits."  *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 343 Mich App 293, 312; 997 NW2d 467 (2022).  But in 2020, EGLE took a different tack and "included discretionary conditions in addition to or more stringent than the mandatory conditions."  *Ante* at 15 (opinion of the Court).  Indeed, as the Court of Appeals observed after examining the 2020 general permit conditions:

> Close analysis of the new conditions indicates that they go beyond the scope of the promulgated rule, Mich Admin Code, R 323.2196.  That which formerly was authorized by the promulgated rule and permitted under the 2010 and 2015 general permits is now barred by unpromulgated general-permit conditions.  Accordingly, the new conditions expand the regulatory restrictions generally applicable to CAFOs that implement and apply the CWA and NREPA.  [*Mich Farm Bureau*, 343 Mich App at 313.]

This notion—i.e., that the 2020 general permit conditions prohibit certain activities that were previously allowed—does not appear to be in serious dispute.  Indeed, the majority mints two new phrases to distinguish between permit conditions that are required by EGLE or federal regulations, coined "mandatory conditions," and those that are *more stringent* than and merely authorized by such regulations, coined "discretionary conditions."  See *ante* at 8 (opinion of the Court).[4]  EGLE argues that the additional and more stringent

---

[4] By using these rhetorical devices to describe certain conditions in the 2020 GP, the majority implicitly suggests that "discretionary conditions" do not impose any obligation on CAFOs and therefore are not rules because they do not have the force and effect of law.  But the majority's framing of those conditions conflates whether EGLE has discretion *to create* those conditions with whether CAFOs have discretion *to comply with* those

3

conditions are necessary to comply with federal law.[5] Of course, compliance with federal mandates does not control whether the agency was required to go through basic APA rulemaking procedures to impose new regulatory requirements under state law.

---

conditions when applying for coverage to discharge under the 2020 GP. To be clear, if an applicant does not demonstrate compliance with the terms of the 2020 GP, including any so-called "discretionary conditions," then EGLE may deny coverage under the 2020 GP. See Mich Admin Code, R 323.2192(b) ("Upon the receipt of an application for coverage under an existing general permit, the department shall determine if the discharge *meets the criteria for coverage under the general permit*. The issuance of a notice of coverage by the department which states that the discharge *meets the criteria initiates coverage by the general permit*.") (emphasis added). Thus, it bears emphasizing that, despite the majority's framing of these conditions, the majority does not say that EGLE has authority to impose these "discretionary conditions" through the 2020 GP or any other "rule." In fact, it holds just the opposite. See *ante* at 30 (opinion of the Court) ("EGLE, therefore, clearly has no power to make rules concerning NPDES permits issued to CAFOs."); *ante* at 31 (opinion of the Court) ("[N]either the general permit nor the discretionary conditions in it can have the force and effect of law . . . ."). With that understanding, the majority's observation that EGLE can "issue a general permit with discretionary conditions in addition to or more stringent than the mandatory conditions," *ante* at 32 (opinion of the Court), means that EGLE can impose those conditions in a certificate of coverage, but not as a binding rule that applies generally to anyone who applies for coverage under the 2020 GP. I have serious doubts about that conclusion as well, for the reasons explained on page 25 of this opinion.

[5] When a state has been delegated authority to administer the NPDES permitting program within its jurisdiction, as Michigan has been, federal law requires the state's NPDES permits to include additional or more-stringent requirements if they are necessary to, among other things, "[a]chieve water quality standards established under section 303 of the CWA . . . ." 40 CFR 122.44(d)(1) (2023); see also 33 USC 1342(b) and (c)(1). If Michigan fails to do so, and does not take sufficient corrective action, the federal government "shall withdraw approval of [the NPDES] program." 33 USC 1342(c)(3). Thus, while EGLE is correct that there is a federal requirement to impose—in certain circumstances—more-stringent conditions in certain permits, that is a duty the state imposed on itself when it decided to administer its own NPDES permitting program.

4

## II. THE 2020 GP FITS THE DEFINITION OF A "RULE" UNDER THE APA

As noted at the outset, whether plaintiff can challenge the validity of the general permit conditions in a declaratory action under MCL 24.264 depends on whether those conditions are properly considered "rules" under the APA. I now turn to that inquiry.

The APA broadly defines "rule" to mean "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency." MCL 24.207. The majority opinion adopts a four-element test for determining whether an agency action is a "rule," as follows:

> (1) it is an agency regulation, statement, standard, policy, ruling, or instruction; (2) it is of general applicability; (3) it implements or applies law enforced or administered by the agency, or it prescribes the organization, procedure, or practice of the agency; and (4) it, in itself, has the force and effect of law. [*Ante* at 27 (opinion of the Court).][6]

The majority finds that the first three elements are easily satisfied in this case, and I agree—so there is little reason to discuss them further. The majority next concludes—

---

[6] The first three elements come from the definition of "rule," but the fourth is derived from one of the exclusions. See MCL 24.207(h). Although it might seem odd to engraft language onto a statutory definition in this fashion, and although EGLE did not raise this argument in its briefs, I agree that the binding nature of the agency action is an important consideration in determining whether an agency action is a rule. See, e.g., *Catawba Co v Environmental Protection Agency*, 387 US App DC 20, 33; 571 F3d 20 (2009) ("[W]hether an agency action is the type of action that must undergo notice and comment depends on 'whether the agency action binds private parties or the agency itself with the "force of law," ' "—that is, whether 'a document expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect.' ") (citations omitted).

erroneously in my view—that the general permit conditions do not have the force or effect of law.[7]  Although it can sometimes be difficult to determine whether an agency action meets the definition of a "rule" under the APA, see *Nat'l Leased Housing Ass'n v United States*, 105 F3d 1423, 1433 (CA Fed, 1997), it is not difficult in this case.  Applying the

[7] It is noteworthy that the majority implicitly rejects EGLE's proffered description of its action as a "license" under the Michigan APA, even though the majority makes passing reference to the definition of "license" under the federal APA.  See *ante* at 51 n 47 (opinion of the Court).  The majority also—rightly in my view—ignores EGLE's meritless argument that the general permit conditions are excluded from the definition of a rule under MCL 24.207(j) as "[a] decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected."  See *American Federation of State, Co & Muni Employees v Dep't of Mental Health*, 452 Mich 1, 12; 550 NW2d 190 (1996) ("The error in this reasoning is that while the department has discretion regarding *whether* to contract for the provision of statutorily mandated services, once it chooses to do so, it cannot abdicate its responsibilities under the Mental Health Code and the APA and set the standards and policies that regulate the provision of such services without complying with the APA's procedural requirements.").  Despite rejecting EGLE's arguments, the majority undertakes its own novel analysis to agree with EGLE that the 2020 GP is not a rule.

The majority declines to decide whether the trial court erred by relying on *Jones v Dep't of Corrections*, 185 Mich App 134, 137-138; 460 NW2d 575 (1990).  See *ante* at 31 n 30 (opinion of the Court).  While I agree that resolution of that issue is not strictly necessary given the majority's conclusion that *Clonlara* alone controls the issue whether the 2020 GP is a rule under the APA, I question whether *Jones* was correctly decided.  There, the Court of Appeals held that MCL 24.264 applies only to rules processed in compliance with the APA's rulemaking procedures.  *Jones*, 185 Mich App at 137-138.  But nothing in the APA's definition of "rule" provides that only agency actions processed in compliance with the APA's rulemaking procedures may be considered rules.  See MCL 24.207.  And if MCL 24.264 referred only to rules processed in compliance with the APA's rulemaking procedures, it would follow that a litigant could challenge only the substantive validity of a rule under MCL 24.264.  Yet the word "validity" as used in the context of the APA clearly refers to more than just substantive validity—it includes procedural validity as well.  After all, MCL 24.243(1) states that "a rule is not *valid* unless it is processed in compliance with [MCL 24.266], if applicable, [MCL 24.242], and in substantial compliance with [MCL 24.241(2), (3), (4), and (5)]."  (Emphasis added.)  See also *Slis v Michigan*, 332 Mich App 312, 340; 956 NW2d 569 (2020) (noting that MCL 24.264 allows a petitioner to challenge either the procedural or substantive validity of a rule).

6

factors that courts have identified to assist in determining whether an agency action has binding effect yields a clear answer: the 2020 GP is a rule.

## A. THE AGENCY'S CHARACTERIZATION OF THE ACTION

This Court has explained that, when distinguishing between "rules" and "interpretative statements," "[t]he crucial question is whether the agency intends to exercise delegated power to make rules having force of law, and the intent usually can best be found in what the agency says at the time of issuing the rules." *Mich Farm Bureau v Bureau of Workmen's Compensation, Dep't of Labor*, 408 Mich 141, 150; 289 NW2d 699 (1980) (quotation marks and citation omitted). Similarly, the United States Court of Appeals for the DC Circuit has explained that "the agency's characterization of the [document]" is an important factor. See *Nat'l Mining Ass'n v McCarthy*, 411 US App DC 52, 61; 758 F3d 243 (2014).[8]

This factor weighs heavily in favor of finding that the 2020 GP is a rule. To begin with, the 2020 GP is written in express terms of mandatory directives and prohibitions. The directives include, among other things, monitoring requirements, waste storage requirements, inspection requirements, and reporting requirements. And the 2020 GP

---

[8] The majority opinion relies, in part, on *Nat'l Mining Ass'n* and describes it as "holding that an agency statement explaining how an agency will exercise its broad permitting discretion under some statute or rule is a general statement of policy under the federal APA and not a rule with the force of law." *Ante* at 34 (opinion of the Court). But the court immediately followed that part of its discussion by observing that "those general descriptions do not describe tidy categories and *are often of little help in particular cases*." *Nat'l Mining Ass'n*, 411 US App DC at 61 (emphasis added). It continued, "So in distinguishing legislative rules from general statements of policy, our cases have focused on several factors," *id*., including those discussed at some length in this opinion (and entirely neglected by the majority opinion).

prohibits CAFOs from land-applying manure for three months of the year, 2020 GP, § I.B.3.f.3, and from selling or transferring manure to another entity for those same three months, 2020 GP, § I.C.8. In addition, any farm field with soil-test phosphorus above a certain threshold cannot receive manure. See 2020 GP, § I.B.3.c.1.a. Finally, the 2020 GP starkly provides:

> All discharges authorized herein *shall be consistent with* the terms and conditions of this permit. . . .
>
> It is *the duty of the permittee to comply* with all the terms and conditions of this permit. *Any noncompliance* with the Effluent Limitations, Special Conditions, or terms of this permit *constitutes a violation of the NREPA and/or the Federal Act* and *constitutes grounds for enforcement action*; for permit or Certificate of Coverage (COC) termination, revocation and reissuance, or modification; or denial of an application for permit or COC renewal. [2020 GP, § II.D.1 (emphasis added).]

The 2020 GP does not contain any disclaimers stating that these conditions are not legally binding.[9] Instead, it "reads like a ukase[;] [i]t commands, it requires, it orders, it dictates." *Appalachian Power Co v Environmental Protection Agency*, 341 US App DC 46, 54; 208 F3d 1015 (2000); see also *Iowa League of Cities v Environmental Protection Agency*, 711 F3d 844, 864 (CA 8, 2013) (" '[T]he mandatory language of a document alone can be

---

[9] The majority disagrees with my conclusion on this point, see *ante* at 42 n 41 (opinion of the Court), based on a section of the 2020 GP that states "[a]ny person *who is aggrieved* by this permit may file a sworn petition with [EGLE], setting forth the conditions of the permit which are being challenged and specifying the grounds for the challenge," 2020 GP, p 2 (emphasis added). But the majority fails to explain how anyone can be aggrieved by something that is not final and has no legal effect. Thus, I fail to see how the 2020 GP's reference to contested case proceedings qualifies as a disclaimer of the 2020 GP's binding language. See also notes 26 and 27 of this opinion and the surrounding text.

sufficient to render it binding . . . .' "), quoting *Gen Electric Co v Environmental Protection Agency*, 351 US App DC 291, 297; 290 F3d 377 (2002).

The difference between the language in the 2020 GP and the language in agency actions or documents that courts have found not to be a rule under the APA is instructive. For example, in *Nat'l Mining Ass'n*, the document included "caveats," including that the document "does not impose legally binding requirements," that "[ran] throughout the document, and more to the point, the document [was] devoid of relevant commands." *Id*. at 61, 62 (quotation marks and citation omitted).

More generally, it is notable that EGLE did not label the 2020 GP and has not described it as guidance, tentative, or otherwise nonbinding.[10] Indeed, EGLE has not even

---

[10] Of course, even if EGLE had labeled the document as nonbinding, it is well established that when an agency action provides directives, the label that the agency assigns to the action "is not determinative of whether it is a rule or a guideline under the APA." *American Federation of State, Co & Muni Employees v Dep't of Mental Health*, 452 Mich 1, 9; 550 NW2d 190 (1996) (*AFSCME*). This qualification is critical given the incentive within agencies to misapply labels and avoid the often-intensive public scrutiny involved in APA procedures. See Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L J 1311, 1363-1364 (1992) ("General knowledge of normal bureaucratic behavior permits us to postulate a basic general proposition about how nonlegislative guidance documents are administered by the agencies' own staffs, especially in the field: Staff members acting upon matters to which the guidance documents pertain will routinely and indeed automatically apply those documents, rather than considering their policy afresh before deciding whether to apply them. Staffers generally will not feel free to question the stated policies, and will not in practice do so. Staff members, including the most conscientious, have every incentive to act in this fashion."). Indeed, this Court has described the APA and its rulemaking procedures as "essential to the preservation of a democratic society" and as "a bulwark of liberty by ensuring that the law is promulgated by persons accountable directly to the people." *AFSCME*, 452 Mich at 14 (quotation marks and citation omitted). See also *Azar v Allina Health Servs*, 587 US 566, 575; 139 S Ct 1804; 204 L Ed 2d 139 (2019) ("Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements. On the contrary, courts have long looked to the *contents* of

9

expressly argued *during this litigation* that the 2020 GP is not binding. This factor weighs heavily in favor of finding that the 2020 GP is a rule under the APA.

## B. THE LEGAL EFFECT OF THE AGENCY ACTION

This Court has also made clear that in determining whether an agency action is a rule, we must focus our inquiry "on the 'actual action undertaken by the directive, to see whether the policy being implemented has the effect of being a rule.' " *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Servs*, 431 Mich 172, 188; 428 NW2d 335 (1988), quoting *Schinzel v Dep't of Corrections*, 124 Mich App 217, 219; 333 NW2d 519 (1983). And the effect of an agency action is particularly relevant "where the agency establishes policies and procedures under a broad grant of authority to administer a program." *Faircloth v Family Independence Agency*, 232 Mich App 391, 404; 591 NW2d 314 (1998), citing *American Federation of State, Co & Muni Employees v Dep't of Mental Health*, 452 Mich 1, 9; 550 NW2d 190 (1996) (*AFSCME*). See also *Nat'l Mining Ass'n*, 411 US App DC at 61 (holding that the "most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities"). This factor, too, weighs in favor of finding that the 2020 GP is a rule.

In addition to the commandments and directives that pervade the 2020 GP itself, EGLE's own regulations also treat the terms of the 2020 GP as having legal effect. EGLE has broad and express authority to regulate the discharge of waste and other pollutants into waters of this state. See MCL 324.3103(1) (general powers); MCL 324.3106 ("The

---

the agency's action, not the agency's self-serving *label*, when deciding whether [the federal APA procedures] apply.").

department shall establish pollution standards for lakes, rivers, streams, and other waters of the state in relation to the public use to which they are or may be put, as it considers necessary."). Every CAFO is required to obtain a permit from EGLE before discharging any waste to waters of the state. See MCL 324.3112(1); see also Mich Admin Code, R 323.2106(1); R 323.2196(1).[11] Implementing that authority, Mich Admin Code, R 323.2192 governs "application requirements for coverage under general permits" that "shall be complied with[.]" Subsection (b) provides:

> Upon the receipt of an application for coverage under an existing general permit, the department shall determine if the discharge *meets the criteria for coverage under the general permit*. The issuance of a notice of coverage by the department which states that the discharge *meets the criteria initiates coverage by the general permit*. [Mich Admin Code, R 323.2192(b) (emphasis added).]

In other words, the 2020 GP sets the standards by which every CAFO applying for coverage under the general permit will be judged. See *ante* at 12 (opinion of the Court) ("If EGLE decides the applicant 'meets the criteria for coverage under the general permit,' EGLE issues a certificate of coverage and the point source may discharge pollutants in accordance with the mandatory and discretionary conditions in the general permit."), quoting Mich Admin Code, R 323.2192(b). Indeed, EGLE's regulations define "general permit" as "a national permit issued *authorizing* a category of similar discharges." Mich Admin Code,

---

[11] Failure to obtain or, once coverage under the 2020 GP is obtained, comply with a permit could lead to serious civil fines and criminal liability. See MCL 324.3114 (authorizing criminal complaints); MCL 324.3115 (authorizing a civil fine of up to $25,000 per day, per violation).

11

R 323.2103(a) (emphasis added).[12] Thus, the legal effect of the 2020 GP is clear—it sets the standards that determine whether a CAFO can obtain coverage under the general permit.

As the majority recounts, in *AFSCME*, the Department of Mental Health issued guidelines that listed what terms and conditions every contract with a private group home operator had to include. See *AFSCME*, 452 Mich at 6-8. The purported guidelines were held to be "rules" under the APA, in part because "many of the provisions in this standard form contract, and the changes to those provisions, go to the heart of the department's statutory mandate." *Id*. at 7-8. And in *Delta Co v Dep't of Natural Resources*, 118 Mich App 458, 468; 325 NW2d 455 (1982), the Court of Appeals held that "the license was conditioned on compliance with 31 stipulations which were departmental guidelines and internal policies. Clearly, then, these guidelines were binding. Therefore, they effectively were rules under the guise of guidelines and policies." See also *Nat'l Mining Ass'n*, 411 US App DC at 60-61 ("An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule.").

The same is true here—under EGLE's rules, the 2020 GP provides the terms and conditions that every applicant for coverage under the general permit must include. See Mich Admin Code, R 323.2192(b).[13] And those authorizations for coverage go to the very

---

[12] As the majority notes, the issuance of the 2020 GP itself does not *directly* authorize any CAFO to discharge. See *ante* at 12 (opinion of the Court) ("When a general permit is finalized, the category of point sources the permit covers does not automatically have coverage."). Rather, the 2020 GP sets the standards to determine whether a CAFO can receive authorization through an application for coverage.

[13] The fact that additional conditions, or variations to the conditions identified in the 2020 GP, might be imposed by part of a CAFO's "comprehensive nutrient management plan"

(CNMP) when a CAFO applies for coverage under the 2020 GP does not change the fact that the blanket terms of the 2020 GP at least set the standard against which the CNMPs will be judged. See *Appalachian Power*, 341 US App DC at 53 ("EPA may think that because the Guidance, in all its particulars, is subject to change, it is not binding and therefore not final action. There are suggestions in its brief to this effect. But all laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.") (citation omitted). Indeed, plaintiffs argue that nothing in a CNMP will change the three prohibitions with which they are most concerned, and EGLE did not refute that position in its briefs.

Moreover, while the majority touts individual permits as a viable alternative to applying for coverage under the 2020 GP, that does not change the practical or legal reality for anyone, like plaintiffs, seeking coverage under a general permit. See *Gen Electric Co*, 351 US App DC at 298 ("[E]ven though the Guidance Document gives applicants the option of calculating risk in either of two ways (assuming both are practical) it still requires them to conform to one or the other, that is, not to submit an application based upon a third way. And if an applicant does choose to calculate cancer and non-cancer risks separately, then it must consider the non-cancer risks specified in the Guidance Document. To the applicant reading the Guidance Document the message is clear: in reviewing applications the Agency will not be open to considering approaches other than those prescribed in the Document."). And the agency retains ultimate authority to deny a request for an individual permit whenever the agency believes, in its view, that the general permit "is more appropriate." Mich Admin Code, R 323.2191(5). The available rules or statutes neither provide material limits on the agency's authority to mandate general permits nor do they establish any right, standard, or expectation that a regulated party can obtain an individual permit with reduced regulatory burdens as an alternative. Therefore, it is unsurprising that in plaintiffs' verified complaint they contend that, because EGLE "requires the vast majority of CAFOs to obtain coverage under its CAFO General Permit, the agency has broadly applied these mandates to the industry" and that the "challenged standards and mandates [in the 2020 GP] force Michigan's largest farms to incur substantial costs and threaten the viability and continued operations of some farms." See also *AFSCME*, 452 Mich at 11 (describing the "choice" of entering into a negotiated contract with the state as "ludicrous" because " 'choosing' not to contract [with the state]" is "choos[ing] to go out of business").

13

heart of the NPDES permitting program.  See MCL 324.3112(1) ("A person shall not discharge any waste or waste effluent into the waters of this state unless the person is in possession of a valid permit from the department.").

The majority's attempt to distinguish *AFSCME* and *Delta Co* is wholly unpersuasive.  The majority distinguishes these cases by saying: "In contrast to *AFSCME* and *Delta Co*, here, there is nothing in the record to suggest that EGLE treats the general permit and conditions as though they restrict its permitting discretion."  *Ante* at 43 n 42 (opinion of the Court).  Frankly, I am dumbfounded by this assertion.  EGLE's own regulation clearly states that, "[u]pon the receipt of an application for coverage under an existing general permit, the department *shall determine if* the discharge meets the criteria for coverage *under the general permit*."  Mich Admin Code, R 323.2192(b) (emphasis added).[14]  And, as to the creation of the general permit itself, Mich Admin Code, R

---

[14] The majority attempts to explain its logic by citing this same provision, emphasizing different words, and concluding that "criteria for coverage" does not control whether a CAFO will receive coverage under the 2020 GP.  See *ante* at 45-46 (opinion of the Court).  But then the majority inexplicably relies on the *very legal effect* that I have identified in this section to support that conclusion.  See *ante* at 45 (opinion of the Court) ("[EGLE] has discretion *to deny an application for a certificate of coverage when EGLE determines that the discretionary conditions are inappropriate* as applied to the applicant."), citing Mich Admin Code, R 323.2192(b) (emphasis added).  Thus, the majority appears to agree that these conditions can be relied upon to deny coverage under the 2020 GP, giving them obvious legal effect.

The majority even acknowledges that a CAFO seeking coverage under the 2020 GP "might have to show how it plans to comply with any discretionary conditions . . . ."  *Ante* at 45 (opinion of the Court).  The clearest example of this is one of the new "discretionary conditions" that plaintiffs challenge here, which requires all CAFOs to have a 35-foot-wide vegetated buffer between their point of discharge and any surface water.  Without that buffer, EGLE can simply deny the CAFO's application for coverage under the 2020 GP.  See Mich Admin Code, R 323.2192(b); Mich Admin Code, R 323.2191(1).

14

323.2191(1) provides that, "[u]pon a determination by the department that certain discharges are appropriately and adequately *controlled by a general permit*, the department may issue a general permit *to cover* a category of discharge." (Emphasis added.) Thus, the clear legal effect of the 2020 GP is that it sets the standards that EGLE applies when determining whether an application for coverage is approved. If there is nothing in the record to suggest that the 2020 GP restricts EGLE's permitting discretion, that is only because the parties already operate with that obvious understanding.[15]

Additionally, the federal courts of appeal have recognized the principle that, when regulated entities have " 'reasonably [been] led to believe that failure to conform will bring adverse consequences,' [that effect] tends to make the document binding as a practical matter" and therefore a "rule" under the APA. *Iowa League of Cities*, 711 F3d at 864, quoting *Gen Electric Co*, 351 US App DC at 297 (first alteration by the *Iowa League of Cities* court). The language in the 2020 GP can lead to no other conclusion than that it has the force and effect of law—it indisputably sets forth the position it plans to follow in deciding whether to issue authorizations for coverage under the 2020 GP. See *Appalachian Power*, 341 US App DC at 53 ("[W]hatever EPA may think of its Guidance generally, the elements of the Guidance petitioners challenge consist of the agency's settled position, a position it plans to follow in reviewing State-issued permits, a position it will insist State

---

[15] The majority's other attempt to distinguish *AFSCME* is based solely on the majority's conclusion that, under *Clonlara, Inc v State Bd of Ed*, 442 Mich 230; 501 NW2d 88 (1993), the 2020 GP is not a rule because EGLE does not have authority to promulgate rules concerning NPDES permits for CAFOs. See *ante* at 30-31, 42 n 42 (opinion of the Court). But as explained below, *Clonlara* is not controlling. See note 21 of this opinion and the surrounding text.

and local authorities comply with in setting the terms and conditions of permits issued to petitioners, a position EPA officials in the field are bound to apply."). Moreover, once a CAFO obtains coverage under the 2020 GP, failure to comply with the conditions carries fines and penalties under MCL 324.3115, which strongly suggests that the 2020 GP is a rule. See *Mann Constr, Inc v United States*, 27 F4th 1138, 1144 (CA 6, 2022) ("[The agency action] creates new substantive duties, the violations of which prompt exposure to financial penalties and criminal sanctions. Those are hallmarks of a legislative . . . rule.").

This factor, too, shows that the 2020 GP conditions are rules under the APA.

## C. THE AGENCY ACTION IS INCONSISTENT WITH EXISTING RULES

It is well established that "[a] policy directive cannot be considered an 'interpretive statement' of a rule if it is in fact inconsistent with the rule or contains provisions which go beyond the scope of the rule." *Jordan v Dep't of Corrections*, 165 Mich App 20, 27; 418 NW2d 914 (1987). See also *Coalition for Human Rights*, 431 Mich at 189 ("The new procedures are not merely mechanical details for the conduct of hearings, but, rather, represent substantial changes in the detailed requirements for the conduct of fair hearings to determine claimants' rights under the Social Welfare Act and applicable federal law."); *Thompson v Dep't of Corrections*, 143 Mich App 29, 32; 371 NW2d 472 (1985) ("Of course, the directive could not be considered an 'interpretive statement' if it were inconsistent with the rules or contained provisions which went beyond the scope of the rules.") (citation omitted); *Schinzel*, 124 Mich App at 221 ("[T]he defendants' policy directive equating postage stamps, the importation, exportation, or possession of which is clearly not prohibited by law, with contraband cannot be deemed an interpretative

16

statement of what 'contraband' means; it changes that term's very definition."); *Gen Electric Co*, 351 US App DC at 296-297 (" 'If a document expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect, the agency may not rely upon the statutory exemption for policy statements, but must observe the APA's legislative rulemaking procedures.' "), quoting Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L J 1311, 1355 (1992).

Here, as noted above, it appears uncontested that the 2020 GP has conditions that are inconsistent with the existing rule for CAFO general permits, Mich Admin Code, R 323.2196, and contains provisions that go well beyond the scope of that rule. See *ante* at 8 (opinion of the Court) (referring to such provisions as "discretionary conditions"). Indeed, as noted, plaintiffs have alleged that the new mandates imposed by EGLE will force regulated farms "to incur substantial costs and threaten the viability and continued operations of some farms." Because the 2020 GP makes substantial changes in the detailed requirements for coverage stated under the existing regulation, it is properly considered a rule.

## D. THE AGENCY ACTION DOES NOT MERELY EXPLAIN WHAT THE STATUTE MEANS

When considering MCL 24.207(h), which the majority incorporates into its definition of a "rule" under the APA, courts in this state have distinguished between a "rule" and something that is "merely explanatory." See, e.g., *Faircloth*, 232 Mich App at 404 ("The policies are not interpretive statements because they do not merely interpret or

explain the statute or rules from which the agency derives its authority. Rather, they establish the substantive standards implementing the program.").[16] The "explanation" must be geared toward uncertain statutory language, where the implementing agency alerts the public to what it believes the statute means, i.e., the interpretation "reminds affected parties of *existing* duties" rather than "creat[ing] *new* law, rights or duties." *Tenn Hosp Ass'n v Azar*, 908 F3d 1029, 1042 (CA 6, 2018) (quotation marks and citation omitted; emphasis added). See *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 240-241; 501 NW2d 88 (1993) ("[I]nterpretive rules . . . state the interpretation of ambiguous or doubtful statutory language which will be followed by the agency unless and until the statute is otherwise authoritatively interpreted by the courts.") (quotation marks and citation omitted; alteration in original); *id*. at 243-244 ("Interpretive rules are statements as to what the agency thinks a statute or regulation means; they are statements issued to *advise* the public of the agency's construction of the law it administers.") (quotation marks and citation omitted).[17]

---

[16] See also *Clonlara*, 442 Mich at 259 (RILEY, J., concurring in part and dissenting in part) ("When an agency 'does not merely interpret, but sets forth onto new substantive ground through rules that it will make binding, the agency must observe the legislative processes laid down by' the Legislature."), quoting *Interpretive Rules*, 41 Duke L J at 1314.

[17] While *Clonlara* used the phrase "interpretive rules," this Court has explained elsewhere that, "while under the Federal [APA] a rule can be legislative or interpretative, under the Michigan [APA] an 'interpretive statement' is *not*, by definition, a rule at all." *Mich Farm Bureau*, 408 Mich at 148. Thus, when *Clonlara* spoke of "interpretive rules," it was talking about "interpretive statements" in Michigan parlance, which are not "rules" at all. See *id*. at 149 ("[A]n analysis of the difference between 'legislative' and 'interpretative' rules under the Federal [APA] . . . is relevant to our analysis of the difference between 'rules' and 'interpretive statements' under our state [APA.]").

18

Here, by contrast, the 2020 GP is not "merely explanatory" and did not interpret any existing statutory or regulatory language; it instead created new "substantive standards implementing the [NPDES] program." See *Faircloth*, 232 Mich App at 404. The 2020 GP conditions represent a quasi-legislative decision that sets quantitative standards for a category of dischargers. Indeed, the majority agrees: "[G]eneral permit and discretionary conditions are not EGLE's attempt to discern the meaning of an ambiguous provision of Part 31 of the NREPA or one of EGLE's rules . . . ." *Ante* at 39 (opinion of the Court).[18] Like the other factors, this one also weighs in favor of finding that the 2020 GP is a rule because it does not merely explain EGLE's interpretation of uncertain statutory language.

## E. OTHER JURISDICTIONS CONSIDER GENERAL PERMITS TO BE RULES

Not surprisingly, courts that have addressed this question have had little trouble concluding that general NPDES permits are "rules" under the federal APA. As one court explained:

> Each [nationwide general permit] easily fits within the APA's definition of "rule." This is so because each [nationwide general permit], which authorizes a permittee to discharge . . . , is a legal prescription of general and prospective applicability which the Corps has issued to implement the permitting authority the Congress entrusted to it in section 404 of the CWA. As such, each [nationwide general permit] constitutes a rule: An "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." [*Nat'l Ass'n of Home Builders v US Army Corps of Engineers*, 368 US App DC 23, 35-36; 417 F3d 1272 (2005) (citations omitted).]

---

[18] The majority makes this observation after having erroneously concluded that the 2020 GP is not a rule under the APA, so the majority apparently finds EGLE's policymaking on this point irrelevant.

See also *Alaska Community Action on Toxics v Aurora Energy Servs, LLC*, 765 F3d 1169, 1172 (CA 9, 2014) (" '[G]eneral permits are considered to be rulemakings . . . .' "), quoting EPA, *General Permit Program Guidance* (February 1988), p 21, available at <https://www3.epa.gov/npdes/pubs/owm0465.pdf> (accessed June 6, 2024) [https://perma.cc/6F66-CNQC].

The majority dismisses *Alaska Community Action* as simply "an acknowledgment that NPDES general permits are issued after notice-and-comment proceedings that track notice-and-comment rulemaking requirements under 5 USC 553 of the federal APA." *Ante* at 50 (opinion of the Court). To be sure, that is *one part* of the court's discussion. See *Alaska Community Action*, 765 F3d at 1172 (noting that "general permits 'are issued pursuant to administrative rulemaking procedures' "), quoting *Natural Resources Defense Council v US Environmental Protection Agency*, 279 F3d 1180, 1183 (CA 9, 2002) (*NRDC*). But that is clearly not all that *Alaska Community Action* said. Rather, as quoted above, it says that general permits *are* rulemakings, i.e., they are rules. Indeed, the very page of the EPA Guidance document that *Alaska Community Action* quoted states, "Since general permits are considered to be rulemakings, *EPA's issuance and promulgation activities must be conducted in accordance with the Administrative Procedure Act* (APA) (5 U.S.C. 551, et seq.)." *General Permit Program Guidance*, p 21 (emphasis added). That directly refutes the majority's speculation. Finally, *Alaska Community Action* expressly recognized the binding nature of the general permit upon issuance. See *Alaska Community Action*, 765 F3d at 1171 ("Once a general permit has been issued, an entity seeking coverage generally must submit a 'notice of intent' to discharge *pursuant to the permit*."),

20

citing 40 CFR 122.28(b)(2) (emphasis added).[19] *NRDC* did the same. See *NRDC*, 279 F3d at 1183. Thus, when read in context, those cases clearly considered an NPDES general permit to be a "rule" with binding effect upon issuance, not simply a nonbinding agency action that happened to go through procedures tracking the federal APA rulemaking requirements.

The majority's attempt to distinguish *Home Builders* is also meritless. The majority points out that the general permits at issue in that case allowed some people to discharge without first applying for coverage. See *ante* at 51 (opinion of the Court). Because the 2020 GP does not do the same thing, the majority concludes that it lacks the force and effect of law. But that conclusion rests on the flawed and unsupported proposition that the *only* way an agency action can have legal effect is to authorize a discharge. The majority simply ignores that the issuance of the 2020 GP carries a significant legal effect by setting the standards for what is necessary to obtain a certificate of coverage. Indeed, under the majority's reasoning, the general permits at issue in *Home Builders* would be "rules" for individuals that may discharge without first applying for coverage but would *not* be "rules" for anyone that must apply. I disagree with such a convoluted and unsupported interpretation of what constitutes a rule.[20] Moreover, that interpretation is refuted by clear logic:

---

[19] I note that this reflects similar provisions in EGLE's own regulations. See Mich Admin Code, R 323.2192(b); Mich Admin Code, R 323.2191(1).

[20] Taken to its logical conclusion, the majority's position suggests that even if an agency has rulemaking authority and, in compliance with the APA, promulgates rules that establish specific criteria necessary to obtain coverage, not even those rules would have the force and effect of law because they do not, in themselves, authorize any discharge. See *ante* at 52 (opinion of the Court) ("A CAFO cannot just start discharging in accordance with those

21

> An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule. (*As to interpretive rules*, an agency action that merely interprets a prior statute or regulation, *and does not itself purport to impose new obligations or prohibitions or requirements* on regulated parties, is an interpretive rule.) [*Nat'l Mining Ass'n*, 411 US App DC at 60-61 (emphasis added).]

The 2020 GP is a rule because it imposes new legal obligations for any CAFO seeking coverage under the 2020 GP.



In sum, nothing in the 2020 GP states that it is intended as guidance, an interpretive statement, or some other unspecified nonbinding action. Instead, the 2020 GP commands, requires, orders, and dictates what a CAFO must do to obtain coverage under it. See *Appalachian Power*, 341 US App DC at 54. EGLE's own regulations and historical practice treat the conditions as mandatory, denying coverage for applicants who do not meet them. The 2020 GP materially alters, rather than merely explains, existing regulatory standards governing CAFOs' discharging activities. If "rules is rules, no matter their gloss," *Nat'l Ass'n of Home Builders*, 368 US App DC at 36 (quotation marks and citation omitted), then surely the 2020 GP—which lacks even the veneer of a nonbinding agency action—should be deemed a rule.

## III. THE MAJORITY ERRS BY CHARACTERIZING THE 2020 GP AS A POLICY EGLE HOPES TO PROVE IS NECESSARY IN CONTESTED CASES

Rather than apply the widely recognized factors that courts use to determine whether an agency action is a "rule" under the APA, the majority charts its own course, leaving

---

conditions. A CAFO must apply to EGLE for a certificate of coverage under the general permit, and even if the CAFO agrees to comply with the discretionary conditions in the general permit, EGLE is not bound to grant the CAFO the certificate of coverage.").

confusion in its wake. First, the majority expands this Court's holding in *Clonlara*. Unlike the nonpublic school act at issue in that case, see *Clonlara*, 442 Mich at 237, Part 31 of NREPA clearly gives EGLE some rulemaking authority. See MCL 324.3103(2) ("However, notwithstanding any rule-promulgation authority that is provided in this part, *except for rules authorized under section 3112(6)*, the department shall not promulgate any additional rules under this part after December 31, 2006.") (emphasis added). So it is not as if EGLE has *no* rulemaking authority under Part 31 of NREPA, such that it could never issue a statement or policy of general applicability that has the force and effect of law. *Clonlara*, therefore, is not controlling.[21]

Yet the majority expands *Clonlara* by bringing a merits question into the threshold jurisdictional issue of whether the action is a rule under the APA. Whether the 2020 GP conditions are within the scope of EGLE's Part 31 rulemaking power is a question on the merits—i.e., whether the 2020 GP conditions are substantively *valid* rules. See *Ins Institute*

_____

[21] This analysis is not affected by the majority's conclusion that EGLE does not have specific authority to make rules concerning NPDES permits issued to CAFOs. That is because the majority's conclusion does not change the fact that EGLE has at least some rulemaking authority under Part 31 of NREPA. Indeed, the authorities upon which the majority relies to argue that *Clonlara* applies here do not support the majority's approach. *Mich Farm Bureau* observed that "[w]hen an agency has *no* delegated power to make law through rulemaking, the rules it issues are necessarily interpretive" and that "what is essential to a *valid* Federal 'legislative rule' or Michigan 'rule' is: a reasonable exercise of legislatively delegated power, pursuant to proper procedure." *Mich Farm Bureau*, 408 Mich at 149, 150 (quotation marks and citation omitted; emphasis added). The agency in *Nat'l Park Hospitality Ass'n v Dep't of Interior*, 538 US 803; 123 S Ct 2026; 155 L Ed 2d 1017 (2003), had no authority to implement the underlying statute. See *id*. at 809 ("[The agency] is not empowered to administer the [statute]."). Conversely, the agency in *Batterton v Marshall*, 208 US App DC 321; 648 F2d 694 (1980), was found to have precisely the type of rulemaking authority required, *id*. at 332, so the court was not presented with the question of whether any other rulemaking authority would suffice.

23

*of Mich v Comm'r of Office of Fin & Ins Servs*, 486 Mich 370, 385; 785 NW2d 67 (2010) (holding that when an agency is empowered to make rules, courts use a three-part test to determine the substantive validity of the rule: "(1) *whether the rule is within the matter covered by the enabling statute*; (2) if so, whether it complies with the underlying legislative intent; and (3) if it meets the first two requirements, when *[sic]* it is neither arbitrary nor capricious") (quotation marks and citation omitted, emphasis added, and alteration by the *Ins Institute of Mich* Court); *Slis v Michigan*, 332 Mich App 312, 340; 956 NW2d 569 (2020) (noting that "[a]n agency rule is substantively invalid when the subject matter of the rule falls outside of or goes beyond the parameters of the enabling statute"); see also MCL 24.232(7) ("A rule must not exceed the rule-making delegation contained in the statute authorizing the rule-making.").

The majority reframes and generalizes *Clonlara* by noting that the agency in *Clonlara* had some rulemaking authority, which the majority believes is analogous to this case and EGLE. See *ante* at 30 (opinion of the Court). But, as the majority recognizes, *Clonlara* merely noted that the agency had rulemaking authority under *the School Code*, MCL 380.1 *et seq.*, as enacted by 1976 PA 451, while the policy at issue related to *the nonpublic school act*, MCL 388.551 *et seq.*, as enacted by 1921 PA 302, and the agency " '[was] not authorized, explicitly or implicitly, to promulgate rules relating to the nonpublic school act.' " *Ante* at 32, quoting *Clonlara*, 442 Mich at 248. Indeed, *Clonlara* did not meaningfully discuss the School Code—the statute that provided the agency some rulemaking authority—until it addressed *the merits* of whether a separate agency policy was a valid interpretation of the School Code. See generally *Clonlara*, 442 Mich at 248-

24

252. The bottom line is that the majority opinion expands the holding of *Clonlara* without meaningful support.

Thus, properly understood and without the majority's expansion of *Clonlara*, the threshold question of *whether* an agency action is a "rule" is controlled by *Clonlara* only when the agency has no rulemaking authority under the statute at issue. If the agency does not, then no action taken by that agency can be a "rule" under the APA. However, where the agency *does* have some rulemaking authority under the statute at issue, *Clonlara* does not apply. In that situation, the court must ask whether the agency action fits the definition of a rule. And, if so, then the merits question becomes whether that action is supported by the agency's rulemaking authority such that it is a *valid* rule. This case passes the threshold test for whether EGLE has any rulemaking authority under *Clonlara*, and for the reasons explained above, the 2020 GP is a rule. The majority's conflation of those two inquiries is no reason to expand *Clonlara*, especially given Justice RILEY's powerful dissent in that case.[22]

---

[22] Justice RILEY provided an extensive analysis rebutting the majority's position in *Clonlara* and explained further that

> [t]he majority incorrectly dismisses the real-world possibility that an agency without statutory authorization to promulgate rules may still attempt to issue a rule with the force of law without conforming to the APA. The majority permits the APA to be easily circumvented by an agency that enacts policies that are in effect binding and later claim that because it was not vested with rule-making power, its policy was valid as a proper interpretation of the law or, at most, a misinterpretation of the law. Meanwhile, the lives of thousands, if not millions, of citizens would have been dictated by purported nonrules promulgated by agencies without public participation and in contradiction to the will of the Legislature. Such unauthorized lawmaking not only violates the APA, but threatens the principles of republican government. [*Clonlara*, 442 Mich at 260-261 (RILEY, J., concurring in part and dissenting in part).

25

In any event, to the extent *Clonlara* is binding, I note that the majority only follows half of the opinion. After *Clonlara* held that the agency action in that case was not a rule, it specifically addressed whether the procedures specified in the agency action were "valid interpretations of the law." *Clonlara*, 442 Mich at 248. Ultimately, the Court held that parts of the procedures were valid, while others were not. *Id*. at 252. The majority fails to undertake the same type of analysis here or even remand this case for the trial court to do so. I note that, because it is undisputed that the terms of the 2020 GP go beyond what is currently required in any state or federal law, it appears to be invalid. See *id*. ("There is thus no requirement that public schools be in session 180 days. As a result, the board

By expanding *Clonlara* here, the majority appears dismissive of these very serious concerns. To put a finer point on it, by the majority's logic, any agency that acts outside of its rulemaking authority would be immune from challenge under MCL 24.264, which is limited to causes of action regarding "rules." Thus, agencies will be free to issue documents and take actions that look like a rule, sound like a rule, and have the practical effect of a rule without public input and without court oversight under the APA. Despite the warning provided by Justice RILEY and despite EGLE's clear attempt to avoid the APA in this case, the majority dismisses these concerns as unfounded alarmism. See *ante* at 47 (opinion of the Court). But Justice RILEY and I are not alone in expressing these concerns. See note 10 of this opinion; see also *Interpretive Rules*, 41 Duke L J at 1317 ("Doubtless more costly yet is the tendency to overregulate that is nurtured when the practice of making binding law by guidances, manuals, and memoranda is tolerated. If such nonlegislative actions can visit upon the public the same practical effects as legislative actions do, but are far easier to accomplish, agency heads (or, more frequently, subordinate officials) will be enticed into using them. Where an agency can nonlegislatively impose standards and obligations that as a practical matter are mandatory, it eases its work greatly in several undesirable ways."). Particularly when considering an approval that is required for a regulated entity to lawfully operate, the majority opinion provides little solace in suggesting that the regulated community can simply wait until an agency attempts to enforce policies that are purportedly not rules and then challenge the policies in an adjudicatory hearing.

cannot base the 180-day school year requirement for home schools on an analogy to or comparability of public school requirements.").

Then, instead of confining itself to the arguments raised by the parties, the majority plucks a label to describe the 2020 GP that no party has used—from a case that no party has cited. The majority adopts the description in *Pacific Gas & Electric Co v Fed Power Comm*, 164 US App DC 371; 506 F2d 33 (1974), of the nonbinding policy guidance given by the agency in that case and describes the 2020 GP as a "statement[] announcing a policy [EGLE] plans to establish in future adjudications . . . ." *Ante* at 36 (opinion of the Court). The majority also relies on *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563; 609 NW2d 593 (2000), when describing the 2020 GP as merely "explaining how [EGLE] plans to exercise a discretionary power . . . ." *Ante* at 34 (opinion of the Court).[23] But EGLE has never described the 2020 GP conditions in that way and did not even cite *Pacific Gas* in its briefs or rely on *Kent Co* for that proposition.[24] As a result, the majority's suppositions about EGLE's unexpressed intentions, while creative, are utterly unfounded.[25] I also note that, because the majority grounds its holding that the 2020 GP is

---

[23] As noted above, the majority rightly ignores EGLE's meritless argument regarding the exception under MCL 24.207(j) to the definition of "rule" for an agency's decision "to exercise or not to exercise a permissive statutory power . . . ." See *AFSCME*, 452 Mich at 12.

[24] Although EGLE cited *Kent Co* in its brief, it did so only for the unremarkable proposition that statutes should be read according to their plain meaning.

[25] There is reason to doubt whether the specific agency action at issue here—EGLE's issuance of the 2020 GP—is even subject to contested case proceedings. Relying on MCL 324.3113(3), the majority summarily finds that it is subject to those proceedings. See *ante* at 10 (opinion of the Court). But the whole of MCL 324.3113 is specific to applications for a "new or increased use of waters," which does not seem to include the issuance (or

27

not a rule on the *Clonlara* decision, Part III(C) of the majority opinion is not binding on that issue because it merely explains the effect of that holding.

Further, in trying to analogize the 2020 GP to an interpretive statement, see *ante* at 35-36 (opinion of the Court), the majority mischaracterizes the analysis and holding of *Pacific Gas*. The majority suggests that *Pacific Gas* turned on the mere opportunity for customers of a natural gas company to prove that, despite the agency's statement announcing which curtailment plans would be given priority, the company's curtailment plan was not reasonable under the circumstances. See *ante* at 36-37 (opinion of the Court). But *Pacific Gas* considered much more than that, most notably the language of the agency's statement itself. Indeed, the court extensively quoted the statement's repeated, explicit references to the fact that the statement did not provide a binding rule before an opportunity for a hearing. See *Pacific Gas*, 164 US App DC at 378-379.

---

reissuance) of the general permit for CAFOs here. Indeed, EGLE argues that the Court of Appeals erred by citing MCL 324.3113(3) as the basis for any contested case proceedings at this stage of the permitting process. EGLE instead argues that the 2020 GP is a "permit" that is subject to contested case proceedings under a different statute, MCL 324.3112(5). But there is reason to doubt that conclusion as well. MCL 324.3112 governs "application[s] for a permit," and each of its provisions appears specific to either an individual permit or application *for coverage under* a general permit, not the issuance of a general permit itself. The same is true of MCL 324.1301(g), which defines "permit" for purposes of various types of review under MCL 24.288 of the APA. If the 2020 GP is not subject to contested case proceedings, then there are two material consequences. First, that would severely undermine the majority's assertion that the 2020 GP is merely "announcing a policy the agency plans to establish in future adjudications . . . ." *Ante* at 36 (opinion of the Court). And because the majority's conclusion that the 2020 GP is not binding turns on that point, it would undermine the majority's holding that the 2020 GP is not a rule. Second, it would mean that the contested case is not an available, much less "exclusive," procedure or remedy for purposes of MCL 24.264. Without such an exclusive remedy, plaintiffs would be able to proceed with their challenge to the 2020 GP in this case. As noted below, I would remand for the Court of Appeals to consider these issues further.

Here, in contrast, the 2020 GP speaks exclusively in terms of immediate, mandatory obligations such as the one requiring that "[a]ll discharges authorized herein shall be consistent with the terms and conditions of this permit." See generally Part II of this opinion. And, unlike in *Pacific Gas*, EGLE has promulgated regulations that require each applicant seeking coverage under the 2020 GP to first demonstrate compliance with its terms and conditions. See Mich Admin Code, R 323.2192(b) ("Upon the receipt of an application for coverage under an existing general permit, the department shall determine if the discharge meets the criteria for coverage under the general permit."). The 2020 GP even provided a specific effective date upon which the 2020 GP would govern applications for coverage. The 2020 GP is not remotely similar to the agency statement at issue in *Pacific Gas*. Thus, *Pacific Gas* does not support the majority's creation of a blanket, extratextual exception to the definition of a "rule" under the APA.

Further, in *Pacific Gas*, the agency guidance specifically contemplated that the guidance was "intended only to state initial guidelines as a means of facilitating curtailment planning *and the adjudication of curtailment cases*." *Pacific Gas*, 164 US App DC at 378 (quotation marks and citation omitted; emphasis added). The 2020 GP says nothing of the sort. While it does refer to an opportunity for a hearing, it does so in terms that suggest the general permit is final upon issuance. See 2020 GP, p 1 ("After notice and opportunity for a hearing, this permit *may be modified, suspended, or revoked* in whole or in part *during its term* in accordance with applicable laws and rules.") (emphasis added); *id.* at 2 ("Any person *who is aggrieved* by this permit may file a sworn petition with [EGLE], setting forth the conditions of the permit which are being challenged and specifying the grounds for the

challenge.") (emphasis added).[26]  Thus, rather than suggest that the permit conditions are nonfinal or that EGLE merely hopes to prove they are necessary during a subsequent hearing, the 2020 GP's express language indicates that the conditions are binding and that CAFOs must comply with those terms when applying for coverage.[27]  This case is distinguishable from *Pacific Gas* and, instead, is analogous to cases that have found an agency action to be a "rule" under the APA when the regulated entities have " 'reasonably [been] led to believe that failure to conform will bring adverse consequences . . . .' " *Iowa League of Cities*, 711 F3d at 864, quoting *Gen Electric Co*, 351 US App DC at 297 (alteration by the *Iowa League of Cities* court).[28]

---

[26] Indeed, in its recitation of facts, the majority recounts that "EGLE issued *the final* 2020 general permit on March 27, 2020, with an effective date of April 1, 2020."  *Ante* at 16 (opinion of the Court) (emphasis added).

[27] Additionally, to the extent the 2020 GP is subject to contested case proceedings, the relevant statute provides that only "[a] person *who is aggrieved* by . . . the reissuance[ or] modification . . . of an existing permit" may request a contested case hearing.  See MCL 324.3112(5) (emphasis added).  A person cannot be aggrieved by an agency action unless it is final and has binding effect on the person.  See *Attorney General v Bd of State Canvassers*, 500 Mich 907, 908 n 6 (2016) (ZAHRA and VIVIANO, JJ., concurring) (explaining that, to be "aggrieved," "a party must demonstrate that it has been harmed in some fashion").  Thus, the majority's argument that the 2020 GP is not final (and therefore not a binding rule) because it is subject to a contested case proceeding is inherently inconsistent with the underlying statute.

[28] Not only do EGLE's regulations expressly require applicants to demonstrate compliance with the terms of the 2020 GP to obtain coverage under the general permit, but the practical reality is that it is infeasible for EGLE to provide an individual permit to each CAFO and that coverage under the 2020 GP is preferred by EGLE and plaintiffs alike.  See *Ohio Valley Environmental Coalition v Horinko*, 279 F Supp 2d 732, 758 (SD W Va, 2003) ("The benefit of the general permit process for individual dischargers is that approval is substantially quicker and less expensive than applying for an individual NPDES permit.").

The majority's treatment of *Kent Co* is also unfaithful to the actual holding in that case.[29] The majority cherry-picks the Court's observation that the site-selection criteria provided by the agency in that case "simply advise[d] a local governmental unit, by way of explanation, what will constitute an equivalent site for construction of a communications tower." *Kent Co*, 239 Mich App at 583. But the majority fails to properly acknowledge that *Kent Co* turned more fundamentally on the Court's conclusion that the site criteria were "simply an intergovernmental communication that does not affect the rights of the public" and therefore were excluded from the definition of "rule" under MCL 24.207(g). *Id*.[30] The same cannot be said here—the 2020 GP speaks to the regulated entities, like plaintiffs, and establishes what they must do to obtain coverage under the 2020 GP. *Kent Co* is simply inapposite, which is likely why EGLE did not rely on it or even make the arguments upon which the majority bases its conclusion.[31]

---

[29] Similarly, the majority's attempt to analogize *Nat'l Mining Ass'n*, see *ante* at 34 (opinion of the Court), is not persuasive because that case is easily distinguishable. See Part II(A) and Part II(B) of this opinion.

[30] The majority's attempt to refute my analysis falls utterly flat. Indeed, it *confirms* my analysis by explaining that "it is difficult to imagine an instance when an agency statement would fall under the [MCL 24.207](g) exception [regarding an agency action that is merely an intergovernmental communication] but not the [MCL 24.207](h) exception [regarding agency actions that are merely explanatory and do not have the force and effect of law]." *Ante* at 35 n 32 (opinion of the Court). In other words, the site criteria's status as an intergovernmental communication drove the panel's analysis in *Kent Co*. The 2020 GP, of course, is not merely an intergovernmental communication. Rather, it sets the standards that private entities must satisfy to obtain a certificate of coverage. Thus, even to the extent the majority is correct that *Kent Co* turned on a conclusion that the site criteria did not have the force and effect of law, the 2020 GP in this case is distinguishable for the reasons discussed above. See generally Part II of this opinion.

[31] As noted above, the majority rejected the specific arguments that EGLE presented.

31

Perhaps more fundamental—and more troubling—than the majority's mischaracterization of those cases is the majority's misunderstanding of the NPDES permitting process. Specifically, despite producing a 54-page opinion, the majority refuses to acknowledge the simple fact that the 2020 GP sets the standards for whether a CAFO's application for coverage will be approved. EGLE's own regulations could not be clearer: "Upon the receipt of an application for coverage under an existing general permit, the department shall determine if the discharge meets *the criteria for coverage under the general permit*." Mich Admin Code, R 323.2192(b) (emphasis added). While the majority is correct that "it is the certificate of coverage—not the general permit itself—that grants the rights and imposes obligations on the CAFO," *ante* at 38 (opinion of the Court), that simply ignores the regulatory directive that the 2020 GP controls whether EGLE will grant a certificate of coverage in the first place. The fact that site-specific factors for an applicant might lead to denial without modification does not change that directive. Similarly, the fact that an operator may be able to obtain an individual permit does nothing to change whether they receive approval for what they applied for—coverage under the 2020 GP. Apparently, the majority believes that nothing short of an all-encompassing directive, without any room for variation, is a rule under the APA.[32]

---

[32] The majority's hypothetical about a world where CAFOs are required to apply for an individual permit and EGLE "circulated a letter to all CAFOs explaining that it tentatively planned to tell its permit writers to include [certain] conditions," *ante* at 38 (opinion of the Court), is completely inapposite. The 2020 GP does not merely explain what EGLE "tentatively planned" to require an applicant to demonstrate in order to obtain coverage under the 2020 GP. The 2020 GP itself, EGLE's own regulations, and EGLE's historical practice of reviewing applications for compliance with the 2020 GP clearly demonstrate that there is nothing tentative about the terms and conditions in that document. They determine whether a CAFO will receive a certificate of coverage. The majority suggests

*✳✳*

The confusion and contradictions in the new legal regime created by the majority opinion will have to be sorted out in this case and others for years to come. For example, the majority holds that EGLE cannot rely on the 2020 GP when reviewing applications for coverage. See *ante* at 40 (opinion of the Court) ("EGLE cannot act as though the general permit or the discretionary conditions constrain its permitting discretion in individual cases involving CAFOs."). Thus, it would appear that EGLE must create a full record specific to each CAFO that applies for coverage under the 2020 GP or any future general permit.[33] In addition, the majority opinion does not address whether EGLE may impose additional or different requirements than those included in Mich Admin Code, R 323.2196, even if EGLE can otherwise justify the nonbinding requirements currently in the 2020 GP.

_____

that I am merely concerned about the practical effect that the 2020 GP has on CAFOs. See *ante* at 46 (opinion of the Court). While that is certainly part of my concern, my opinion is based primarily on the *legal* effects that flow from Mich Admin Code, R 323.2192(b) and Mich Admin Code, R 323.2191(1), which clearly impose a legal requirement for any CAFO seeking coverage under the 2020 GP to demonstrate compliance with the terms and conditions contained therein before EGLE will approve coverage.

[33] The majority disagrees that its opinion carries such a requirement. See *ante* at 40 n 38 (opinion of the Court). This disagreement is confusing for multiple reasons. First, it suggests that EGLE is not required to create a full record when deciding whether a particular CAFO is approved for coverage under a general permit. But a full record is fundamental to such adjudicative actions. Second, the majority says in no uncertain terms that "EGLE must genuinely evaluate whether the discretionary conditions are necessary as applied to that particular CAFO." *Ante* at 40 (opinion of the Court). That sure sounds like EGLE must explain the basis for its decision to approve or deny a certificate of coverage based on a full record. Finally, the majority explains that it holds only "that, when a CAFO applies for a certificate of coverage and agrees to comply with the discretionary conditions in the general permit, EGLE cannot act as though the CAFO is automatically entitled to a certificate of coverage." *Ante* at 40 n 38 (opinion of the Court). But that does not mean EGLE's decision need not be based on a full record.

33

Finally, EGLE apparently cannot rely on any decision from a CAFO's contested case hearing to determine whether the conditions in that CAFO's certificate of coverage are appropriate for the next applicant. See *ante* at 40 (opinion of the Court) ("[W]hen a CAFO applies for a certificate of coverage under the general permit, EGLE must retain discretion to decide whether the discretionary conditions in the general permit are necessary as applied to the particular CAFO. And again, EGLE must genuinely evaluate whether the discretionary conditions are necessary as applied to that particular CAFO."). Thus, in effect, all permit applications will be treated as applications for an individual permit, spelling the end of EGLE's general permitting program. This outcome does not appear to be one that was even contemplated by EGLE or the regulated parties.

Given that historically over 92% of CAFOs have been covered by a general permit, the majority's erroneous decision will surely be to the financial detriment of CAFOs across the state, which will now be required to engage in an uncertain, laborious, and litigious individual permitting process. Indeed, the majority opinion sentences CAFOs (which cannot operate without a permit) to perpetual permitting litigation—including the litigation that will be necessary to parse the majority's convoluted and confusing opinion.

## IV. CONCLUSION

Under NREPA, the APA, and our caselaw interpreting those statutes, it is clear that the 2020 GP is a "rule" that may be challenged in a pre-enforcement declaratory-judgment action under MCL 24.264. The majority's attempt to label it as something else is

34

unfounded and not persuasive. Therefore, I respectfully dissent and would instead affirm the Court of Appeals' principal holding that the 2020 GP is a rule.[34]

David F. Viviano
Brian K. Zahra

---

[34] However, I would vacate the portion of the Court of Appeals opinion affirming the dismissal of plaintiffs' action on the ground that "[t]his case could not be commenced in the trial court because plaintiffs failed to first seek a declaratory ruling from EGLE before filing their declaratory-judgment action, as required by MCL 24.264." *Mich Farm Bureau*, 343 Mich App at 318. Plaintiffs indicate in their cross-appeal that they already requested a declaratory ruling from EGLE, and the agency denied their request. Therefore, plaintiffs have cured this defect by exhausting their administrative remedies, and the issue now appears to be moot. See *League of Women Voters of Mich v Secretary of State*, 506 Mich 561, 580; 957 NW2d 731 (2020) (holding, in part, that "a moot case is one which seeks to get a . . . judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy") (quotation marks and citation omitted). Given my conclusion that the 2020 GP is a rule under the APA, I would remand this case to the Court of Appeals to determine (1) whether EGLE adequately preserved its argument that plaintiffs cannot challenge the validity of the 2020 GP under MCL 24.264 because "an exclusive procedure or remedy is provided by a statute governing the agency"; and (2) if so, whether plaintiffs' suit is barred under that provision.